**EXHIBIT A**

# The State of New Hampshire

GRAFTON, SS.                                        2ND CIRCUIT – DISTRICT DIVISION - PLYMOUTH

STATE OF NEW HAMPSHIRE

V.

DANIEL MCCARTHY, ET. AL.

DOCKET # 469-2017-CR-01888, ET. AL.

## ORDER

    A hearing was held in these consolidated matters on January 11, 2018 to address the Defendants' Motion to Suppress, filed December 8, 2017, and the State's Objection thereto, filed December 27, 2017. Both sides also filed memoranda of law on the issues raised. The defendants also filed a Defendants' Reply to State's Objection on January 10, 2018.[1]

    The State was represented by Gabriel Nizetic, Esquire and Cayla Kevlik, Esquire. The defendants were represented by Gilles R. Bissonette, Esquire; Mark Sisti, Esquire and Albert E. Scherr, Esquire.  Of the sixteen defendants involved in these cases all were present with the exception of Kyle Goodell.[2]

    Most of the material facts in these cases are not in dispute. For a brief period in both August and September, 2017 the United States Customs and Border Protection (CBP) set up a temporary checkpoint on Interstate 93 southbound approximately ninety (90) miles from the border between the United States and Canada in the Town of Woodstock, NH.[3] Law enforcement officers of the Woodstock Police Department (WPD) were also present at the checkpoints in August. The CBP used search dogs to monitor the vehicles passing through the checkpoints. If the dog alerted on a vehicle it would be diverted to a secondary processing area.

---

[1] Also pending at the time of the hearing were  Defendants' Emergency Motion for Discovery and to Compel Witnesses, filed December 22, 2017; State's Objection to Defendants' Motion to Compel, filed December 27, 2018; and State's Motion to Strike Exhibits, filed December 27, 2017. None of these pleadings were noticed for the hearing on January 11, 2018, but they were briefly addressed at the commencement of the hearing.

[2] There were originally eighteen defendants, but the charges against two of the defendants, were *nol prossed* prior to the hearing.

[3] All of the charges pending in these matters stem from the checkpoint conducted in August. All the charges pending against the defendants were filed by the Woodstock Police Department.

The defendants' vehicles were searched by the CBP at the secondary processing area resulting in discovery of illegal controlled substances. That contraband was then turned over to the WPD, which resulted in these prosecutions. None of these searches or seizures was sanctioned by a warrant. As a result of these searches, forty-four individuals, including the defendants in these cases, were charged with possession of small amounts of controlled substances – mostly marijuana.

The State argued that the primary purpose of the checkpoints was border enforcement, searching for individuals who were in this country illegally. Federal law authorizes border checkpoints to be conducted within one hundred (100) miles of an international border. There is no dispute that the checkpoints in these matters were within that zone. The State argued that the checkpoints were a legitimate exercise of the authority of the CBP, as officers of the federal government, to maintain the integrity of the borders of the United States. Conversely, the State argued that the State of New Hampshire has no such authority. The State argued that the Supremacy Clause in Article 4 of the United States Constitution precludes the application of the protections of the New Hampshire Constitution to actions by federal officials acting under federal authority. The State argued that there is no legal bar to federal law enforcement officials cooperating with state law enforcement officials in the enforcement of the law. *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960)[4] The State argued that a brief stop by border patrol agents at such checkpoints without a reasonable articulable suspicion is constitutional. *United States v. Martinez-Fuentes*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1975) The State argued that the use of the trained search dogs by federal officers at the checkpoints was a valid tool for detection of illegal drugs and does not require a reasonable suspicion of criminal activity prior to the use of the dogs. *United States v. Place*, 462 U.S. 696; 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)

The State argued that there was no state action involved in these cases because the WPD did not actually conduct any of the searches in these matters and did not seize any evidence from the defendants. The State argued that the CBP agents were working independently from the State law enforcement officials and were enforcing federal law.

---

[4] In *U.S. v. Clarke*, 110 F.3d 612 (1997) the continued viability of *Able* was questioned based on the U.S. Supreme Court's decision in *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89(1996).

The State argued that based on the "border search exception" the searches by the CBP do not require probable cause and are not governed by state law. *U.S. v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972 (1977) *People v. Mitchell,* 79 Cal. Rptr. 764, 275 Cal. App. 2nd 351, 355 (1969) The State maintained that the CBP is not required to get permission or approval for border enforcement operations from the state when conducting border enforcement operations. The State argued that the protections of Part 1, Article 19 of the <u>New Hampshire Constitution</u> only apply to New Hampshire law enforcement officers and not to federal officers.

The State argued that the legal authority relied upon by the defendants does not support the positions they are asserting. The State argued that the defendants' argument that the primary purpose of the checkpoints was drug interdiction ignores the fact that approximately twenty-five people were arrested at these checkpoints based on their immigration status. The State also argued that the *Koppel* case has been superseded by RSA 256:1-a and the decision in *State v. Hunt*, 155 N.H. 465 (2007)

The defendants argued that these warrantless searches of their vehicles violated Part I, Article 19 of the <u>New Hampshire Constitution</u>. The defendants argued that the court must consider the admissibility of the evidence pursuant to the protections afforded the defendants by the <u>New Hampshire Constitution</u> regardless of the fact that the evidence was seized by federal law enforcement officers in the first instance. *Citing, State v. Turmelle,* 132 N.H. 148, 152 (1989) and *State v. McDermott*, 131 N.H. 495, 900 (1989) The defendants argued that pursuant to *State v. Pellici*, 133 N.H. 523 (1990) the State must be able to articulate a reasonable suspicion of criminal activity before using a trained search dog to conduct the search of their motor vehicle.  The defendants argued that the State had no reasonable and articulable suspicion of criminal activity prior to conducting the searches in these cases. The defendants also argued that the checkpoints violated the Fourth Amendment of the <u>United States Constitution</u> and Part I, Article 19 of the <u>New Hampshire Constitution</u> because their primary purpose was for drug interdiction, citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 40-42 (2000) and *United States v. Martinez-Fuerte*, 428 U.S. 543, 558 (1976). Finally the defendants argued that the searches violated Part I, Article 19 of the <u>New Hampshire Constitution</u> because the degree of intrusion on the individuals' rights by the searches outweighed the value to the public interest. *Citing, State v. Koppel*, 127 N.H. 286 (1985)

3

As with any search and seizure issue in the State of New Hampshire the analysis starts with Part I, Article 19 of the New Hampshire Constitution, which provides in relevant part that, "Every subject hath a right to be secure from all unreasonable searches and seizures of his person, his houses, his papers, and all his possessions." The New Hampshire Supreme Court (N.H. Sup. Ct.) has consistently held that, "a warrantless search is *per se* unreasonable and evidence derived from such a search is inadmissible unless the State proves that the search comes within one of the recognized exceptions to the warrant requirement." *Turmelle*, at 152, citing *State v. Beede*, 119 N.H. 620 (1979)(string cites omitted); *also see*, *State v. Ball*, 124 N.H. 226, 234 (1983) In order for the results of a search to be admissible the State must prove by a preponderance of the evidence that the search was either reasonable or subject to one of the recognized exceptions to the warrant requirement. *Id.*

The N.H. Sup. Ct. has recognized that the act of stopping a motor vehicle by a law enforcement officer is a seizure that ordinarily must be prefaced by "an articulable suspicion that the person detained has committed or is about to commit a crime" in order to be constitutional under both the state and federal constitutions. *State v. Joshua Mckinnon–Andrews*, 151 N.H. 19, 22 -23 (2004) The N.H. Sup. Ct. has also recognized that the New Hampshire Constitution may afford more protection of individual rights than the United States Constitution. The N.H. Sup. Ct. has declared:

> "This court has historically viewed the rights of people in light of both the United States Constitution and the Constitution of the State of New Hampshire." *State v. Settle,* 122 N.H. 214, 217, 447 A.2d 1284, 1285 (1982). While the role of the Federal Constitution is to provide the *minimum* level of national protection of fundamental rights, our court has stated that it has the power to interpret the New Hampshire Constitution as more protective of individual rights than the parallel provisions of the United States Constitution. *State v. Settle,* 122 N.H. 214, 217, 447 A.2d 1284, 1285 (1982); *State v. Osborne,* 119 N.H. 427, 433, 402 A.2d 493, 497 (1979); *State v. Hogg,* 118 N.H. 262, 264, 385 A.2d 844, 845 (1978). The Supreme Court has recognized this authority and has stated that its holdings "[do] not affect the State's power to impose higher standards on searches and seizures than required by the Federal Constitution if it chooses to do so." *Cooper v. California,* 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967).

*Ball,* at 231-232

In its analysis of the propriety of sobriety checkpoints the N.H. Sup. Court explained:

> ... where the search or seizure of a motor vehicle is involved, article 19 provides significantly greater protection than the fourth amendment against intrusion by the State. Accordingly, in evaluating the constitutionality of a warrantless search or seizure, we will apply a more stringent test in cases like this one than we applied in *Landry*.[5] To justify the search or seizure of a motor vehicle, absent probable cause or even a reasonable suspicion that a criminal offense is being committed, the State must prove that its conduct significantly advances the public interest in a manner that outweighs the accompanying intrusion on individual rights. It must further prove that no less intrusive means are available to accomplish the State's goal.

*State v. Koppel*, 127 N.H. 286, 291-292 (1985)

The State argued that in today's world of mobile terrorists the protection of our nation's borders by way of border checkpoints searching for people entering the country illegally is a public interest that justifies the minimal intrusion involved in the initial stop at the checkpoint. This Court agrees. The analysis then turns to the use of the drug sniffing dogs to search the vehicles that are stopped at the checkpoints. It is here that the protections under the federal constitution and those under the New Hampshire Constitution, as well as those of other states, would seem to diverge. *See, State v. Pellici*, 133 N.H. 523 (1990)(canine sniff implicates protections of Part I, Article 19); *Accord, State v. Carter*, 697 N.W.2d 199, 202 (Minn.2005) (canine sniff of storage unit is a search under state constitution); *State v. Tackett*, 67 P.3d 295 (Mont. 2003) (canine sniff of trunk a search under state constitution); *Com. v. Rogers*, 849 A.2d 1185 (Pa. 2004)(canine sniff a search under state constitution); *People v. Dunn*, 564 N.E.2d 1054 (N.Y. 1990)(canine sniff a search under New York Constitution)

Ignoring for the moment the issue of the primary purpose of the checkpoints, this Court recognizes that if the defendants in these cases were tried in federal court for federal charges based on the current state of the law the evidence seized by the CBP officers would be admissible.[6]

---

[5] *State v. Landry*, 116 N.H. 288 (1976)

[6] This assumes that the government is able to prove that the dogs were trained and certified. Federal cases on this issue have recognized that the government must prove by a preponderance of the evidence that the dogs are properly trained and certified. *U.S. v. One Million, Thirty–Two Thousand, Nine Hundred Eighty Dollars in U.S. Currency ($1,032,980.00)*, 855 F.Supp.2d, 678, 697-698 (D.Ct. – N.D. Ohio)(2012); *Florida v. Harris*, 568 U.S. 237, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013) (drug-sniffing dog's satisfactory performance in a certification or training program is a sufficient basis to trust his alert and thus establish probable cause.), excepts as noted in paragraph 2 on page 13 of this Order.

In *United States v. Place*, 462 U.S. 696; 103 S.Ct. 2637 (1983) the United States Supreme Court held that a canine sniff of the defendant's luggage at an airport was not a search and hence was not subject to Fourth Amendment requirements of probable cause or even an articulable suspicion that a crime was being committed to justify the intrusion.

In *Illinois v. Caballes*, 543 U.S. 405; 125 S.Ct. 834 (2005) the United States Supreme Court held that the use of a well-trained narcotics detection dog during a lawful traffic stop generally does not implicate legitimate privacy interests protected by the 4th Amendment.[7] The holding in that case was premised on the fact that the implementation of the detection dog did not extend the length of the traffic stop.

However, the holdings in *Place* and *Caballes* are inconsistent and irreconcilable with the holding in *State v. Pellici*, 133 N.H. 523 (1990) in which the N.H. Sup. Ct. held that, "Employing a trained canine to sniff a person's private vehicle in order to determine whether controlled substances are concealed inside is certainly a search in these terms."[8] *Id.,* at 533 Writing for the majority in *Pellici*, Justice Johnson also held that the State must be able to articulate a reasonable suspicion of criminal activity before using a search dog to conduct the search. *Id.* at 536 In his opinion, Justice Johnson expressly distinguished the holding in *Pellici* from that of the United States Supreme Court in *Place*. *Id.,* at 531 -534

Based on *Pellici*, this Court finds that had the State Police or a local law enforcement agency employed search dogs in the manner employed in the instant cases the evidence would be inadmissible because there was no articulable reasonable suspicion that any of these defendants was involved in criminal activity prior to the initial dog search. The issue thus becomes whether the inadmissibility of the evidence changes given the fact that the searches were conducted by CBP officers rather than State law enforcement officers.

---

[7] It is interesting to note that New Hampshire's most prominent jurist, the Honorable David Souter, issued a dissent in that case indicating that he would find the use of the drug detection dog to be a search which would not be justified in a traffic stop without a reasonable articulable suspicion. He chided the majority opinion because it relied very heavily in the reliability of the search dog's performance stating, "The infallible dog, however, is a creature of legal fiction."

[8] The phrase "in these terms" refers back to the Court's definition of a search in the prior paragraph as, "a quest by an officer of the law, a prying into hidden places for that which is concealed." *Pellici*, at 533. (citations omitted)

The State cited several cases across the country that have held that evidence obtained by CBP agents operating pursuant to their federal authority is admissible in prosecutions of state criminal charges.[9] None of the cases cited were from New Hampshire. However, the State did cite cases from our neighboring states of Vermont and Maine.

In *State v. Coburn*, 165 Vt. 318 (VT 1996) the defendant's luggage was searched by a customs agent in New York after a drug sniffing dog alerted on the luggage. The bags were searched and marijuana was detected.

The federal authorities had no interest in prosecuting the drug charges but did alert the local customs agent in Vermont as well as the Vermont State Police. The evidence was repackaged and sent to Vermont with the luggage. The Vermont State Police eventually took possession of the items and delivered them to the defendant, which led to his arrest and prosecution. In addressing the defendant's motion to suppress the evidence the Vermont Supreme Court held:

> [T]he Vermont Constitution does not apply to the conduct of federal government officials acting under the exclusive federal authority to safeguard the borders of the United States. We are not alone in holding that the state constitution does not apply to federal border searches. See, e.g., *People v. Mitchell,* 275 Cal.App.2d 351, 79 Cal.Rptr. 764, 767 (1969) ("A border search by a United States Customs Officer is lawful; does not depend upon probable cause; and is not governed by state laws."); *Morales v. State,* 407 So.2d 321, 329 (Fla.Dist.Ct.App.1981) (evidence seized by Customs officers pursuant to reasonable border search is clearly admissible in either federal or state courts); *State v. Allard,* 313 A.2d 439, 451 (Me.1973) (no state constitutional violation where Customs officer turned over evidence to state police); *State v. Bradley,* 105 Wash.2d 898, 719 P.2d 546, 549 (1986) ("Neither state law nor the state constitution can control federal officers' conduct.").

*Id.,* at 325

Similarly, in *State v. Allard*, 313 A.2d 439 (1973) the defendant was asked to empty his pockets by a customs officer at the border crossing in Calais, ME. The officer discovered that the defendant was in possession of LSD. He notified his superior who advised him to call the Maine State Police who then took possession of the contraband and prosecuted the defendant. In addressing the denial of the defendant's motion to suppress the Maine court held,

> "[W]e see no constitutional violation occasioned by this turning over of evidence to the local police. The seizure by the Customs officials was reasonable and proper as based on mere suspicion at a border crossing. See, e. g., *Alexander v. United States*, 362 F.2d 379 (9th Cir.), cert. denied, 385 U.S. 977, 87 S.Ct. 519, 17 L.Ed.2d 439 (1966). There was no seizure by the Calais policeman who received the evidence from the Customs officer.

---

[9] State's <u>Memo of Law</u>, Section I, pp. 4-5

> We do not perceive any policy similar to that directed toward police officers in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) which would lead us to forbid this cooperation between federal and state officials. The turning over of evidence does not promote improper conduct by either local police or Customs agents.

*Id.*, at 451

Ordinarily secondary authority from neighboring New England states is afforded slightly more deference than opinions from other parts of the country due to the shared experience of heritage and origins. However, these cases are case both distinguishable from the instant cases. Maine appears to follow the federal law on the issue of dog sniffs and does not require articulable suspicion prior to using the dog. *See*, *State v. Jeremy Soucy*, 2006 WL 2002396 (2006) Vermont has still not addressed the issue of whether a so-called "dog sniff" with the purpose of locating drugs is a search under Article 11 of the <u>Vermont Constitution</u>. *State v. Cunningham*, 183 VT 401 (2008)(Dooley dissent)

The State argued that New Hampshire has long recognized the validity of police officers from one jurisdiction transferring information establishing probable cause to another jurisdiction. *State v. Hutton*, 108 N.H. 279 (1967); *State v. Merriam*, 150 N.H. 548 (2004)

The defendants argued evidence used to prosecute state criminal charges in New Hampshire must be governed by the protections of the <u>New Hampshire Constitution</u>. They argued that allowing the State to prosecute state criminal charges using evidence collected in violation of the State constitution by federal CBP officers would eviscerate the protections of Article 19 of the <u>New Hampshire Constitution</u>. The defendants' invoked the principle articulated in *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437; 4 L.Ed.2d 1969 (1960) in which the U.S. Supreme Court declared:

> To the victim[10] it matters not whether his constitutional right has been invaded by a federal agent or by a state officer. It would be a curiously ambivalent rule that would require the courts of the United States to differentiate between unconstitutionally seized evidence upon so arbitrary a basis. Such a distinction indeed would appear to reflect an indefensibly selective evaluation of the provisions of the Constitution. Moreover, it would seem logically impossible to justify a policy that would bar from a federal trial what state officers had obtained in violation of a federal statute, yet would admit that which they had seized in violation of the Constitution itself. (footnotes and citations omitted)

*Id.*, at 215

---

[10] "Victim" in the context of the opinion was referring to a defendant in case where evidence illegally procured by state law enforcement officials was used against him/her in a federal prosecution.

The defendants also argued that the so-called "reverse silver platter doctrine" does not apply in New Hampshire. The "reverse silver platter doctrine" has been described as follows:

> Evidence that is obtained by federal agents acting lawfully and in conformity with federal authority is admissible in state proceedings. *Gutierrez,* 22 S.W.3d at 84. This has been referred to as the "reverse silver-platter" doctrine. *Id.* The underlying concept of the "reverse silver-platter" doctrine is that "protections afforded by the constitution of a sovereign entity control the actions only of the agents of that sovereign entity." *State v. Toone,* 823 S.W.2d 744, 748 (Tex.App.—Dallas 1992), *aff'd on other grounds,* 872 S.W.2d 750 (Tex.Crim.App.1994). Thus a state constitution will not be applied to control the conduct of officers of a foreign jurisdiction. *State v. Mollica,* 114 N.J. 329, 554 A.2d 1315, 1325 (1989). Simply put, "state constitutions do not control federal action." *Id.* at 1327.

*Pena v. Texas*, 61 S.W.3d 745, 754 (2001)(Texas Court of Appeals)

The defendants correctly point out that the United States Supreme Court rejected the "silver platter doctrine" which allowed federal officers to use evidence obtained by state officers acting in violation of state law in federal prosecutions. *Elkins v. United States*, 364 U.S. 206 (1960); See also, *Mapp v. Ohio*, 367 U.S. 643 (1961)

The defendants also argued that the N.H. Sup. Ct.'s decision in *Turmelle* is a rejection of the "reverse silver platter doctrine." In *Turmelle*, a federal officer working for the U.S. Department of Agriculture (U.S.D.A.) in Hawaii conducted a search of packages addressed to the defendant to ascertain whether they contained agricultural articles or pests and detected the presence of marijuana. The DEA was contacted and subsequently forwarded the packages to the police in Dover, New Hampshire. The Dover police obtained a search warrant and had the packages delivered to the defendant's residence. The defendant was then arrested and charged with possession of a controlled substance with the intent to sell.

At trial Ms. Turmelle moved to suppress the evidence based on an allegation that the warrantless search by the U.S.D.A. officer violated her rights under the <u>New Hampshire Constitution</u>. In upholding the validity of the search, the N.H. Sup. Ct. adopted the administrative search exception to the warrant requirement articulated in *New York v. Burger*, 107 S. Ct. 2634 (1987) and thereby found that the search by the U.S.D.A. officer was reasonable. Given that N.H. Sup. Ct. ruled that the evidence would be admissible under the <u>New Hampshire Constitution</u> based on the "administrative search exception" which was adopted by New Hampshire for the first time in that decision, this Court fails to see how that decision stands for a rejection of the "reverse silver platter doctrine" as argued by the defendants.

In other words, the evidence was admissible under both the State and Federal constitutions. Therefore there was no silver platter.

The defendants next argued that *State v. McDermott*, 131 N.H. 495 (1989) also signifies a rejection of the "reverse silver platter doctrine." In *McDermott* the defendant, who was acting as a confidential informant for the federal Drug Enforcement Administration, confessed to a murder after being told by a DEA agent that anything he said would not leave the office. The New Hampshire Supreme Court ruled that, "A confession made in reliance upon a promise of confidentiality or a promise of immunity is involuntary and coerced under the State Constitution," and was therefore inadmissible. *Id.,* p. 501 However, the decision never addressed the issue of whether the confession would be admissible under the Federal Constitution. If, as this Court suspects, the confession would not have been admissible in a federal prosecution either, this case does represent a clear rejection of the "reverse silver platter doctrine." This Court finds that the New Hampshire Supreme Court has never directly addressed the issue of the "reverse silver platter doctrine."

The defendants then cite numerous cases from various state courts in which evidence seized by federal officials has been deemed inadmissible based on the protections in the state constitutions.[11] There is no need to analyze each of those cases here, but the cases are incorporated herein by reference.

This Court finds that given that the defendants in this matter are facing prosecution in the State court for violations of State laws the constitutional protections of the <u>New Hampshire Constitution</u> should apply. As noted in *Elkins*, "To the [defendant] it matters not whether his constitutional right has been invaded by a federal agent or by a state officer." Supra, p. 215 As such, based on the Court's finding above that the evidence would be inadmissible if seized by State law enforcement officials because there was no articulable reasonable suspicion that any of these defendants was involved in criminal activity prior to the initial dog search, the Court also finds that the inadmissibility of the evidence does not change based on the fact that it was seized by federal officers and then handed over to the State.

Ordinarily the Court would stop there, but given that this order is likely to be subjected to further review the Court will address the balance of the arguments presented.

---

[11] *See,* <u>Defendants' Memorandum of Law</u>, pp. 10 – 12

The defendants argued that the CBP and the WPD worked in collaboration with each other to facilitate the prosecution of these drug charges. This Court agrees.

The CBP agents testified that the primary purpose of the searches at the checkpoints was to discover human beings that had entered or remained in the United States illegally. They were aware of the fact that the United States Attorney would not prosecute individuals for small amounts of drugs even before they set up the checkpoints. They then reached out to State law enforcement to ascertain whether they would prosecute the drug charges. ***Exhibit 11*** From the facts of the instant cases it is patently clear that the primary purpose of WPD being present at the checkpoint in August to accept the illegal drugs confiscated by the CBP searches in order to prosecute the defendants on state drug charges. CPB Officer Labaff testified that the WPD, "was there to take the marijuana that was seized."[12] It also appears that there were times when the WPD actually seized the contraband from the defendant's vehicle.[13] Officer Labaff testified that if a local law enforcement officer was not able to take possession of the confiscated illegal drugs that evidence would have been transported to a federal processing center with no criminal charges filed.[14] In addition to taking possession of the evidence the WPD performed other functions such as traffic control or supervision of the detainees. The Court finds that the State and federal authorities were absolutely working in collaboration with each other. The CBP agent in charge of the checkpoint operations, Paul F. Kuhn, wrote to the Woodstock Chief of Police, Ryan Oleson, "Without you folks we would have been hamstrung." ***Exhibit 2***

The State argued that the primary purpose of the CBP checkpoints was to maintain the integrity of the international borders of the United States. The defendants argued that the primary purpose of the checkpoints was drug interdiction, citing *Edmund v. Goldsmith*, 183 F.3d 659 (7th Cir. 1999) They noted that the number of arrests for drug charges far outnumbered the arrests for immigration violations.[15] They argued that there was no evidence that any of the individuals arrested for immigration violations had crossed the Canadian border. In fact, most of the individuals arrested for immigration violations had entered the United States legally but overstayed their visas.

---

[12] Hearing Transcript, p.37, line 9.
[13] *Id.*, line 16
[14] *Id.*, p. 38, line 8
[15] There were approximately forty-four (44) arrests for drug charges compared to approximately twenty-five (25) people that were arrested for immigration violations.

This Court finds that while the stated purpose of the checkpoints in this matter was screening for immigration violations the primary purpose of the action was detection and seizure of drugs.

The CBP was aware of that prior to setting up the checkpoints which is precisely why they felt the need to reach out to the State and local agencies for assistance. In *City of Indianapolis v. Edmund*, 532 U.S. 32, 121 S.Ct. 447 (2000) the United States Supreme Court argued that the primary purpose of a motor vehicle checkpoint cannot be the random detection of criminal activity such as drug detection. As such, the checkpoints were unconstitutional under both State and federal law.

Finally, the defendants argued that the checkpoint searches were illegal in light of the holding in *State v. Koppel,* 127 N.H. 286 (1985) which was a case involving DWI checkpoints. In that case the N.H. Sup. Ct. held that to justify a search or seizure of a motor vehicle without probable cause or a reasonable suspicion that the occupants are engaged in criminal activity, the State must prove that the "conduct significantly advances the public interest in a manner that outweighs the intrusion on individual rights" and "must further prove that no less intrusive means are available to accomplish the State's goal." *Id.,* pp. 291-292. The State argued that the criteria set forth in *Koppel* has been superseded by RSA 265:1-a and *State v. Hunt.* However, that argument is misplaced. In *Hunt* the N.H. Sup. Ct. expressly reaffirmed that the *Koppel* analysis is still the law in this State. *Hunt*, p. 475 Moreover, the procedure for approval of the sobriety checkpoints set forth in RSA 265:1-a was not utilized in the instance case, making a *Koppel* analysis appropriate.

The State's stated purpose for conducting the checkpoints was to discover illegal aliens. As previously held, that is a significant public interest that outweighs a minor intrusion on an individual's rights occasioned by the initial stop. However, the State failed to prove the necessity of subjecting each of the motor vehicles stopped at the checkpoints to searches by trained search dogs. The testimony of the CBP officers revealed that there were numerous, "non-productive alerts," by the dogs at the checkpoints which extended the duration of the stops for those individuals but resulted in no evidence of a crime being found. The primary purpose of detecting illegal aliens could have, in most cases, been accomplished by a mere visual inspection of the interior of the vehicle and a brief interrogation of its occupant(s). If those measures then resulted in a reasonable articulable suspicion of criminal activity then the dog searches would have been warranted.

In fact, the testimony of the CBP officers revealed that no "concealed humans" were found.[16] CBP Officer Qualter testified that he has never located a "concealed human" in a motor vehicle in his seventeen years of service.[17]

CBP Officer Labaff testified correctly, that an alert by his trained canine constitutes probable cause for a search.[18] However, none of the CBP officers took steps to procure a search warrant based on that alleged probable cause prior to continuing the search.

Based on the foregoing the Court orders the following:

1. The Defendants' Consolidated Motion to Suppress, filed December 8, 2017, is GRANTED for the reasons stated above. The CBP and the WPD were working in collaboration with each other with the understanding that the WPD would take possession of any drugs seized below the federal guidelines for prosecution in federal court and bring charges in this court based on that evidence. The evidence was seized in violation of constitutional rights recognized by the New Hampshire Supreme Court in *State v. Pellici, supra.* The New Hampshire Constitution governs prosecution of state laws in state courts.

2. The Defendants' Consolidated Motion to Suppress is granted on a separate and independent basis for the individuals listed below based on the fact that the State failed to present any evidence that the canine, Sam, working with CBP Officer John Marquisse, was properly trained and certified.[19]

   a. Daniel McCarthy, #469-2017-CR-01888

   b. Richard Robinson, #469-2017-CR-01887

   c. Adam Clark, #469-2017-CR-01872

   d. Jacob Rushing, #469-2017-CR-01871

   e. Michael Benoit, #469-2017-CR-01878

   f. Timothy Lucier, #469-2017-CR-01911

   g. Taylor O'Neill, #469-2017-CR-01982

3. The Defendants' Emergency Motion for Discovery and to Compel Witnesses, filed December 22, 2017, is moot and therefore DENIED.

---

[16] Hearing Transcript, p. 54, line 19
[17] *Id.*, p. 64, line 14
[18] This is a correct statement of federal law. *Florida v. Harris, supra*
[19] *See, U.S. v. One Million, Thirty–Two Thousand, Nine Hundred Eighty Dollars in U.S. Currency, supra.*

4. The <u>State's Motion to Strike Exhibits</u>, filed December 27, 2017, is GRANTED with respect to defendants' *Exhibit 17* (ID) and *Exhibit 18* (ID) only and DENIED with respect to defendants' *Exhibit 1* through Exhibit *16*, inclusive.[20]

IT IS SO ORDERED:

May 1, 2018
Date                                                        Judge Thomas A. Rappa, Jr.

---

[20] The State stipulated to the admission of Defendants' *Exhibits 1, 2, 3, 9* and *Exhibit 11.*

14