## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW HAMPSHIRE

Jesse Drewniak

      v.

                                  Civil No. 20-cv-852-LM
                                  Opinion No. 2021 DNH 071 P

U.S. Customs and Border Protection et al.

# O R D E R

Plaintiff Jesse Drewniak brings this suit against U.S. Customs and Border Protection, U.S. Border Patrol,[1] Chief Patrol Agent Robert N. Garcia of the Swanton Sector of the U.S. Border Patrol, and Agent Mark A. Qualter of the U.S. Border Patrol.[2]  Drewniak alleges that defendants violated his Fourth Amendment rights by seizing him without reasonable suspicion at a traffic checkpoint erected for the primary purpose of discovering and prosecuting drug crimes.  Drewniak sues Qualter in his individual capacity for damages under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).  Drewniak sues CBP and Garcia for injunctive and declaratory relief, alleging that there is a substantial risk his rights will again be violated if CBP and Garcia are not enjoined from conducting additional checkpoints in New Hampshire.

---

[1] For simplicity, the court will refer to these two defendants (U.S. Customs and Border Protection and U.S. Border Patrol) collectively as "CBP."

[2] Drewniak's complaint also names Supervising U.S. Border Patrol Agent Jeremy Forkey as a defendant.  On November 23, 2020, the parties filed a stipulation stating that Drewniak voluntarily dismissed Forkey without prejudice pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure.

Qualter moves to dismiss the claim against him pursuant to Federal Rule of Civil Procedure 12(b)(6), asserting, inter alia, that it is not cognizable in a Bivens action.  See doc. no. 19.  CBP and Garcia separately move to dismiss Drewniak's claim against them pursuant to Federal Rule of Civil Procedure 12(b)(1), asserting that Drewniak lacks standing to seek injunctive and declaratory relief.  See doc. no. 20.  For the reasons discussed below, the court grants Qualter's motion (doc. no. 19) but denies CBP and Garcia's motion (doc. no. 20).

## STANDARDS OF REVIEW

Under Rule 12(b)(6), the court must accept the factual allegations in the complaint as true, construe reasonable inferences in the plaintiff's favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted."  Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71, 75 (1st Cir. 2014) (citation and internal quotation marks omitted).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

Under Rule 12(b)(1), a party can challenge the court's subject matter jurisdiction in one of two ways: (1) by challenging the sufficiency of the allegations relied upon in the complaint to support jurisdiction; or (2) by challenging the accuracy of those allegations.  See Hernández-Santiago v. Ecolab, Inc., 397 F.3d 30, 33 (1st Cir. 2005); see also 5B Arthur R. Miller et al., Fed. Prac. & Proc. Civ. § 1350

(3d ed.).  The court's standard of review differs depending on the challenge brought.

See Valentin v. Hosp. Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001).  Where a

defendant challenges the sufficiency of the plaintiff's allegations, the standard of

review is the same as the Rule 12(b)(6) standard.  See Sevigny v. United States, Civ.

No. 13-cv-401-PB, 2014 WL 3573566, at *2-3 (D.N.H. July 21, 2014); Valentin, 254

F.3d at 363.  Where a defendant challenges the accuracy of the plaintiff's

allegations, those allegations "are entitled to no presumptive weight," and "the

court must address the merits of the jurisdictional claim by resolving the factual

disputes between the parties."  Valentin, 254 F.3d at 363.  A challenge to the

accuracy of the plaintiff's allegations must be supported by "materials of evidentiary

quality,"  id., and the court may consider the proffered materials in resolving the

Rule 12(b)(1) motion without converting it into a motion for summary judgment, see

Gonzalez v. United States, 284 F.3d 281, 287-88 (1st Cir. 2002).

Here, CBP and Garcia have attached a declaration prepared by Garcia to

their Rule 12(b)(1) motion.  See doc. no. 20-2.  The declaration contains assertions

regarding CBP and Garcia's use of checkpoints in New Hampshire and is intended

to challenge the accuracy of Drewniak's allegation that they are likely to conduct

additional checkpoints.  The court will therefore consider Garcia's declaration in

highlighting the relevant facts below and in resolving CBP and Garcia's standing

challenge.  See Gonzalez, 284 F.3d at 287-88.

## BACKGROUND

CBP has conducted numerous temporary traffic checkpoints in New Hampshire over the last several years.  Although it conducted no such checkpoints from 2012 through 2016 due to lack of resources, the agency obtained necessary funding and personnel to re-initiate the use of checkpoints in 2017.[3]  That year, the agency prepared an "operation order" detailing its plans to conduct traffic checkpoints in New Hampshire.  Doc. no. 20-2 ¶ 9.  Agency counsel reviewed the order's "legal sufficiency," and CBP management at both the local and national level ultimately approved the order.  Id.  After the order's approval, CBP resumed conducting traffic checkpoints in New Hampshire.

At CBP checkpoints, agents stop every vehicle traveling on the roadway where the checkpoint is located.  When a vehicle begins approaching a checkpoint, agents direct the vehicle to a "primary checkpoint location" where CBP agents ask the vehicle's occupants questions about their citizenship status.  Agents also use trained dogs to perform "pre-primary free air sniffs" of vehicles waiting to pass through the primary checkpoint.  CBP dogs are trained to detect persons concealed in traveling vehicles as well as narcotics.  If a dog alerts, agents direct the vehicle to a secondary checkpoint area for further investigation.

---

[3] Although Garcia's declaration states that CBP "re-initiated" the use of checkpoints in New Hampshire in 2017, neither his declaration nor Drewniak's complaint make clear when, prior to 2012, CBP last conducted a checkpoint program in the State.

CBP conducted two checkpoints in New Hampshire in 2017—one in August and one in September.  It conducted an additional four checkpoints in 2018—one in May over Memorial Day weekend, one in June over Father's Day Weekend, one in August, and one in September.  CBP then conducted four more checkpoints in 2019—one in April, one in May, one in June during Laconia Motorcycle Week, and one in September.[4]  Most of these checkpoints lasted multiple days.  Seven took place on Interstate 93 ("I-93") in Woodstock, including the checkpoint occurring August 25-27, 2017.

Drewniak is a resident of Hudson, New Hampshire, and is an avid outdoorsman.  He travels to the White Mountains region of New Hampshire from his home in Hudson at least fifty times each year during fishing season, which generally lasts from March to November.  During ice fishing season, which lasts from December to February, he travels to the White Mountains an additional ten times to enjoy outdoor recreation.  In traveling to the White Mountains, Drewniak generally drives on I-93, which is the most direct route to the region from his home and which passes through the town of Woodstock, New Hampshire.

On August 26, 2017, Drewniak was returning home with his friends on I-93 from a fishing trip in the White Mountains.  CBP agents stopped Drewniak's vehicle, along with every other vehicle travelling through Woodstock on I-93, at the Woodstock checkpoint taking place on that date.  As Drewniak's vehicle approached

---

[4] As of the date of this order's issuance, CBP has not conducted a checkpoint in New Hampshire since September 2019.

the primary checkpoint location, CBP agents asked Drewniak and his friends about their citizenship status through the driver's side window.  As they did so, another agent circled the vehicle with a trained dog.  The agent handling the dog signaled to the agent questioning Drewniak and his friends, who then told the vehicle's driver to proceed to the secondary checkpoint area.[5]

Once the vehicle arrived at the secondary checkpoint area, agents instructed Drewniak and his friends to exit.  Qualter then searched the vehicle along with his canine partner.  However, Qualter's dog failed to alert to any detectable odors. After completing his search, Qualter shouted at Drewniak—in close proximity and in a threatening manner—"Where's the fucking dope?"  Drewniak told Qualter that there was a small amount of marijuana in the vehicle's center console, and Qualter demanded that Drewniak retrieve it.  Drewniak entered the vehicle and removed a small quantity of hash oil in a container, turning it over to Qualter.  Qualter then gave the hash oil to Sergeant Millar of the Woodstock Police Department, who was standing nearby.[6]  Sergeant Millar charged Drewniak with violating New Hampshire's Controlled Drug Act.  See RSA ch. 318-B; RSA 318-B:2-c, III, V (establishing that "any person who knowingly possesses 5 grams or less of hashish . . . shall be guilty of a violation" punishable only by a fine).

---

[5] Drewniak was a passenger in the vehicle.

[6] Local and State Police assisted CBP in carrying out the August 2017 checkpoint.

In his subsequent state court prosecution, Drewniak filed a motion to suppress.  The presiding judge granted Drewniak's motion, concluding that the CBP dog's "free air sniff" occurring during the initial citizenship questioning constituted a search under the New Hampshire Constitution requiring reasonable suspicion. See doc. no. 1-1.  Because the court found that CBP lacked reasonable suspicion, it ruled that the search violated Part I, Article 19 of the New Hampshire Constitution. The court further ruled that the State could not avoid suppression merely because federal rather than state officers conducted the unlawful search.[7]

Drewniak thereafter initiated this lawsuit.  His complaint brings two counts. Count I alleges that Qualter violated Drewniak's Fourth Amendment rights by searching and seizing him at the August 2017 checkpoint.  Drewniak sues Qualter in his individual capacity for damages under Bivens.  Count II alleges that CBP and Garcia have a practice of erecting unconstitutional traffic checkpoints in New Hampshire, and that Drewniak's Fourth Amendment rights were violated at the August 2017 checkpoint as a result of this practice.  Drewniak seeks declaratory relief under this count, as well as injunctive relief precluding CBP and Garcia (who is sued only in his official capacity) from operating additional traffic checkpoints on I-93.

---

[7] The court also found that the August 2017 checkpoint violated the United States Constitution because its primary purpose was drug interdiction, not immigration enforcement.

Defendants filed two motions to dismiss.  See doc. nos. 19 & 20.  Qualter moves to dismiss Count I.  See doc. no. 19.  CBP and Garcia move to dismiss Count II.  See doc. no. 20.  The court considers defendants' motions separately below.

## DISCUSSION

I.   <u>Qualter's Motion to Dismiss</u>

Qualter argues that Count I must be dismissed because the claim alleged therein is not cognizable in a <u>Bivens</u> action.  He further argues that Count I must be dismissed because the facts alleged in Drewniak's complaint demonstrate that Qualter is entitled to qualified immunity.  In the alternative, Qualter argues that he is entitled to summary judgment on the basis of qualified immunity.  The court begins by analyzing whether Drewniak may bring his claim against Qualter under <u>Bivens</u>.

A.   *Bivens* Actions Are Disfavored

42 U.S.C. § 1983 permits plaintiffs to bring damages suits against state officials for constitutional violations.  See, e.g., Ziglar v. Abbasi, 137 S. Ct. 1843, 1854 (2017).  No analogous statutory cause of action exists for suits against federal officials.  See id.  In <u>Bivens</u>, the Supreme Court held that the Fourth Amendment contained an implied cause of action enabling plaintiffs to bring damages suits against federal officials for violating their right to be free from unreasonable searches and seizures.  See González v. Vélez, 864 F.3d 45, 52 (1st Cir. 2017) (citing

8

Bivens, 403 U.S. at 389, and Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 66-67 (2001)).  In the years that followed, Bivens came to stand for the proposition that there exists a "federal analog to § 1983 actions against state officials" implicit in the Constitution itself.  Soto-Torres v. Fraticelli, 654 F.3d 153, 158 (1st Cir. 2011).

Not all constitutional claims are cognizable in a Bivens action, however. Bivens itself involved a claim that F.B.I. agents violated the plaintiff's Fourth Amendment rights by searching his home and arresting him without a warrant or probable cause, and by using excessive force to effect his arrest.  See Bivens, 403 U.S. at 389.  The Supreme Court thereafter recognized the availability of Bivens actions in two additional contexts: a suit brought by a Congressional staffer against a Congressman alleging that the staffer had been fired because of her sex in violation of the Fifth Amendment's equal protection guarantee, see Davis v. Passman, 442 U.S. 228, 229-32 (1979); and a suit brought by a federal prisoner's mother against prison officials alleging that the prisoner had been deprived of needed medication in violation of the Eight Amendment's prohibition on cruel and unusual punishment, see Carlson v. Green, 446 U.S. 14, 16-19 (1980).  "These three cases—Bivens, Davis, and Carlson—represent the only instances in which the [Supreme] Court has approved of an implied damages remedy under the Constitution itself."  Abbasi, 137 S. Ct. at 1855.

Bivens, Davis, and Carlson were decided at a time when the Supreme Court took a "different approach to recognizing implied causes of action than it follows now."  Id.  "In the mid-20th century, . . . the Court assumed it to be a proper judicial

9

function to 'provide such remedies as are necessary to make effective' a statute's purpose," and, "as a routine matter with respect to statutes, the court would imply causes of action not explicit in the statutory text itself."  Id. (quoting J.I. Case Co. v. Borak, 377 U.S. 426, 433 (1964)).  "Bivens extended this practice to claims based on the Constitution itself."  Hernandez v. Mesa, 140 S. Ct. 735, 741 (2020).

In the years following the Bivens triumvirate, the Court "came to appreciate more fully the tension between" inferring causes of action not expressly authorized by Congress "and the Constitution's separation of legislative and judicial power." Id.; see, e.g., Bush v. Lucas, 462 U.S. 367, 373-74 (1983).  The Court's approach to inferring causes of action now recognizes that "[n]o law 'pursues its purposes at all costs,'" and "a lawmaking body that enacts a provision that creates a right or prohibits specified conduct may not wish to pursue the provision's purpose to the extent of authorizing private suits for damages."  Hernandez, 140 S. Ct. at 741-42 (quoting Am. Express Co. v. Italian Colors Rest., 570 U.S. 228, 234 (2013)).  "For this reason, finding that a damages remedy is implied by a provision that makes no reference to that remedy may upset the careful balance struck by the lawmakers." Id. at 742; see also Abbasi, 137 S. Ct. at 1858 (noting that "the decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide," including the individual burdens "on Government employees who are sued personally," as well as the systemic burdens of using "the tort and monetary liability mechanisms of the legal system . . . to bring about the proper formulation and implementation of public policies").  The Court has gone so far to note that, "in

light of the changes to the Court's general approach to recognizing implied damages remedies, it is possible that the analysis in the Court's three <u>Bivens</u> cases might have been different if they were decided today."  <u>Abbasi</u>, 137 S. Ct. at 1856.

This notion finds support in the Court's post-<u>Carlson</u> decisions.  Following its more cautious approach to recognizing implied causes of action, the Supreme Court has uniformly refused to extend <u>Bivens</u> after <u>Carlson</u> despite numerous opportunities to do so.  <u>See</u> <u>Bush</u>, 462 U.S. at 368; <u>Chappell v. Wallace</u>, 462 U.S. 296, 297, 304-05 (1983); <u>United States v. Stanley</u>, 483 U.S. 669, 671-72, 683-84 (1987); <u>Schweiker v. Chilicky</u>, 487 U.S. 412, 414-15, 418 (1988); <u>FDIC v. Meyer</u>, 510 U.S. 471, 473-74 (1994); <u>Malesko</u>, 534 U.S. at 63-65; <u>Wilkie v. Robbins</u>, 551 U.S. 537, 547-48, 562 (2007); <u>Minneci v. Pollard</u>, 565 U.S. 118, 120-21 (2012); <u>Abbasi</u>, 137 S. Ct. at 1853-54, 1858, 1869; <u>Hernandez</u>, 140 S. Ct. at 739-40.  Indeed, <u>Abbasi</u> expressed what one Court of Appeals deemed "open hostility" to recognizing additional <u>Bivens</u> actions.  <u>Tun-Cos v. Perrotte</u>, 922 F.3d 514, 521 (4th Cir. 2019). Given the Court's consistent refusal to expand <u>Bivens</u> over the last forty years, the Court's discarding of the very analysis by which the <u>Bivens</u> cause of action was recognized, and the Court's recent and pronounced aversion to further expansion of the doctrine, it is beyond question that "expanding the <u>Bivens</u> remedy is now a disfavored judicial activity."  <u>Berry v. Federal Bureau of Investigation</u>, Civ. No. 17-cv-143-LM, 2018 WL 708155, at *3 (D.N.H. Feb. 5, 2018) (quoting <u>Abbasi</u>, 137 S. Ct. at 1857); <u>see</u> <u>also</u> <u>Hernandez</u>, 140 S. Ct. at 750-53 (Thomas, J., concurring, joined by Gorsuch, J.) (calling on the Court to abandon the <u>Bivens</u> doctrine in its entirety).

11

B.     The Modern *Bivens* Analysis

Under the Court's modern approach to Bivens, as recently clarified in Abbasi and Hernandez, a "rigorous" two-step analysis is used to determine whether a particular constitutional claim is cognizable in an implied cause of action for damages.  Bistrian v. Levi, 912 F.3d 79, 89-90 (3d Cir. 2018) (quoting Vanderklok v. United States, 868 F.3d 189, 200 (3d Cir. 2017)); see Hernandez, 140 S. Ct. at 743. First, the court must analyze whether the plaintiff's claim "arises in a 'new context' or involves a 'new category of defendants.'"  Hernandez, 140 S. Ct. at 743 (quoting Malesko, 534 U.S. at 68).  A context is new if it is "different in a meaningful way from" Bivens, Davis, and Carlson.  Abbasi, 137 S. Ct. at 1859-60; accord Tun-Cos, 922 F.3d at 522-23.  A meaningful difference may be "small . . . in practical terms," and can arise even when the plaintiff alleges a violation of the same constitutional right that was at issue in one of the Court's prior Bivens cases.  Abbasi, 137 S. Ct. at 1859, 1865; see also Hernandez, 140 S. Ct. at 743 ("A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized.") (declining to infer Bivens action for Fourth Amendment claim against Border Patrol agent).

Examples of meaningful differences from the Court's three previous Bivens cases include:

> [T]he rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or

12

emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous <u>Bivens</u> cases did not consider.

<u>Abbasi</u>, 137 S. Ct. at 1860.  Given the Court's broad understanding of what constitutes a meaningful difference from its three prior <u>Bivens</u> cases, "the new-context inquiry is easily satisfied."  <u>Id.</u> at 1865; <u>see</u> <u>Hernandez</u>, 140 S. Ct. at 743.

If the plaintiff's claim involves no new context or category of defendants, a <u>Bivens</u> action is available.  <u>See</u> <u>Tun-Cos</u>, 922 F.3d at 522-23.  However, if the claim seeks to extend <u>Bivens</u> to a new context or category of defendants, the court proceeds to the second step of the analysis.  <u>See</u> <u>Abbasi</u>, 137 S. Ct. at 1860.

At the second step of the analysis, the court must determine whether there are "special factors counseling hesitation" against expanding <u>Bivens</u>.  <u>Id.</u> at 1857 (quoting <u>Carlson</u>, 446 U.S. at 18).  Although the Supreme Court has not attempted to set forth an exhaustive list of what constitutes a special factor counseling hesitation, it has stated that the analysis primarily focuses on "separation-of-powers principles," and "on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed."  <u>Id.</u> at 1857-58; <u>accord</u> <u>Hernandez</u>, 140 S. Ct. at 743; <u>see</u>, <u>e.g.</u>, <u>Abbasi</u>, 137 S. Ct. at 1860 (concluding that potential for a <u>Bivens</u> action to require discovery into the deliberations behind a challenged executive branch policy was a special factor counseling hesitation); <u>see also</u> <u>Alvarez v. U.S. Immigration & Customs Enforcement</u>, 818 F.3d 1194, 1206 (11th Cir. 2016) (noting

that courts have found "military concerns, separation of powers, the comprehensiveness of available statutory schemes, national security concerns, and foreign policy considerations" to be special factors counseling hesitation (quoting Arar v. Ashcroft, 585 F.3d 559, 573 (2d Cir. 2009) (en banc))); Arar, 585 F.3d at 573 (noting that "special factors" "is an embracing category, not easily defined").

The "relevant threshold" for a factor to counsel hesitation "is remarkably low." Arar, 585 F.3d at 574.  "Hesitation is a pause, not a full stop, or an abstention; and to counsel is not to require."  Id.  A factor counsels hesitation "whenever thoughtful discretion would pause even to consider" it.  Id.; see also Abbasi, 137 S. Ct. at 1858 ("[I]f there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy . . . the courts must refrain from creating the remedy . . . .") (emphasis added)); Tun-Cos, 922 F.3d at 525 ("In determining whether 'special factors' are present, we focus on whether Congress might doubt the need for an implied damages remedy.").

In sum, if a court has any "reason to pause before applying Bivens in a new context or to a new class of defendants," the court must decline to recognize a Bivens action.  Hernandez, 140 S. Ct. at 743.  Having set the stage, the court now analyzes whether Drewniak may bring his claim against Qualter in a Bivens action.

C.   <u>Drewniak's Claim Arises in a New Context and Against a New
     Category of Defendants</u>

Drewniak's claim arises in a context that meaningfully differs from the
Supreme Court's three prior <u>Bivens</u> cases.  First, "the statutory or other legal
mandate under which the officer was operating" is distinct from <u>Bivens</u>, <u>Davis</u>, and
<u>Carlson</u>.  Abbasi, 137 S. Ct. at 1860.  According to Drewniak's complaint, CBP,
Garcia, and Qualter claim authority to erect interior checkpoints—including the
August 2017 checkpoint at which Drewniak was detained—pursuant to the
Immigration and Nationality Act ("INA") and its implementing regulations.  See 8
U.S.C. § 1357(a)(3) (authorizing warrantless searches of any vehicle located "within
a reasonable distance from any external boundary of the United States . . . for the
purpose of patrolling the border to prevent the illegal entry of aliens into the United
States"); 8 C.F.R. § 287.1(a)(2) (defining "reasonable distance" as "within 100 air
miles from any external boundary of the United States").  The officials sued in the
Supreme Court's three prior <u>Bivens</u> cases did not operate under the INA.  These
diverging legal mandates constitute meaningful differences from the Supreme
Court's <u>Bivens</u> jurisprudence.  See Abbasi, 137 S. Ct. at 1860; Loumiet v. United
States, 948 F.3d 376, 382 (D.C. Cir. 2020) (explaining that "the legal mandate under
which the . . . officials were operating is different from the ones in <u>Bivens</u>, <u>Davis</u>,
and <u>Carlson</u>" because plaintiff's claim "arose from the enforcement of federal
banking laws," which were not at issue in the <u>Bivens</u> triumvirate).

Drewniak argues that the INA, and immigration enforcement more broadly, is irrelevant to an analysis of whether his claim would extend <u>Bivens</u> to a new context.  He argues that this court must, at the motion to dismiss stage, assume the truth of his allegation that Qualter was not operating under authority of the INA because Qualter's primary purpose in stopping Drewniak's vehicle was general drug interdiction, not preventing illegal entries at the border.  However, while this allegation may show that Qualter <u>exceeded</u> the authority granted him by § 1357(a)(3) and its accompanying regulations, it does not show that the INA  is irrelevant to an analysis of his claim's <u>Bivens</u> context.

The complaint alleges that CBP routinely conducts traffic checkpoints throughout the country's interior and that it "claims that [these] checkpoints across the country are . . . for the purpose of detecting and apprehending undocumented individuals attempting to travel further into the interior of the United States after evading detection at the border."  Doc. no. 1 ¶¶ 31-33.  The thrust of Drewniak's complaint is that, although CBP's stated purpose in conducting the August 2017 checkpoint and others like it may be consistent with the agency's statutory authority, its actual purpose was general crime control—an end which CBP is not authorized to pursue under § 1357(a)(3).  However, the fact that Drewniak's claim <u>puts at issue</u> the scope of CBP's authority to conduct traffic checkpoints under the INA makes his claim "different in a meaningful way" from those advanced in the Supreme Court's three prior <u>Bivens</u> cases—none of which involved the INA or the

16

authority granted therein.  Abbasi, 137 S. Ct. at 1859.  Thus, recognizing a Bivens action for Drewniak's claim would require extending the doctrine to a new context.

Even if Drewniak's claim involved no new context, however, his claim seeks to extend Bivens to a new category of defendants.  The Court's three Bivens cases approved suits against the following categories of defendants: "FBI Agents" in Bivens itself; "a Congressman" in Davis; and "prison officials" in Carlson.  Abbasi, 137 S. Ct. at 1860.  Here, Drewniak seeks damages from a Border Patrol agent. Recognizing a Bivens action against a Border Patrol agent would require extending Bivens to a new category of defendants.  See Boule v. Egbert, 980 F.3d 1309, 1313 (9th Cir. 2020) (concluding that plaintiff's claim required an extension of Bivens "given that the Defendant is an agent of the border patrol rather than of the F.B.I."); Tun-Cos, 922 F.3d at 525 (concluding that the plaintiffs' claim sought "to extend Bivens liability to a new category of defendants – ICE agents"); Loumiet, 948 F.3d at 378, 382 (concluding that officials from the Office of the Comptroller of the Currency constituted a new category of defendants for Bivens purposes).

Thus, because Drewniak's claim against Qualter is brought in a new Bivens context and seeks damages from a new category of defendants, the court must proceed to the second step of the analysis and consider whether special factors counsel hesitation against extending Bivens.

### D.    Multiple Special Factors Counsel Hesitation

The Supreme Court has recognized that special factors exist if Congress has created "an alternative remedial structure" providing for "any alternative, existing process for protecting the injured party's interest." Abbasi, 137 S. Ct. at 1858 (brackets omitted) (quoting Wilkie, 551 U.S. at 550). Congress's remedial scheme "need not 'provide complete relief for the plaintiff.'" Alvarez, 818 F.3d at 1206 (quoting Schweiker, 487 U.S. at 423). "[A]s long as Congress has established an 'elaborate, comprehensive scheme'" in the context in which a plaintiff's claim is brought, the courts "will not allow a Bivens remedy to supplement that system." Id. (quoting Schweiker, 487 U.S. at 436); accord González, 864 F.3d at 54-55. Courts have held that the INA is an alternative remedial structure counseling hesitation against extending Bivens to contexts implicating the Act. See Tun-Cos, 922 F.3d at 526; Alvarez, 818 F.3d at 1208; De La Paz v. Coy, 786 F.3d 367, 377-78 (5th Cir. 2015); Mirmehdi v. United States, 689 F.3d 975, 982 (9th Cir. 2012). For the following reasons, the court agrees with the opinions of these courts and concludes that the careful attention paid by Congress to CBP's enforcement activities in the INA and its regulations counsel hesitation against augmenting the INA with a judicially-inferred damages action.

First, the INA contains numerous guardrails to protect against constitutional violations. For example, a CBP agent may conduct a warrantless search of a person or his possessions only if the agent has "reasonable cause to suspect that" such a search would disclose "grounds . . . for denial of admission to the United States." 8

18

U.S.C. § 1357(c).  "A search warrant should be obtained prior to conducting a search in a criminal investigation unless a specific exception to the warrant requirement is authorized by statute or recognized by the courts."  8 C.F.R. § 287.9(a).  In addition, INA regulations limit the categories of officers and agents who may exercise search authority under the Act and requires officers within the permitted categories to complete specified training.  8 C.F.R. § 287.5(d).  And CBP is required to promulgate guidelines governing officers' conduct relating to searches and seizures. See 8 C.F.R. § 287.9(a).

The INA also places limits on warrantless arrests.  It authorizes CBP agents to make warrantless arrests for conduct occurring outside the agent's presence only if the agent has reasonable grounds to believe the person arrested has committed a felony or an immigration violation.  8 U.S.C. § 1357(a)(4)-(5); see also 8 C.F.R. § 287.8(c)(2)(i) ("An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States.").  Even then, an agent may only effect a felony arrest if the agent "is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest."  8 U.S.C. § 1357(a)(5).  If there is no "reason to believe that the person is likely to escape before a warrant can be obtained," the INA's regulations require that "[a] warrant of arrest shall be obtained."  8 C.F.R. § 287.8(c)(2)(ii).

Further, the INA includes training requirements and an internal review process.  See De La Paz, 786 F.3d at 376 ("The INA maintains [these] standards of conduct by training individuals in those standards and 'establish[ing] an expedited, internal review process for violations of such standards.'" (quoting 8 U.S.C. § 1357(a)(5))).  With respect to training, the INA requires the implementation of regulations which: (1) limit "the categories and employees . . . who may use force" in effecting an arrest; (2) "establish standards" governing when warrantless arrests may be made; (3) preclude officers from effecting warrantless felony arrests "unless the officer has received certification as having completed a training program which covers such arrests" and the standards under which they can be made.  8 U.S.C. § 1357(a)(5).

With respect to the internal review process, INA regulations provide that "[a]ny persons wishing to lodge a complaint pertaining to violations of enforcement standards" may do so by contacting the Department of Homeland Security.  8 C.F.R. § 287.10(b).  Any alleged violations must be "investigated expeditiously."  Id. § 287.10(a).  Complaints are "referred promptly for investigation" and for the preparation of an "investigative report," which must then be "referred promptly for appropriate action."  Id. § 287.10(c).

In sum, the INA's complex remedial structure—created by Congress and implemented by the Executive pursuant to Congressional directive and duly-promulgated regulations—suggests that a judicially-superimposed damages action may "interfer[e] with the authority of the other branches."  Hernandez, 140 S. Ct. at

20

743; see De La Paz, 922 F.3d at 375-77.  The comprehensive nature of the INA and the choices made by Congress as to how to violations ought to be redressed support the notion that the absence of an individual damages remedy against immigration officers was intended.  See De La Paz, 786 F.3d at 377-78.  And while Drewniak argues that existing remedial schemes would fail to adequately redress the constitutional violation he alleges, "[t]he question is not what remedy the court should provide for a wrong that would otherwise go undressed," but rather, "whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy." Bush, 462 U.S. at 388; accord, e.g., Mack v. Yost, 968 F.3d 311, 320 (3d Cir. 2020); see also Stanley, 483 U.S. at 683 ("[I]t is irrelevant to a 'special factors' analysis whether the laws currently on the books afford [plaintiff] an 'adequate' federal remedy for his injuries."); Tun-Cos, 922 F.3d at 526-27 (rejecting plaintiffs' argument that Bivens action should be inferred due to fact that INA's protections "often do not redress constitutional violations that occur apart from removal proceedings" because the elaborate remedial scheme provided for in the INA suggested that Congress "did not want a money damages remedy against ICE agents for their allegedly wrongful conduct"); Barron v. United States, 998 F. Supp. 117, 121 (D.N.H. 1999) ("Even if, as the plaintiff has alleged, Greeley's alleged constitutional violations go beyond the scope of the remedial scheme, the comprehensiveness of the scheme suggests that Congress intended it to be exclusive.").  In sum, the INA's complex remedial structure gives the court

"reason to pause before applying <u>Bivens</u> in [this] new context or to [this] new class of defendants." <u>Hernandez, 140 S. Ct. at 743</u>; <u>see</u> <u>also</u> <u>Arar, 585 F.3d at 574</u>.

Hesitation is further counseled by the fact that, although Congress has amended the INA numerous times since its enactment in 1952, it has never seen fit to provide an individual damages remedy against immigration officers for actions undertaken in the course of their duties. <u>See</u> <u>Tun-Cos, 922 F.3d at 527</u>; <u>De La Paz, 786 F.3d at 377</u>; <u>see</u> <u>also</u> REAL ID Act of 2005, <u>Pub. L. No. 109-13</u>, 119 Stat. 302; Illegal Immigration Reform and Immigration Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-546; Antiterrorism and Effective Death Penalty Act of 1996, <u>Pub. L. No. 104-132</u>, 110 Stat. 1214; Immigration Act of 1990, <u>Pub. L. No. 101-649</u>, 104 Stat. 4978; Immigration Reform and Control Act of 1986, <u>Pub. L. No. 99-603</u>, 100 Stat. 3359; Act of Oct. 20, 1976, <u>Pub. L. No. 94-571</u>, 90 Stat. 2703; Act of Oct. 3, 1965, Pub. L. No. 89-236, 79 Stat. 911. "A fair reading of legislative developments" pertaining to immigration enforcement matters "leads ineluctably to the conclusion that Congress's failure to provide an individual damages remedy 'has not been inadvertent.'" <u>De La Paz, 786 F.3d at 377</u> (quoting <u>Schweiker, 487 U.S. at 423</u>); <u>see</u> <u>also</u> <u>Alvarez, 818 F.3d at 1209</u> ("[T]he complexity of the Immigration and Nationality Act, and Congress's frequent amendments to it, suggest that no <u>Bivens</u> remedy is warranted.").

Further counseling hesitation is the fact that other forms of judicial relief are potentially available to redress the constitutional violation alleged. The Supreme Court has stated that, when "'other alternative forms of judicial relief' . . . are

available, a <u>Bivens</u> remedy usually is not." <u>Abbasi</u>, 137 S. Ct. at 1863 (quoting

<u>Minneci</u>, 565 U.S. at 124)); <u>see</u>, <u>e.g.</u>, <u>id.</u> at 1862-63 (concluding that the possibility of

injunctive or habeas relief was a special factor counseling hesitation against

inferring a <u>Bivens</u> action).  Such "[a]lternative processes, for <u>Bivens</u> purposes, do

not have to be creations of Congress." <u>Callahan v. Fed. Bureau of Prisons, 965 F.3d</u>

<u>520, 524 (6th Cir. 2020)</u>; <u>see</u>, <u>e.g.</u>, <u>Minneci</u>, 565 U.S. at 127-30 (concluding that state

tort law provided an adequate alternative avenue for relief precluding creation of a

<u>Bivens</u> action).  Here, Drewniak had the opportunity to contest the constitutionality

of the August 2017 checkpoint in his state court criminal proceeding by seeking—

and obtaining—suppression of the drugs seized from his vehicle.  Where Drewniak

alleges that Qualter's primary purpose in erecting the traffic checkpoint was

discovering and prosecuting drug crimes, the possibility that evidence unlawfully

obtained from that checkpoint will be excluded from any resulting state criminal

trial provides "roughly similar incentives" for CBP agents to comply with the Fourth

Amendment as does a <u>Bivens</u> action.  <u>Minneci</u>, 565 U.S. at 130; <u>see also</u> <u>Callahan,</u>

<u>965 F.3d at 524</u> (noting that an alternative remedy need not be "'perfectly

congruent' with a <u>Bivens</u> remedy or 'provide complete relief' for the alleged

violation" to be a special factor counseling hesitation (quoting <u>Minneci</u>, 565 U.S. at

129)); <u>Every v. Dep't of Veterans Affs., Civ. No. 15-cv-177-LM, 2017 WL 899972, at</u>

<u>*3 (D.N.H. Mar. 6, 2017)</u> (same).  In addition, the possibility that Drewniak may

obtain injunctive relief in this very case counsels hesitation against allowing a

damages action against Qualter to proceed.  <u>See</u> <u>Abbasi</u>, 137 S. Ct. at 1862.

23

Another special factor counseling hesitation is the potential effect on national security that may arise from grafting an implied damages action against CBP officers onto the remedial structure already provided by Congress, the Executive, and the Judiciary via separate avenues.  See Hernandez, 140 S. Ct. at 746; Arar 585 F.3d at 575.  National security concerns are relevant to the special factors inquiry for at least two reasons: (1) "[n]ational security . . . is the [Constitutional] prerogative of the Congress and the President," Abbasi, 137 S. Ct. at 1861 (citing U.S. Const. Art. I, § 8; Art II, § 1, § 2); and (2) the Judiciary has comparatively "limited institutional competence" in matters of national security, Arar, 585 F.3d at 575 (citing, inter alia, Boumediene v. Bush, 553 U.S. 723, 797 (2008) ("Unlike the President and some designated Members of Congress . . . federal judges [do not] begin the day with briefings that may describe new and serious threats to our Nation and its people.")); see Hernandez, 140 S. Ct. at 743 (noting that separation of powers and institutional competence concerns are central to a special factors analysis).

As the Supreme Court recently noted, CBP is responsible for "attempting to prevent the illegal entry of dangerous persons and goods" into the country, "and one of its main [statutory] responsibilities is 'to detect, respond to, and interdict terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States.'"  Hernandez, 140 S. Ct. at 746 (quoting 6 U.S.C. § 211(c)(5)).  Judicial efforts to regulate CBP agents' statutorily-prescribed duties by inferring a constitutional damages action

would "unquestionably ha[ve] national security implications." Id. at 747.   For example, "Bivens liability could deter agents from vigorous enforcement" of their duties.  De La Paz, 786 F.3d at 379.  And "Bivens suits concerning immigration enforcement may disclose more than 'normal domestic law-enforcement priorities and techniques' and might involve 'the disclosure of foreign-policy objectives and foreign-policy products.'"  Id. (ellipsis omitted) (quoting Mirmehdi, 689 F.3d at 983).

That is especially true where, as here, a plaintiff challenges an agent's or agency's motivation for engaging in a particular enforcement practice.  Even if Drewniak's claim against Qualter were "confined to the conduct of a particular . . . [o]fficer in a discrete instance," i.e., Qualter's conduct at the August 2017 checkpoint, Drewniak's claim that the checkpoint was erected for an impermissible purpose "would call into question the formulation and implementation of" CBP's alleged "general policy" of conducting interior traffic checkpoints.  Abbasi, 137 S. Ct. at 1860.  "This in turn, would necessarily require inquiry and discovery into the whole course of the discussions and deliberations that led to the policies and governmental acts being challenged."  Id.  If the judiciary were to recognize a Bivens action against CBP officers in this context, damages actions and their attendant disruptive inquiries may proliferate.  See De La Paz, 786 F.3d at 379. Because recognizing a Bivens action in this context would create a tangible risk of disclosing matters of national security—as well as unwarranted judicial intrusion into an area in which the Judiciary lacks comparative constitutional authority and

competence—the court is not inclined to entertain Drewniak's request to extend Bivens.

In conclusion, multiple special factors counsel hesitation in recognizing the availability of a Bivens action in this context. Because Drewniak seeks to extend Bivens to a new context, and because special factors counsel hesitation against doing so, a Bivens action is not available.

E. Summary

Bivens actions are disfavored. Under the rigorous two-step inquiry mandated by governing Supreme Court jurisprudence, it is difficult to infer a damages action for claims that differ in even modest ways from those advanced in Bivens, Davis, and Carlson. Here, a principled application of this analysis leads to the conclusion that Drewniak may not pursue his constitutional claim against Qualter in an implied action for damages.[8] The court therefore grants Qualter's motion to dismiss Count I of the complaint (doc. no. 19).

II. CBP and Garcia's Motion to Dismiss

As previously noted, Count II of Drewniak's complaint brings a claim for injunctive and declaratory relief against CBP and Garcia (who is sued only in his

---

[8] In light of this conclusion, the court need not address Qualter's alternative arguments that Count I should be dismissed—or that Qualter should be awarded summary judgment on Count I—on the basis of qualified immunity.

official capacity).  Drewniak alleges that CBP and Garcia violated his Fourth Amendment rights by erecting the August 2017 checkpoint at which his vehicle was stopped and searched.  He further alleges that CBP has "a practice [or] custom of conducting unconstitutional Border Patrol checkpoints in Northern New England" and that there is a "substantial risk" his rights will again be violated at a future checkpoint.  Doc. no. 1 ¶¶ 108, 115.  Drewniak seeks declaratory relief and to enjoin CBP and Garcia "from operating additional unconstitutional Border Patrol checkpoints" in New Hampshire.  Id. ¶¶ 112-13.  CBP and Garcia move to dismiss Count II, arguing that Drewniak lacks standing to pursue injunctive and declaratory relief.  See doc. no. 20.

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'"  Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157 (2014) (quoting U.S. Const. Art III, § 2).  "The doctrine of standing gives meaning to these constitutional limits by 'identifying those disputes which are appropriately resolved through the judicial process.'"  Id. (footnote and brackets omitted) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  "To establish Article III standing, a plaintiff must show: '(1) [he] has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'"  Petrello v. City of Manchester, Civ. No. 16-cv-008-LM, 2017 WL 3972477, at *16 (D.N.H. Sept. 7, 2017) (quoting Friends of the

Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000)); accord

Perez-Kudzma v. United States, 940 F.3d 142, 144-45 (1st Cir. 2019).  Here, CBP

and Garcia contest only the first element of this test: whether Drewniak has

suffered an "injury in fact."

Where a plaintiff seeks equitable or declaratory relief, the fact of a prior

injury does not satisfy the requirement that an injury be "actual or imminent."  See

Am. Postal Workers Union v. Frank, 968 F.2d 1373, 1376 (1st Cir. 1992) (citing Los

Angeles v. Lyons, 461 U.S. 95, 111 (1983)); Berner v. Delahanty, 129 F.3d 20, 24

(1st Cir. 1997); see also Friends of the Earth, 528 U.S. at 185 (explaining that the

plaintiff "must demonstrate standing separately for each form of relief sought").

Where equitable or declaratory relief is sought, "a plaintiff must 'establish a real

and immediate threat . . . that [he] will" suffer a future injury.  Gray v. Cummings,

917 F.3d 1, 19 (1st Cir. 2019) (quoting Frank, 968 F.2d at 1376); see Lyons, 461 U.S.

at 104 (allegation that the plaintiff "may again" be harmed in the future failed to

demonstrate standing to pursue declaratory relief).  A plaintiff demonstrates a

sufficient threat of future injury for Article III purposes "if the threatened injury is

'certainly impending,' or there is a 'substantial risk'" that the alleged injury will

occur.  Susan B. Anthony List, 573 U.S. at 158 (quoting Clapper v. Amnesty Int'l

USA, 568 U.S. 398, 409, 414 n.5 (2013)); see also Berner, 129 F.3d at 24 (concluding

that plaintiff had standing to pursue injunctive relief where he "face[d] a realistic

risk of future exposure to the challenged policy").

Here, CBP and Garcia contend that Drewniak has failed to demonstrate a sufficient likelihood that he will be detained at a future checkpoint on I-93 in Woodstock because he has alleged "nothing more than a vague intent to travel to the White Mountains in the future."  Doc. no. 20 at 12.  Citing the Supreme Court's opinion in Lujan v. Defenders of Wildlife, 504 U.S. 555, 564 (1992), CBP and Garcia argue that Drewniak has alleged only an intention to travel to the White Mountains "some day" in the future, which, they contend, is not sufficient to demonstrate an actual or imminent injury.

The court does not agree that Drewniak's complaint alleges nothing more than a vague intent to travel on I-93 in Woodstock at some point in the future.  In Lujan, the plaintiffs—various wildlife and environmental organizations—sought an injunction requiring the Secretary of the Interior to promulgate a regulation that would interpret a provision of the Endangered Species Act of 1973 to apply extraterritorially.  See Lujan, 504 U.S. at 558-59.  Plaintiffs alleged that, absent extraterritorial application of the provision, there would be an "increas[e] [in] the rate of extinction of endangered and threatened species."  Id. at 562.  The Secretary sought summary judgment on standing grounds.  See id. at 559.  Plaintiffs submitted affidavits from their members in opposition to the Secretary's motion, averring that they "intend[ed]" to travel abroad again in the "hope[s]" of observing endangered species, but that they "had no current plans" to do so.  Id. at 563-64.  The Supreme Court held that "the affiants' profession of an 'intent'" to travel abroad was "simply not enough" to establish a threat of future harm sufficient for standing

29

to seek injunctive relief.  Id. at 564.  "Such 'some day' intentions—without any description of concrete plans, or indeed any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require."  Id. (emphasis omitted).

Drewniak's stated intentions of future travel are a far cry from those found insufficient in Lujan.  Drewniak, a resident of Hudson, New Hampshire, is an avid outdoorsman who travels to the White Mountains virtually every week of the year to recreate.  The most efficient route to the White Mountains from Drewniak's home is I-93, and he often takes that route.  In light of these factual allegations—assumed to be true at the motion to dismiss stage[9]—the allegation in Drewniak's complaint that he "will continue trips through Woodstock on I-93" on a near-weekly basis is not analogous to the vague intent to travel "some day" that the Supreme Court rejected in Lujan.  See Alasaad v. Nielsen, No. 17-cv-11730-DJC, 2018 WL 2170323, at *10 (D. Mass. May 9, 2018) (concluding that plaintiffs' allegations of future travel were sufficient at the motion to dismiss stage even though "they omit specific plans or dates of future travel" where plaintiffs alleged "that they regularly travel" to the relevant location); see also Berner, 129 F.3d at 24-25 (concluding that the plaintiff— an attorney—had standing to seek to enjoin a judge's policy banning political pins in the courtroom because attorney regularly appeared before the judge).

---

[9] CBP and Garcia submit no evidence contesting the accuracy of Drewniak's allegations of future travel or the frequency with which he travels to the White Mountains.  The court therefore assumes these allegations to be true.  See Valentin, 254 F.3d at 364.

CBP and Garcia further contend that Drewniak has failed to establish a sufficient likelihood of future injury because they "currently have [no] plans for future temporary border checkpoints anywhere in New Hampshire." Doc. no. 20-1 at 12. In support of this contention, they submit a declaration prepared by Garcia in November 2020 in which he states that there are "no scheduled immigration checkpoints planned to occur in New Hampshire," and that "[t]he re-initiation of immigration checkpoints is contingent upon operational needs, manpower, and budgetary considerations."[10] Doc. no. 20-2 ¶ 12. For several reasons, this argument and the supporting declaration are not persuasive.

First, they fail to meaningfully contest Drewniak's allegation that CBP and Garcia have a policy or practice of conducting traffic checkpoints in New Hampshire. Courts have held that plaintiffs have standing to pursue injunctive or declaratory relief when the constitutional violations complained of stem from "a pattern of . . . behavior" or "an officially authorized policy." McBride v. Cahoone, 820 F. Supp. 2d 623, 634 (E.D. Pa. 2011) (collecting cases); see, e.g., Dudley v. Hannaford Bros. Co., 333 F.3d 299, 306 (1st Cir. 2003) (concluding that plaintiff had shown "a real and immediate threat of ongoing harm" where the "offending policy" which caused a prior injury "remains firmly in place"); see also LaDuke v. Nelson, 762 F.2d 1318, 1324 (9th Cir. 1985) ("The Supreme Court has repeatedly upheld the

---

[10] As previously noted, the court may consider this declaration in resolving the Rule 12(b)(1) motion without converting it into a motion for summary judgment. See González, 284 F.3d at 287-88.

appropriateness of federal injunctive relief to combat a 'pattern' of illicit law enforcement behavior."), amended on other grounds, 796 F.2d 309 (9th Cir. 1986). The rationale for permitting injunctive or declaratory relief to abate a pervasive practice or official policy is that, where a past injury is alleged to be due to the practice or policy, there is a substantial likelihood that the injury will recur. See, e.g., Charlotte E. ex rel. Deshawn E. v. Safir, 156 F.3d 340, 344-45 (2d Cir. 1998); Alasaad, 2018 WL 2170323, at *10 (concluding that plaintiffs had standing to seek injunctive relief because their "alleged future injury does not depend upon defendants' future illegal conduct untethered to a pattern of past practice . . . , but rather upon recurring conduct authorized by official policies" (citation omitted)); Dudley, 333 F.3d at 299. Here, Drewniak alleges that he was detained as a consequence of CBP and Garcia's pattern or practice of conducting traffic checkpoints in New Hampshire. And, if anything, Garcia's declaration supports the notion that Drewniak's detention resulted from an official practice or policy.

For example, it is undisputed that CBP and Garcia conducted at least ten checkpoints in New Hampshire between 2017 and 2019, many of which lasted for multiple days. The checkpoints' recurring nature supports the existence of an official practice or policy. See Floyd v. City of New York, 283 F.R.D. 153, 170 (S.D.N.Y. 2012). Furthermore, Garcia's declaration states that CBP uses traffic checkpoints "to carry out the U.S. Border Patrol's operational mission of immigration enforcement," and that such checkpoints "are strategically located" on New Hampshire's "interstate highways and roadways that serve as main

thoroughfares from the U.S.-Canadian border to major cities in the interior such as Boston and New York City" in order to "stop vehicles and individuals seeking to evade immigration law requirements traveling from the international land border." Doc. no. 20-2 ¶ 4.  Garcia's assertion of the checkpoints' strategic import in carrying out his agency's duties further supports the notion that the August 2017 checkpoint was erected pursuant to an official practice or policy.  See Ortega-Melendres v. Arpaio, 836 F. Supp. 2d 959, 979-80 (D. Ariz. 2011) (plaintiffs had standing to pursue injunctive relief where defendant sheriff's office claimed authority to engage in the complained-of practice in order "to investigate potential violations of the state [human] smuggling statute").

In addition, prior to "re-initiat[ing]" the use of traffic checkpoints in New Hampshire in 2017, CBP and Garcia prepared an "operation order" for such checkpoints which underwent "legal sufficiency review" by CBP counsel and which was ultimately approved by both local and national CBP management.  Doc. no. 20-2 ¶¶ 8-9.  The official approval of CBP and Garcia's "operational plan" to conduct traffic checkpoints in New Hampshire further supports Drewniak's theory of standing.  See Charlotte E., 156 F.3d at 345 (concluding that "there is a likelihood of recurring injury because the [challenged] activities are authorized by a written memorandum of understanding between the [city's counsel] and the Police Commissioner").

Finally, the court is not persuaded by Garcia's declaration that future checkpoints are unlikely or that CBP no longer has a policy to conduct checkpoints

in New Hampshire. Garcia states in his declaration only that no checkpoints are currently planned, and that the re-initiation of checkpoints depends on available resources. However, Garcia fails to explain the reason that no checkpoints are currently planned. He does not state that the agency has abandoned the use of checkpoints as an enforcement tool. Nor does he state that the agency lacks sufficient resources to conduct checkpoints; he merely states that erecting checkpoints requires resources. In other words, Garcia's declaration provides no explanation for the lack of currently scheduled checkpoints. Given the recent and recurring history of checkpoints on I-93 in New Hampshire, Garcia's acknowledgment of the checkpoints' importance to the agency in carrying out its duties, and the extensive planning and approval process that went into the 2017 re-initiation of checkpoints in New Hampshire, the court cannot conclude from the mere fact that no checkpoints are currently scheduled that additional checkpoints are unlikely.

Drewniak has sufficiently demonstrated standing at the pleading stage. He has plausibly alleged that he travels along I-93 in Woodstock on a frequent basis, and CBP and Garcia fail to persuasively contest Drewniak's allegation that they have a practice or policy of conducting checkpoints in that area. For these reasons, the court denies CBP and Garcia's motion to dismiss Count II of Drewniak's complaint (doc. no. 20).

34

## CONCLUSION

Qualter's motion to dismiss Count I of the complaint (doc. no. 19) is granted.

CBP and Garcia's motion to dismiss Count II of the complaint (doc. no. 20) is

denied.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

April 8, 2021

cc:  Counsel of Record.