## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| JESSE DREWNIAK, and | ) | |
| | ) | |
| SEBASTIAN FUENTES | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:20-cv-852-LM |
| | ) | |
| U.S. CUSTOMS AND BORDER PROTECTION, | ) | |
| | ) | **AMENDED COMPLAINT FOR** |
| U.S. BORDER PATROL, | ) | **DAMAGES AND INJUNCTIVE** |
| | ) | **RELIEF** |
| MARK A. QUALTER, | ) | |
| U.S. Border Patrol Agent[1], | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| ROBERT N. GARCIA, | ) | |
| Former Chief Patrol Agent of Swanton Sector of | ) | |
| U.S. Border Patrol, and | ) | |
| | ) | |
| RICHARD J. FORTUNATO, | ) | |
| Acting Chief Patrol Agent of Swanton Sector of | ) | |
| U.S. Border Patrol | ) | |

Defendants.

## INTRODUCTION

1.      This is a civil rights action seeking injunctive relief and damages as a result of the

illegal search and seizure of Plaintiff Jesse Drewniak and seizure of Plaintiff Sebastian Fuentes at

temporary interior checkpoints in Woodstock, New Hampshire by Defendants United States

Customs and Border Protection ("CBP"), United States Border Patrol ("Border Patrol"), Border

Patrol Agent Mark A. Qualter, and former Chief Patrol Agent of the Swanton Sector Robert N.

Garcia.  Plaintiffs' claim for prospective injunctive relief is also against Defendant Acting Chief

---

[1] Plaintiffs recognize that, on April 8, 2021, this Court dismissed Defendant Mark A. Qualter as a defendant, along with Count I brought under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  Plaintiffs have not removed this claim to ensure that they preserve any of their appellate rights concerning this dismissal.

Patrol Agent of the Swanton Sector Richard J. Fortunato.

2.      It is clearly established law that traffic checkpoints are unconstitutional when used for the primary purpose of general crime control. *City of Indianapolis v. Edmond*, 531 U.S. 32, 41-42 (2000). In violation of this principle, Border Patrol agents have routinely erected a temporary interior checkpoint in Woodstock—approximately 90 driving miles from the Canadian border—for the primary purpose of general crime control and drug interdiction.

3.      From August 25-27, 2017, Border Patrol agents, in collaboration with the Woodstock Police Department ("WPD"), stopped every single vehicle traveling southbound on I-93 and used drug-sniffing dogs to inspect each vehicle.  During this three-day checkpoint that caused lengthy traffic jams, Border Patrol stopped countless people without a warrant or reasonable suspicion of criminal activity.  Because of the checkpoint, 33 people who were lawfully in the United States were arrested or summonsed for state drug-related offenses. Of these 33 individuals, 31 were charged in state court with violation-level offenses for allegedly possessing small amounts of drugs for personal use (mostly marijuana or marijuana derivatives). No individual was summonsed or charged with unlawfully crossing the Canadian border.

4.      Plaintiff Jesse Drewniak is a United States citizen, a resident of New Hampshire, and one of the persons Defendants' unconstitutionally seized during this temporary interior checkpoint. On August 26, 2017, Mr. Drewniak was a passenger in a vehicle driving southbound on I-93 in Woodstock on his way home to Hudson from a fishing trip in the White Mountains. During this journey home, Border Patrol stopped and searched him as part of this checkpoint. Border Patrol agents illegally detained and searched Mr. Drewniak for almost an hour, searching inside the entirety of the vehicle, with Defendant Agent Mark Qualter, on information and belief, shouting in his face "WHERE'S THE FUCKING DOPE?" After detecting a small quantity of

hashish oil for a vaping device, Border Patrol agents turned Mr. Drewniak over to a WPD Sergeant who was assisting with the unconstitutional checkpoint. The Sergeant then charged Mr. Drewniak with the state law violation-level offense of unlawful possession of a prohibited substance. Border Patrol records indicate that the agent directly involved in this search and seizure was Defendant Mark A. Qualter. There were at least two additional Border Patrol agents involved in this search and seizure that Plaintiff Mr. Drewniak has not yet identified.

5.      The direct collaboration between Border Patrol and the WPD demonstrates how the primary purpose of this August 2017 checkpoint was drug interdiction in clear violation of *Edmond*. For example, in a *Union Leader* interview, WPD Chief Ryan Oleson acknowledged that Border Patrol has "a lot more leeway" to conduct a drug-sniffing-dog examination, whereas "he could not use a dog to search a car unless he has a suspicion of drug possession that he can articulate."[2]

6.      The 2nd Circuit (District Division) in Plymouth reviewed the charges against Mr. Drewniak and 15 others arising out of the August 2017 checkpoint, and suppressed all the evidence seized. *See McCarthy* Order *Ex. A*, *New Hampshire v. McCarthy*, Docket No. 469-2017-CR-01888 (2nd Cir. Dist. Div. Plymouth, Grafton, May 1, 2018). After hearing testimony from three Border Patrol agents, including Defendant Mark Qualter, Judge Thomas Rappa, Jr. found that Border Patrol used the checkpoint for the impermissible purpose of general crime control, not immigration enforcement. As Judge Rappa concluded, "while the stated purpose of the checkpoints … was screening for immigration violations[,] the primary purpose of the action was detection and seizure of drugs." *Id.* at *11-12. In other words, the August 2017 checkpoint was

---

[2] *See* Mark Hayward, *Border Patrol arrests 25 illegals at I-93 roadblock, seizes pounds of pot,* Union Leader (Aug. 29, 2017), https://www.unionleader.com/news/crime/us-border-patrol-arrests-25-illegals-at-i-93-roadblock-seizes-pounds-of-pot/article_b33260da-4ea6-59ad-a44d-6a9f0ba3ce4f.html.

pretextual where Border Patrol used the ruse of immigration enforcement to engage in general crime control in violation of *Edmond*.  Following this suppression, the State voluntarily dismissed all charges against Mr. Drewniak and the 15 other individuals.

7.     Because of the August 2017 checkpoint, Mr. Drewniak suffered harm from the invasion of his constitutional rights during this lengthy warrantless seizure, as well as economic harm during the period that a charge remained pending against him. He seeks compensatory and punitive damages against the Border Patrol agents involved in this seizure under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

8.     Additionally, there is a substantial risk that harm from the unconstitutional checkpoint will recur as to Mr. Drewniak. Mr. Drewniak frequently travels to the White Mountains each summer[3]—the time that Border Patrol has historically been the most active at the Woodstock checkpoint, stopping countless people each time.  Mr. Drewniak seeks declaratory and injunctive relief against CBP, Border Patrol, and the Chief Patrol Agent for the Swanton Sector to prevent them from further invasions of his rights in the future.

9.     Plaintiff Sebastian Fuentes is a United States citizen, a resident of New Hampshire, and another one of the persons Defendants' unconstitutionally seized during these temporary interior checkpoints.  Mr. Fuentes was first ensnared in the Woodstock checkpoint in the Fall of 2017—likely the August 2017 checkpoint—as he was traveling on I-93 South from his then place of employment at the Omni Mount Washington Resort in Bretton Woods, New Hampshire to his home in Thornton, New Hampshire—a town in the White Mountains that is directly south of Woodstock.  Mr. Fuentes was deeply troubled by his experience in this checkpoint, and he subsequently went through the Woodstock checkpoint when it was set up on August 21, 2018 and

---

[3] *See supra* note 21.

June 9, 2019 to chronicle by video his experience in these checkpoints, how they are conducted, and his objection to them.

10.     There is also a substantial risk that harm from these unconstitutional checkpoints will recur as to Mr. Fuentes.  Living one town away from Woodstock and just over five driving miles from where the checkpoint occurred, Mr. Fuentes drives in the precise location of the Woodstock checkpoints virtually every day, including when driving southbound on I-93 towards his home (i) from his current place of employment at the Mountain View Grand Resort and Spa in Whitefield, New Hampshire (at least five days a week), and (ii) from where his children live in the North Country of New Hampshire (Littleton) and the Northeast Kingdom of Vermont. Accordingly, Mr. Fuentes seeks declaratory and injunctive relief against CBP, Border Patrol, and the Chief Patrol Agent for the Swanton Sector to prevent them from further invasions of his rights in the future.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

12.     This complaint is for damages by Mr. Drewniak based upon civil rights violations committed by federal officials contrary to the Fourth Amendment to the United States Constitution. This case is brought against Border Patrol agents and supervisors pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and the Fourth Amendment to the United States Constitution. This case is also brought under the Declaratory Judgment Act, 28 U.S.C. § 2201, and seeks injunctive relief under Fed. R. Civ. P. 65.

13.     This Court has authority to award reasonable costs and attorney's fees pursuant to 28 U.S.C. § 2412.

14.     Venue is proper in the District of New Hampshire because a substantial part of the events complained of and giving rise to Plaintiffs' claims occurred in this District. *See* 28 U.S.C. §§ 1391(b), 1391(e), 1402(b).

## PARTIES

15.     Plaintiff Jesse Drewniak is a United States citizen currently residing in Hudson, New Hampshire.

16.     Plaintiff Sebastian Fuentes is a United States citizen currently residing in Thornton, New Hampshire—a town in which I-93 passes that is immediately south of Woodstock.

17.     Defendant CBP is the sub-agency of the U.S. Department of Homeland Security ("DHS"), and the parent agency of Defendant United States Border Patrol.  CBP is responsible for the initial processing and detention of noncitizens who are apprehended near the United States border, including at ports of entry.

18.     Defendant United States Border Patrol operates within CBP.  While CBP officers are stationed at ports of entry, Border Patrol agents are present along United States borders (between ports of entry) and in the interior of the United States.

19.     Defendant Mark A. Qualter, at all times relevant to this complaint, was a Border Patrol agent.  He is sued in his personal capacity. At all times relevant to this complaint, Defendant Qualter acted under color of law.  Agent Qualter searched and seized Plaintiff during the August 2017 checkpoint without a warrant or any reasonable suspicion of criminal activity.

20.     Defendant Robert N. Garcia was the Chief Border Patrol Agent for the Swanton Sector.  He was also the former Deputy Chief Border Patrol Agent of the Swanton Sector, serving in that role during the August 2017 checkpoint. The Swanton Sector covers (i) the entire State of Vermont, (ii) Clinton, Essex, Franklin, St. Lawrence, and Herkimer counties of New York, and

(iii) Coos, Grafton, and Carroll counties of New Hampshire. Mr. Garcia is sued in his official capacity. At all times relevant to this complaint, Mr. Garcia acted under color of law.

21.    Defendant Richard J. Fortunato is currently the Acting Chief Border Patrol Agent for the Swanton Sector.  Mr. Fortunato is sued in his official capacity. At all times relevant to this complaint, Mr. Fortunato acted or will act under color of law.

## FACTS

### I.    Border Patrol Checkpoints for the Primary Purpose of Drug Interdictions Violate Federal Law and the Fourth Amendment

22.    By statute, CBP and Border Patrol claim the authority to conduct stops and warrantless searches, including at traffic checkpoints, on vessels, trains, aircraft, or other vehicles anywhere within "a reasonable distance from any external boundary of the United States." *See* 8 U.S.C. § 1357(a)(3). A federal regulation defines a "reasonable distance" as "100 air miles from any external boundary of the United States."  *See* 8 C.F.R. § 287.1(a)(2).  An "external boundary" is defined as "the land boundaries and the territorial sea of the United States extending 12 nautical miles from the baselines of the United States determined in accordance with international law." 8 C.F.R. § 287.1(a)(1).

23.    Approximately two-thirds of the U.S. population live within this so-called 100-mile zone, which encompasses the entirety of the states of Connecticut, Delaware, Florida, Hawaii, Maine, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island, and Vermont.

24.    Although CBP and Border Patrol often assert sweeping authority, their actual power is circumscribed not only by the express terms of the statute, *see* 8 U.S.C. § 1357(a)(3), but also by the limitations of the Fourth Amendment to the United States Constitution.  Both prohibit warrantless searches for the purpose of general crime control in the interior of the United States.

25.     Under 8 U.S.C. § 1357(a)(3), a Border Patrol agent is authorized to conduct a search only "*for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States*[.]" (emphasis added).  This statute does not authorize Border Patrol agents to stop or search vehicles in the interior of the United States for the purposes of general crime control.  Nor does the statute authorize dragnet searches for other types of immigration violations.  Instead, the statutory authority is limited to "patrolling the border to prevent the illegal entry" of individuals into the United States. 8 U.S.C. § 1357(a)(3).

26.     Echoing established constitutional principles, federal regulations emphasize that immigration enforcement officials—including Border Patrol agents—must have a "reasonable suspicion, based upon specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an [individual] illegally in the United States" before a vehicle stop may be initiated.  *See* 8 C.F.R. § 287.8(b)(2).

27.     Fundamentally, warrantless and suspicionless stops at checkpoints for the general purpose of crime control violate the Fourth Amendment to the United States Constitution.  No act of Congress or agency regulation "can authorize a violation of the Constitution." *United States v. Brignoni–Ponce*, 422 U.S. 873, 877 (1975) (quoting *Almeida–Sanchez v. United States*, 413 U.S. 266, 272 (1973)).

28.     These suspicionless interior checkpoints are unconstitutional under the Fourth Amendment when used for the "general interest in crime control." *City of Indianapolis v. Edmond*, 531 U.S. 32, 41-42 (2000). Drug enforcement is the perfect example of general crime control, and checkpoints for the purpose of drug interdiction violate the Fourth Amendment. *Id.* As the Court explained in *Edmond*, "We cannot sanction stops justified only by the generalized

and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime." *Id.* at 44.

29.     The Supreme Court has also held that interior Border Patrol checkpoints are consistent with the Fourth Amendment only if (i) they are limited to a "brief detention of travelers" during which the vehicle's occupants are subjected to a "brief question or two" about their citizenship status, and (ii) Border Patrol can show that their effectiveness at minimizing illegal entry from the border outweighs the degree of intrusion on individual rights. *See, e.g.*, *United States v. Martinez-Fuerte*, 428 U.S. 543, 554, 558 (1976).  In other words, a checkpoint's reasonableness "still depends on a balancing of the competing interests at stake and the effectiveness of the program."  *Edmond*, 531 U.S at 47; *see also Jasinski v. Adams*, 781 F.2d 843, 849 (11th Cir. 1986) (per curiam) ("Plaintiff alleges that the checkpoint was merely a 'dragnet' to catch illegal aliens travelling in south Florida, regardless of their point of entry.  If true, these allegations could constitute an abuse of administrative discretion and might establish defendant Mongiello's liability.") (internal citations omitted).

30.     In determining the purpose of an interior Border Patrol checkpoint, courts consider record evidence regarding the effectiveness of the checkpoint with respect to its stated goal. For example, one of the permanent checkpoints at issue in *Martinez-Fuerte* led to the apprehension of some 17,000 undocumented individuals in 1973.  The same checkpoint yielded "725 deportable [individuals] in 171 vehicles" over an eight-day period.  *Martinez-Fuerte*, 428 U.S. at 554.  When evaluating the constitutionality of that permanent checkpoint, the Court credited these statistics as support for the effectiveness of that checkpoint in furthering its stated purpose of minimizing unlawful immigration from the border. *See id.*  Indeed, in *Martinez-Fuerte*, the Court focused on evidence that highways at issue there would provide undocumented individuals *who snuck across*

9

*the U.S./Mexico border* "a quick and safe route into the interior." *Id.* at 557. The "reasonableness" analysis in *Martinez-Fuerte* also includes consideration of the location, method of operation, and other logistics about the interior checkpoints, to assess the degree of intrusion on individuals. *See United States v. Soto-Zuniga*, 837 F.3d 992 (9th Cir. 2016).

31.     Significantly, *Martinez-Fuerte* did not hold that *all* interior Border Patrol checkpoints are *per se* constitutional. Rather, the Court expressly emphasized that its holding as to the permanent checkpoints at issue there was "limited to the type of stops described in this opinion." 428 U.S. at 567. Indeed, as explained below, the specific circumstances of the temporary interior Border Patrol checkpoint in Woodstock render it unconstitutional. Its effectiveness (if any) at minimizing illegal entry from the Canadian border has been (and is) outweighed by the degree of intrusion on the rights of people detained at the checkpoint without a warrant or any reasonable suspicion of criminal activity.

**II.     Border Patrol Traffic Checkpoints and the Enforcement of Domestic Drug Laws**

32.     CBP is the largest and best-funded law enforcement agency in the country. In 2017, CBP's budget was more than $13 billion, and the President's budget for 2020 would have increased that amount to $18.2 billion. For comparison, the operating budget for the largest police department in the country, the New York City Police Department, is slightly more than $5 billion, totaling almost $11 billion once expenses like pensions and fringe benefits are included.

33.     Over the years, Border Patrol has assumed an increasing role in drug law enforcement. (As recent events have demonstrated, CBP's activities have even exceeded drug and immigration enforcement.[4])

---

[4] In May 2020, CBP flew military-grade drones over protests in Minneapolis following the police murder of George Floyd. *See* Geneva Sands, *Customs and Border Protection Drone Flew Over Minneapolis to Provide Live Video to Law Enforcement*, CNN (May 29, 2020), https://www.cnn.com/2020/05/29/politics/cbp-drone-

34.     Border Patrol seizes a substantial amount of drugs at interior traffic checkpoints. In 2009, the Government Accounting Office ("GAO") found that "[c]heckpoints have contributed to the Border Patrol's ability to … seize illegal drugs," with drugs seized from checkpoints amounting to "over one-third of the Border Patrol's total drug seizures" at that time.

35.     Over the past eleven years, Border Patrol has continued to seize a large volume of drugs following encounters at interior checkpoints.  For example, from October 2019 to May 2020, the Border Patrol made the following drug seizures at checkpoints:

**Monthly U.S. Border Patrol Nationwide Checkpoint Drug Seizures**

Numbers below reflect FY20 To Date (TD) **May**.

*Fiscal Year 2020 runs October 01, 2019 - September 30, 2020.*

|           | Marijuana | Cocaine | Heroin | Methamphetamine | Fentanyl | Other |
|-----------|-----------|---------|--------|-----------------|----------|-------|
| October   | 2,431     | 462     | 22     | 2,313           | 35       | 109   |
| November  | 3,662     | 292     | 69     | 493             | 36       | 100   |
| December  | 3,066     | 177     | 21     | 383             | 6        | 4     |
| January   | 925       | 126     | 87     | 963             | 9        | 63    |
| February  | 3,351     | 156     | 11     | 815             | 14       | 2     |
| March     | 2,296     | 229     | 9      | 367             | 35       | 9     |
| April     | 2,057     | 119     | 3      | 756             | 32       | 264   |
| May       | 2,780     | 193     | 10     | 759             | 18       | 32    |
| June      |           |         |        |                 |          |       |
| July      |           |         |        |                 |          |       |
| August    |           |         |        |                 |          |       |
| September |           |         |        |                 |          |       |

*weights are in pounds (lb)

---

minneapolis/index.html.  The Department of Homeland Security also has deployed helicopters, airplanes, and drones over 15 cities where demonstrators gathered to protest the murder of George Floyd, logging at least 270 hours of surveillance according to CBP data.  *See* Zolan Kanno-Youngs, U.S. Watched George Floyd Protests in 15 Cities Using Aerial Surveillance, N.Y. Times (June 19, 2020), https://www.nytimes.com/2020/06/19/us/politics/george-floyd-protests-surveillance.html?smid=tw-share.  CBP also deployed agents to Washington D.C. amid the protests of the murder of George Floyd.[4]  Most recently, CBP agents have been stationed as federal paramilitary forces in Portland, Oregon to crack down on protestors, using "force and unmarked vehicles to transport arrested protesters." *See* Mark Hosenball, *U.S. Homeland Security Confirms Three Units Sent Paramilitary Officers to Portland*, Reuters (July 21, 2021), https://www.reuters.com/article/us-global-race-protests-agents/us-homeland-security-confirms-three-units-sent-paramilitary-officers-to-portland-idUSKCN24M2RL.

36.     Although CBP claims that interior checkpoints across the country are also for the purpose of detecting and apprehending undocumented individuals attempting to travel further into the interior of the United States after evading detection at the border, the agency does not publish any data on the number of such individuals detected at checkpoints across the country, including whether any of the individuals apprehended actually had crossed the border unlawfully.

37.     According to Border Patrol data nationwide (not limited to checkpoints), apprehensions in fiscal year 2019 in Border Patrol's "northern border sectors," including the Swanton sector, formed a small fraction of total apprehensions across the country.[5] Specifically, there were 4,408 apprehensions in the northern border sectors, approximately 0.5% of the total 859,501 apprehensions across the country. CBP provides no publicly available data on how many of those apprehensions arose from checkpoints, nor how many people apprehended at checkpoints had recently crossed the border.

38.     Border Patrol's northern border sectors, including the Swanton sector, are responsible for a much larger percentage of Border Patrol's drug seizures. In fiscal year 2019, for example, Border Patrol's northern border sectors were responsible for approximately 7% to 30% of drug apprehensions. Specifically, Border Patrol's northern border sectors made up approximately 7.5% of total marijuana seizures, 7% of cocaine seizures, 9% of heroin seizures, 30% of methamphetamine seizures, 4% of ecstasy seizures, and 12% of other seizures of drugs.

39.     Additionally, in at least some sectors along the northern border, there has been more outbound migration into Canada than there is inbound traffic in recent years, including in 2017. For example, public information shows that most of the traffic in the Houlton Sector (in Maine, neighboring the Swanton Sector) has "more outbound traffic occurrences" going into Canada "than

---

[5] The "northern border sectors" includes the Blaine, Buffalo, Detroit, Grand Forks, Havre, Houlton, Spokane, and Swanton Sectors.

illegal entries from Canada" during FY17—a trend that CBP projects will "likely increase" in the future.

### III.    Border Patrol Checkpoints in New Hampshire and Northern New England

40.    CBP and Border Patrol have a practice and custom of conducting unconstitutional Border Patrol checkpoints in northern New England.

41.    Indeed, in recent years, CBP has ramped up temporary interior Border Patrol checkpoints in northern New England, staging at least ten temporary checkpoints in the interior of New Hampshire from 2017 to the present. Unsurprisingly, these checkpoints have predominantly resulted in drug seizures, as well as intimidating and harassing drivers and passengers.

42.    For example, on two separate occasions from August 25-27, 2017 and September 26-28, 2017, Border Patrol instituted temporary interior checkpoints southbound on I-93 in Woodstock, New Hampshire. Woodstock is a small town (population 1,374) located in the White Mountains—a popular tourist attraction—that is approximately 90 driving miles from the Canadian border.

43.    During these August and September 2017 checkpoints, Border Patrol stopped vehicles and directed them to a primary checkpoint location where Border Patrol agents asked about passengers' citizenship. While these vehicles were stationary, Border Patrol agents— without any reasonable suspicion of criminal activity—used drug-detection dogs to perform "pre-primary free air sniffs" of the vehicles waiting to go through the primary checkpoint.  This tactic is unconstitutional under the New Hampshire Constitution.  *See State v. Pellicci*, 580 A.2d 710, 716 (N.H. 1990) (holding that a canine sniff is a search under the New Hampshire Constitution that requires a reasonable suspicion of criminal activity).  If a dog alerted to an odor that it is trained to detect, the K9-agent alerted the primary agent who then sent the vehicle to a secondary

checkpoint for further investigation.   Once in the secondary checkpoint, Border Patrol agents searched the vehicles.

44.     During the August 2017 checkpoint, if alleged contraband was found, Border Patrol surrendered it to the Woodstock Police Department, which was at the scene of the checkpoint.  The WPD then charged these individuals in state court for violating state drug laws.

45.     Similarly, during the September 2017 checkpoint, if alleged contraband was found, Border Patrol surrendered it to the New Hampshire State Police, which was at the scene of the checkpoint.  The State Police then charged these individuals in state court for violating state drug laws.

46.     Border Patrol knew from the outset that its primary purpose would be to catch people for drug offenses during these August and September 2017 checkpoints. This is why Border Patrol engaged the WPD and the State Police about the possibility of collaborating well before these checkpoints began. This is why Border Patrol asked the State Police via email as early as July 24, 2017 whether individuals caught with marijuana could be charged with a crime.[6]  This is why, during the August and September 2017 checkpoints, the WPD and State Police responded to calls from Border Patrol to charge individuals allegedly caught with drugs. This is why, during the August 2017 checkpoint, the WPD was on the scene to observe Border Patrol's use of dog-sniff searches (which, according to the WPD chief in an interview with the *Union Leader*, was "impressive to watch"[7]). This is why one Border Patrol official told the WPD police chief via email on August 28, 2017 that, "[w]ithout you folks [the WPD,] we [Border Patrol] would have

---

[6] Border Patrol specifically asked in this email in part: "When we do the checkpoint we will probably have some personal use seizures.  Our federal attorney will not prosecute that amount of marijuana.  Do your guys or local police in general still ticket for this type of thing?"

[7] *See* Mark Hayward, *Border Patrol arrests 25 illegals at I-93 roadblock, seizes pounds of pot,* Union Leader (Aug. 29, 2017), https://www.unionleader.com/news/crime/us-border-patrol-arrests-25-illegals-at-i-93-roadblock-seizes-pounds-of-pot/article_b33260da-4ea6-59ad-a44d-6a9f0ba3ce4f.html.

been hamstrung." And this is why, after the August 2017 checkpoint had come to a close, Border Patrol officials drafted I-44 forms (Reports of Apprehension or Seizure) for those allegedly caught with contraband and sent these forms to the WPD so the WPD could prosecute these individuals in state court. This collaboration was for no other purpose than to engage in drug interdiction.

47.     Further evidencing this collaboration, the WPD acknowledged in a press release issued after the August 2017 checkpoint "that for those traveling through our area over this past weekend traffic slowing and then having to stop to answer these questions might create a small delay," but insisted that "it is a necessary function to ensure the security of our Nation *and an opportunity to remove illegal narcotics from our communities*." (emphasis added).

48.     Because of the August 2017 checkpoint, 33 people who were lawfully in the United States were arrested or summonsed for state drug-related offenses by the WPD. Of these 33 individuals, 31 were charged with possessing small amounts of drugs for personal use (mostly marijuana or marijuana derivatives). All 31 were charged with violation-level offenses.[8] According to Border Patrol, only 25 individuals—including three children (two eleventh graders and a seventh grader)[9]—were detained during this checkpoint due to immigration-related issues. A majority of these individuals allegedly overstayed their visas, and none were detected using the drug-sniffing dogs. There is also no evidence that any of these individuals ever crossed the Canadian border. Indeed, in discussing the August 2017 checkpoint, Defendant Qualter and two other Border Patrol agents testified in court that they were unaware whether anyone stopped at the checkpoint had crossed the Canadian border. Border Patrol's press release publicizing the

---

[8] A 32nd person was charged with felony drug possession, but the State dismissed his case. The 33rd person was charged with running the checkpoint along with other drug charges.
[9] NHPR Staff, *Three Children Among 25 Undocumented Immigrants Detained at N.H. Highway Checkpoint*, NHPR (Aug. 30, 2017), https://www.nhpr.org/post/three-children-among-25-undocumented-immigrants-detained-nh-highway-checkpoint#stream/0.

apprehensions from the August 2017 checkpoint says nothing about the likely thousands of individuals who were needlessly detained because of the checkpoint.

49.     The September 2017 checkpoint was conducted in a fashion identical to the August 2017 checkpoint, but with the State Police at the scene to charge individuals with state drug offenses.  Eleven (11) people who were lawfully in the United States were arrested or summonsed for state drug-related offenses by the State Police.  One was charged with a violation-level offense and a class B misdemeanor.  Another was charged with a class B misdemeanor. The nine (9) other individuals were charged with violation-level offenses under New Hampshire's marijuana decriminalization law that went into effect on September 16, 2017. *See* RSA 318-B:2-c.  According to Border Patrol, only eight (8) individuals were detained for immigration-related reasons during this checkpoint.  None was detected using the drug-sniffing dogs. There is also no evidence that any of these individuals ever crossed the Canadian border. Once again, Border Patrol's press release publicizing these apprehensions says nothing about the likely thousands of individuals who were needlessly detained because of the checkpoint.

50.     In total, during the August and September 2017 checkpoints, 44 individuals who were in the United States lawfully were charged in state court with drug possession. Of these 44 individuals, 42—including the Plaintiff Jesse Drewniak—were charged with possessing small amounts of drugs for personal use (mostly marijuana or marijuana derivatives).  None of these 42 individuals was charged with an offense greater than a class B misdemeanor, and none was alleged to possess drugs with the intent to sell.

51.     Subsequently, Border Patrol conducted checkpoints at this Woodstock location on five separate occasions in 2018 (May 27-29 Memorial Day Weekend, June 15-17 Father's Day Weekend, August 21-23, and September 25-27) and 2019 (June 8-9 during Laconia Motorcycle

Week).  Border Patrol conducted these five checkpoints using canines in the same manner as they conducted the August and September 2017 checkpoints.[10]

52.     During the May 27-29, 2018 Memorial Day Weekend checkpoint, Border Patrol reported arresting 17 allegedly undocumented individuals, six of whom were visa overstays (though, again, it did not report the thousands of other individuals it detained without a warrant or reasonable suspicion).  Border Patrol also reported seizing "drugs and drug paraphernalia including a small amount of marijuana, hash oil and THC vape oil."  Two of the 17 immigrants arrested by Border Patrol came to the United States over 19 years ago from South Korea and were in New Hampshire on vacation with their 23-year-old daughter who was a recipient of the Deferred Action for Childhood Arrivals Program ("DACA").[11]

53.     During the June 15-17, 2018 Father's Day Weekend checkpoint, Border Patrol reported arresting five undocumented individuals (though, again, it did not report the thousands of other individuals it detained without a warrant or reasonable suspicion).  Border Patrol also reported seizing "drugs including marijuana, marijuana edibles and THC vape oil."

54.     As to the August 21-23, 2018, September 25-27, 2018, and June 8-9, 2019 checkpoints in Woodstock, Border Patrol did not issue a press release concerning the results, which suggests that it apprehended no undocumented persons, while needlessly detaining likely hundreds of individuals.  Indeed, at least one media outlet reported that the June 8-9, 2019 checkpoint—

---

[10] From September 3-6, 2019, Border Patrol also set up a checkpoint on Interstate 89 in Lebanon, near Dartmouth College—a location nearly 100 miles from the Canadian border.  Further, Border Patrol held two one-day checkpoints in Columbia, New Hampshire on April 7, 2019 and May 27, 2019.

[11] Robert Garrova, *Family Vacationing In N.H. Reeling After Arrest At Checkpoint 90 Miles From The Border*, NHPR (Jul. 6, 2018), https://www.nhpr.org/post/family-vacationing-nh-reeling-after-arrest-checkpoint-90-miles-border#stream/0.

which Border Patrol conducted during Laconia Motorcycle Week—yielded no immigration arrests.[12]

55.     Similarly, a recent checkpoint in Maine led to only one immigration arrest for a Haitian man who had been living in the United States for more than a decade—as well as "10 drug seizures."[13] Likewise, a recent checkpoint in Vermont yielded "two narcotics seizures, but no arrests," leading some to believe that the searches were intended in part to "assist local law enforcement in efforts to curb drug trafficking."[14]

56.     Indeed, members of Congress from Vermont, New Hampshire, and Maine sent a letter to CBP on November 13, 2019 noting "the lack of arrests from the random stops" in those states, and questioning whether those results justify "the harmful economic impact" from border checkpoints.[15]

57.     The November 13, 2019 letter shows that unnecessary checkpoints continue in New Hampshire and other New England states. For example, the lawmakers mentioned the June 2019 checkpoint "along I-93 near Woodstock, NH that news reports indicate resulted in no arrests but caused severe traffic problems during the beginning of Laconia Motorcycle Week in New

---

[12] Alyssa Dandrea, *Immigration checkpoint on I-93 nets no arrests but draws concern*, Concord Monitor (June 11, 2019, 2:16 PM), https://www.concordmonitor.com/Border-patrol-checkpoint-immigration-Woodstock-NH-26181887.
[13] Callie Ferguson & Alex Acquisto, *Border patrol agents arrest 1 at I-95 checkpoint about citizenship*, Bangor Daily News, (June 21, 2018), https://bangordailynews.com/2018/06/21/news/border-patrol-agents-question-drivers-at-i-95-checkpoint-about-citizenship/; *see also Border Patrol Agents Arrest 2 at Immigration Checkpoint on Interstate 95*, Bangor Daily News (Aug. 16, 2019), https://bangordailynews.com/2019/08/16/news/aroostook/border-patrol-agents-arrest-2-at-immigration-checkpoint/ (arresting two Mexican nationals, one who "entered . . . illegally, more than 20 years ago" and the other who violated his work visa by leaving a prior job).
[14] Xander Landen, *Vermonters Question Ramped Up Border Security*, VTDigger (Sept. 15, 2019), https://vtdigger.org/2019/09/15/ramped-up-border-patrol-checkpoints-divide-vermonters/.
[15] Associated Press, *New England Lawmakers Question Border Patrol Checkpoints Far from the Border*, Portland Press Herald (Nov. 15, 2019), https://www.pressherald.com/2019/11/15/new-england-lawmakers-question-border-patrol-checkpoints-far-from-the-border/; *see also* Associated Press, *Politicians Seek Info on Interior New England Border Checks*, U.S. News & World Rep. (Nov. 14, 2019), https://www.usnews.com/news/best-states/maine/articles/2019-11-14/politicians-seek-info-on-interior-new-england-border-checks; Letter from Jeanne Shaheen et al., U.S. Sen., to Mark Morgan, Acting Comm'r U.S. Customs & Border Prot. (Nov. 13, 2029), https://www.shaheen.senate.gov/imo/media/doc/2019-11-13%20Letter%20to%20CBP%20-%20Border%20Patrol%20in%20Northern%20New%20England%20(002).pdf.

Hampshire."[16] As another example in Vermont, "Border Patrol conducted four checkpoints since [summer 2018] . . . which resulted in approximately 4,200 stopped cars but only one [immigration-related] arrest – for a visa overstay."[17]

58.     Border Patrol has continued interior checkpoints in New England states despite the ongoing dangers of the COVID-19 pandemic.   On July 21-23, 2020, Border Patrol officers performed an interior checkpoint in Sherman, Maine, approximately 40 driving miles from the Canadian border, stopping hundreds of cars on the highway without providing any legitimate justification for doing so.

59.     In contrast to the minimal numbers of apprehensions at checkpoints in New England, CBP's records show a significant interest in drug interdiction in the New England states. CBP's training records regarding border checkpoints suggest a focus on drug offenses, including training regarding fentanyl, oxycodone, and marijuana.

60.     As with operations elsewhere in the country, CBP's operations along the northern border are plagued with concerns of racial profiling and unfair and excessive enforcement practices. For example, CBP arrested two citizens in Montana just for speaking Spanish. Complaints about Border Patrol checkpoints, including in New Hampshire, "range from allegations of 'unnecessary delays, harassment and sometimes abuse' to allegations of 'unconstitutional searches and seizures, excessive use of force, racial profiling, and other agent misconduct.'"[18]

---

[16] Letter from Jeanne Shaheen, *supra* note 15, at 1.

[17] *Id.*

[18] Jesus A. Osete, *The Praetorians: An Analysis of U.S. Border Patrol Checkpoints following* Martinez-Fuerte, 93 Wash. U. L. Rev. 803, 806 (2016) (internal citations omitted); *see also* Fernanda Santos, *Border Patrol Accused of Profiling and Abuse*, N.Y. Times, (Oct. 14, 2015), https://www.nytimes.com/2015/10/15/us/aclu-accuses-border-patrol-of-underreporting-civil-rights-complaints.html; Kathleen Masterson, *Broad Jurisdiction of U.S. Border Patrol Raises Concerns about Racial Profiling*, WBUR (Oct. 11, 2017), https://www.wbur.org/news/2017/10/11/border-patrol-stops-profiling.

**IV.    Border Patrol Subjected Mr. Drewniak to an Unconstitutional Checkpoint for the Primary Purpose of Drug Interdiction**

61.    Mr. Drewniak is currently 41 years old, and lives with his wife and youngest stepson in Hudson, New Hampshire.  He is a citizen of the United States and has never left the country (with the exception of going to the Bahamas once when he was 8-years-old).

62.    At around noon on August 26, 2017, after a fly-fishing trip with friends in the White Mountains on Profile Lake (near the former Old Man of the Mountain on Cannon Mountain), Mr. Drewniak was a passenger in a vehicle driving southbound on I-93 in the Town of Woodstock, New Hampshire.  During his journey home, he approached a temporary interior checkpoint set up by Border Patrol. He was accompanied by two friends, who had joined him on the fishing trip.

63.    This specific Border Patrol checkpoint was located approximately 90 driving miles from the U.S./Canadian border.

64.    Mr. Drewniak had no advanced notice of the checkpoint and had no opportunity to exit the highway to avoid the checkpoint.

65.    As Mr. Drewniak's vehicle drove down I-93, he saw a sign notifying motorists of "federal agents" ahead and a snarl of traffic ahead on the highway.  Mr. Drewniak's vehicle was among many vehicles that Border Patrol stopped at the checkpoint, causing traffic to slow.

66.    After several minutes of inching forward in heavy traffic, Mr. Drewniak's vehicle approached Border Patrol agents wearing green.  Two of the agents had machine guns.  As Mr. Drewniak's vehicle entered the checkpoint—and as traffic was backed up—one of the Border Patrol agents said "immigration checkpoint, have your license ready."

67.    The Border Patrol agents at the checkpoint—which included Defendant Agent Qualter—had no individualized suspicion to stop Mr. Drewniak at this interior checkpoint.

68.     The agents were accompanied by drug-sniffing dogs for the purpose of enforcing federal and state drug laws.

69.     At the checkpoint, Border Patrol Agent Qualter used trained search dogs to conduct "pre-primary canine free air sniffs" of the vehicles waiting at the checkpoint.  The dogs have training to alert to odors of some controlled substances.

70.     If the dog alerted on a vehicle in this preliminary inspection, the vehicle would be diverted to a secondary inspection area.

71.     As Mr. Drewniak's vehicle approached the checkpoint, the Border Patrol agents asked the driver of the vehicle in which Mr. Drewniak was a passenger, through the driver's window, whether the driver was a United States citizen.  The driver said "yes."  Mr. Drewniak and the other passenger answered "yes" as well, as they believed that the agents were asking all the individuals in the vehicle for citizenship information. Consistent with what they were previously told, all three occupants of the vehicle showed their driver's licenses, which an agent looked at through the window.  Despite the occupants' prompt confirmation of their citizenship—thus dispelling any notion that Mr. Drewniak and the other occupants were undocumented—the Border Patrol agents continued to prolong their detention.

72.     At or around the time of this interaction, one Border Patrol agent was circling the car with a dog.

73.     As the dog circled the car, the agent with the dog gave a signal to the agent near the driver's window.  The agent near the driver's window then pointed to the secondary inspection area and told the driver of Mr. Drewniak's vehicle to go there.  As a result, Mr. Drewniak's vehicle was diverted to a secondary inspection area in the highway median for further investigation.

74.     Once parked at the median, agents opened the doors of the vehicle.  On information and belief, Defendant Agent Qualter opened the driver's side door.  One of the agents told the other passenger to exit the vehicle.  Because Border Patrol agents opened both doors, Mr. Drewniak took this to mean that all occupants of the vehicle should exit.  Mr. Drewniak and his friends complied and exited the vehicle.

75.     For approximately 15 minutes, Mr. Drewniak and his friends stood outside their vehicle while Agent Qualter conducted a secondary inspection with his dog "Marian."

76.     During this inspection, Agent Qualter circled the vehicle numerous times with his dog, and opened the trunk and passenger doors of the vehicle to allow the dog to sniff both in and around the car more thoroughly. Agent Qualter also had a machine gun in his hand while this inspection occurred.

77.     After the dog jumped in the trunk but failed to alert to any odor it was trained to detect, Agent Qualter had his dog enter the vehicle (the doors had already been opened) to sniff the front seat and back seats to perform a lengthy and invasive search of the entire vehicle.  The dog jumped into the vehicle, including on the center console.

78.     Despite this invasive search, and on information and belief, the dog did not provide another alert to any odor.  This process took approximately 15 minutes, and Agent Qualter and his dog circled the vehicle again at least six or seven times.

79.     Seemingly without an alert from the dog, Border Patrol Agent Qualter, on information and belief, yelled at Mr. Drewniak "WHERE'S THE FUCKING DOPE?"

80.     After Agent Qualter shouted in his face in a threatening manner, Mr. Drewniak said that there was a small amount of marijuana in the center console of the vehicle.  Agent Qualter yelled at Mr. Drewniak, "GET IT FOR ME!"  Mr. Drewniak then went into his vehicle and

removed a small quantity of hash oil in a tupperware container from the center console.  He then gave it to Agent Qualter.

81.     Agent Qualter seized the oil and went into a mobile trailer at the scene for approximately five minutes, presumably to test the substance.  Agent Qualter then exited the trailer.  Presumably because the test concluded that this was hashish oil, and not a more serious substance, Agent Qualter then immediately provided the substance to Sergeant Millar of the Woodstock Police Department who was standing nearby.

82.     Sergeant Millar issued Mr. Drewniak a citation for Acts Prohibited, *see* RSA 318-B:2, requiring him to attend court on October 23, 2017.

83.     When Sergeant Millar was writing out the citation to Mr. Drewniak, Sergeant Millar asked Mr. Drewniak to "write out" the citation and complete the "Uniform Statement Form" because Sergeant Millar's hand hurt from writing so many citations.

84.     Mr. Drewniak was subsequently released, and then waited approximately 20 minutes more to get back to the highway due to Border Patrol agents blocking their way.

85.     From the moment Mr. Drewniak was first stuck in checkpoint traffic, to the moment when he was able to continue on his drive home, approximately one hour had elapsed during which Mr. Drewniak was unlawfully detained at the Border Patrol checkpoint.

86.     Forty-two (42) individuals, including Mr. Drewniak, were charged in state court with possession of small amounts of controlled substances—mostly marijuana or marijuana derivatives—during the August 2017 and September 2017 Border Patrol checkpoints.

87.     Sixteen (16) people, including Mr. Drewniak, challenged the charges arising out of the August 2017 checkpoint and moved to suppress all evidence seized because the checkpoint

violated the Fourth Amendment to the United States Constitution and Part I, Article 19 of the New Hampshire Constitution.[19]

88.     Judge Thomas A. Rappa of the 2nd Circuit (District Division) in Plymouth held a suppression hearing on January 11, 2018.  At the hearing—in an effort to show that the purpose of the immigration checkpoints was not drug interdiction—Border Patrol agents testified that the purpose of the dogs used at the checkpoints was "to detect concealed humans within vehicles." Border Patrol's argument was a ruse designed to conceal that the obvious purpose of the dogs was to detect for drugs.  This was made clear at the suppression hearing where Defendant Agent Qualter admitted that Border Patrol found no concealed humans during the August 2017 checkpoint and that his dog had _never_ detected a concealed human throughout his years of service as a Border Patrol agent.  Out of desperation, the State of New Hampshire also attempted to argue at the suppression hearing that the WPD was at the scene, not for the purpose of drugs, but because other functions may need to be performed, like, for example, treating someone "who has a heart attack" at the checkpoint or "if there's a child that needs to be delivered."

## V.     The New Hampshire Circuit Court Finds the August 2017 Checkpoint Unconstitutional

89.     On May 1, 2018, Judge Rappa found that the evidence seized during this August 2017 checkpoint was in violation of the United States and New Hampshire Constitutions and therefore granted a Consolidated Motion to Suppress any evidence seized during this checkpoint. *See McCarthy* Order *Ex. A*.

90.     The Court evaluated the results and logistics of this purported "immigration" checkpoint in New Hampshire, finding that its primary purpose was, instead, detection and seizure

---

[19] Two additional defendants were slated to challenge the September 2017 checkpoint in a suppression motion, but the State nolle prossed these charges.  *See McCarthy* Order *Ex. A*, at *1 n.2.

of drugs. *Id.* at 11-12. Specifically, "the number of arrests for drug charges" arising from the checkpoint "far outnumbered the arrests for immigration violations," and "there was no evidence that any of the individuals arrested for immigration violations had crossed the Canadian border." *Id.* at 11. These facts, plus Border Patrol's overtures "to the State and local agencies for assistance," supported the conclusion that "the primary purpose of the action was detection and seizure of drugs"—making the checkpoints "unconstitutional under both State and federal law." *Id.* at 12.

91.     The Court also held that the search was unconstitutional for the independent reason that the New Hampshire Constitution prohibits the use of suspicionless dog sniffs. *See id.* at 5. Specifically, the New Hampshire Supreme Court has previously held that "[e]mploying a trained canine to sniff a person's private vehicle in order to determine whether controlled substances are concealed inside is certainly a search in these terms." *Id.* at 6 (quoting *State v. Pellicci*, 580 A.2d 710 (N.H. 1990)). Under this rule, the checkpoint's use of dog sniffs without any individualized suspicion violated the New Hampshire Constitution, thereby preventing this evidence from being used in a New Hampshire criminal proceeding. *See id.* at 5-10.

92.     Notably, added to this concern with dog sniffs is that abuses at Border Patrol checkpoints involving service canines are both common and rarely investigated. These include dozens of troubling accounts of service canines falsely alerting at vehicle checkpoints, resulting in prolonged detention and searches of innocent travelers.[20] *See also id.* at 12 (noting that CBP testimony "revealed that there were numerous, 'non-productive alerts,' by the dogs at the checkpoints which extended the duration of the stops for those individuals but resulted in no evidence of a crime being found").

---

[20] *See* ACLU Nat'l Pol. Advocacy Dep't, *From the Border to Disasters and Beyond: Critical Canine Contributions to the DHS Mission*, ACLU 3 (May 18, 2017), https://www.aclu.org/sites/default/files/field_document/2017-05-18_aclu_statement_house_homeland_security_hearing_critical_canine_contributions_to_the_dhs_mission.pdf.

93.     Accordingly, in light of the violations of both the United States and New Hampshire Constitutions, the Court granted the Defendants' motion to suppress any drugs or drug paraphernalia seized as part of the August 2017 checkpoint.

94.     The Circuit Court denied the State's Motion for Reconsideration on August 21, 2018.  *See McCarthy* Order *Ex. B*, *New Hampshire v. McCarthy*, Docket No. 469-2017-CR-01888 (2nd Cir. Dist. Div. Plymouth, Grafton, Aug. 21, 2018).

95.     In September 2018, the State voluntarily dismissed the charges against Mr. Drewniak and the 15 other defendants after the Attorney General's Office declined to appeal the decision to the New Hampshire Supreme Court.

## VI.     Harms to Mr. Drewniak from the Checkpoint

96.     The August 2017 checkpoint harmed Mr. Drewniak by invading his right to privacy and right to freedom of movement.

97.     The unconstitutional search and seizure by federal agents also caused Mr. Drewniak emotional and financial harm.  Mr. Drewniak has a close family member who has taught him to respect law enforcement.  However, this experience has caused Mr. Drewniak to experience anxiety and fear when dealing with law enforcement and when thinking about this incident (which he thinks about every day).

98.     The entire experience of the August 2017 checkpoint, including having an armed Border Patrol agent shout in his face, was traumatizing and caused stress and emotional distress, making it difficult for him to even sleep.

99.     The stress from the checkpoint and the pending charge also put a toll on Mr. Drewniak's family life, his health, and his work.

100.    Mr. Drewniak also suffered financial harm. In August 2017, Mr. Drewniak was working in food services and aspired to start his own restaurant. However, the pending charge delayed Mr. Drewniak's efforts to start his new business because he was worried that the charge may affect his ability to get necessary loans and other approvals (including licensing) to start the restaurant.

101.    There is a substantial risk that Mr. Drewniak will be harmed in a similar way in the future. Mr. Drewniak regularly travels through Woodstock to the White Mountains. He is not just an occasional visitor to the White Mountains. As an avid fly fisherman, Mr. Drewniak will travel to the White Mountains at least 50 times to fish, forage, hike, and swim during fishing season (from approximately March to November). During ice fishing season (approximately December to February), he will also travel to the White Mountains and Lake Winnipesaukee approximately 10 times to enjoy outdoor recreation. Below are several photographs documenting Mr. Drewniak's trip on the day he was ensnared in the checkpoint on August 26, 2017:[21]

---

[21] These allegations were accurate as of the filing of the original complaint on August 11, 2020. However, as of today's date in light of COVID-19, additional work responsibilities, and a family medical emergency, Plaintiff Mr. Drewniak travels to the White Mountains with less frequency than he once did or anticipated would be the case when this case was first filed. While the future is beyond prediction, Drewniak ideally intends to resume his prior frequent transit to the North Country once his life's circumstances again allow.




102.    The most efficient route by far between the White Mountains and Mr. Drewniak's home in Hudson is southbound on I-93, where Border Patrol checkpoints regularly occur. Avoiding I-93 South adds approximately 45 minutes to the trip. Because of his experience with the Border Patrol checkpoint and resulting trauma, Mr. Drewniak often avoids I-93 South when driving home. However, there are several occasions each year when it is not feasible for Mr. Drewniak to take the additional 45-minutes on his drive home, and, on these occasions, Drewniak drives home on  I-93 South, where Border Patrol checkpoints regularly occur, placing him at imminent risk of encountering another unconstitutional Border Patrol checkpoint.[22]

---

[22] *See supra* note 21.

103.    Border Patrol checkpoints are particularly common in the summer, the same time that Mr. Drewniak most frequently travels to the White Mountains. Consistent with the numerous checkpoint procedures described above, Border Patrol has stated that "it plans on using more checkpoints in northern New England in the future."[23] CBP has provided no guarantee that it will cease these unconstitutional operations, undertaken primarily to enforce state and federal drug laws. Indeed, even after the New Hampshire court ruled the August 2017 checkpoint unconstitutional, Border Patrol has continued to use the Woodstock temporary checkpoint for the purpose of drug interdiction. *See supra* ¶¶ 51-54.

104.    In other words, Mr. Drewniak will continue trips through Woodstock on I-93 in the future during popular travel summer weekends, and Border Patrol likely will continue to conduct temporary checkpoints in this area in the future during these times. Accordingly, there is an imminent threat that Mr. Drewniak will be subjected to such checkpoints again in the future.

## VII.    Sebastian Fuentes's Experience

105.    Plaintiff Sebastian Fuentes has similarly been harmed by these checkpoints.

106.    Mr. Fuentes came to the United States in 2001 from Peru to work in the hope of pursuing the American dream.  He arrived in the United States with a backpack and only $300, and he began working at the Omni Mount Washington Resort in Bretton Woods, New Hampshire. He was granted Unites States citizenship on July 4, 2016. Mr. Fuentes is married and has four biological children, and one step-child.

107.    Mr. Fuentes was first ensnared in the Woodstock checkpoint during the Fall of 2017—likely in August—as he was traveling on I-93 South from his then place of employment at

---

[23] Masterson, *supra* note 18.

the Omni Mount Washington Resort to his home in Thornton, New Hampshire—a town in the White Mountains that is directly south of Woodstock.

108.    Mr. Fuentes was deeply troubled by his experience in this checkpoint, and he subsequently went through the Woodstock checkpoint when it was set up on August 21, 2018 and June 9, 2019 to chronicle by video his experience in these checkpoints, how they are conducted, and his objection to them.

109.    These checkpoints harmed Mr. Fuentes by invading his right to freedom of movement.

110.    There is a substantial risk that Mr. Fuentes will be harmed in a similar way in the future.  Living one town south of Woodstock and just over five driving miles from where the checkpoint occurred, Mr. Fuentes drives in the precise location of the Woodstock checkpoints virtually every day, including when driving southbound on I-93 towards his home (i) from his current place of employment at the Mountain View Grand Resort and Spa in Whitefield, New Hampshire (at least five days a week), and (ii) from where his children live in the North Country of New Hampshire (Littleton) and the Northeast Kingdom of Vermont.  As Border Patrol likely will continue to conduct temporary checkpoints in this area in the future at this location, there is an imminent threat that Mr. Fuentes will be subjected to such checkpoints again in the future.

## CAUSES OF ACTION

### COUNT ONE – FOURTH AMENDMENT
*Plaintiff Jesse Drewniak Against Defendant Border Patrol Agent Mark A. Qualter (individual capacity)*
*(BIVENS)*

111.    The foregoing allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

112.    The Fourth Amendment to the U.S. Constitution prohibits "unreasonable searches and seizures."

113.    It is clearly established law that a warrantless checkpoint for the primary purpose of drug interdiction violates the Fourth Amendment.  *See City of Indianapolis v. Edmond*, 531 U.S. 32, 41-42 (2000); *see also* 8 U.S.C. § 1357(a)(3) (limiting authority to conduct stops and warrantless searches, including at traffic checkpoints, on vessels, trains, aircraft, or other vehicles anywhere within "a reasonable distance from any external boundary of the United States" only "*for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States*") (emphasis added).

114.    In violation of this clearly established law, Defendant Border Patrol Agent Mark A. Qualter erected a warrantless checkpoint in August 2017 for the primary purpose of drug interdiction, and searched and seized Mr. Drewniak as part of this unconstitutional checkpoint, causing him harm.

115.    Defendant Qualter acted with a malicious intention to deprive Mr. Drewniak of his rights or to do him injury.  *See Carlson v. Green*, 446 U.S. 14, 22 (1980) ("punitive damages may be awarded in a *Bivens* suit").[24]

## COUNT TWO – INJUNCTIVE AND DECLARATORY RELIEF (28 U.S.C. § 2201)
***All Plaintiffs Against Defendants United States Customs and Border Protection, United States Border Patrol, Chief Robert N. Garcia, and Acting Chief Richard J. Fortunato (official capacity)***

116.    The foregoing allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

117.    Plaintiffs are entitled to declaratory and injunctive relief.  CBP and Border Patrol have a practice and/or custom of conducting unconstitutional Border Patrol checkpoints in

---

[24] *See supra* note 1.

northern New England, including in Woodstock, New Hampshire approximately 90 driving miles from the Canadian border.

118.    A ripe and justiciable controversy exists with regard to the circumstances and legality of Plaintiffs' detention.

119.    As a result, Plaintiffs are entitled to a declaration in their favor pursuant to 28 U.S.C. § 2201 that the August 2017 Border Patrol checkpoint and other checkpoints in which they were detained violated the Fourth Amendment for two independent reasons—namely, the checkpoints (i) were for the purpose of drug interdiction, and (ii) unreasonably seized Plaintiffs without a warrant or reasonable suspicion because the checkpoints' effectiveness (if any) at minimizing illegal entry from the border was outweighed by the degree of intrusion on their individual rights.

120.    Plaintiffs are also entitled to two separate injunctions that reflect the two independent Fourth Amendment violations presented by these checkpoints.

121.    First, this Court must preliminarily and permanently enjoin CBP, Border Patrol, former Chief Border Patrol Agent Robert N. Garcia, and Acting Chief Border Patrol Agent Richard J. Fortunato from operating additional unconstitutional Border Patrol checkpoints in New Hampshire for the purpose of drug interdiction.  *See Edmond*, 531 U.S. at 41-42; 8 U.S.C. § 1357(a)(3) (limiting authority to conduct stops and warrantless searches, including at traffic checkpoints, on vessels, trains, aircraft, or other vehicles anywhere within "a reasonable distance from any external boundary of the United States" only "*for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States*") (emphasis added).

122.    Second, this Court must preliminarily and permanently enjoin CBP, Border Patrol, former Chief Garcia, and Acting Chief Fortunato from operating additional unconstitutional

Border Patrol checkpoints on I-93 in Woodstock, New Hampshire that seize individuals without a warrant or reasonable suspicion.  The facts of these individual checkpoints indicate that their purported effectiveness (if any) at minimizing illegal entries from the Canadian border is outweighed by the degree of intrusion on individual rights. *See, e.g.*, *Martinez-Fuerte*, 428 U.S. at 554, 558.  For example, during the course of the Woodstock checkpoint from 2017 to 2019, Border Patrol has uncovered only a relatively small number of undocumented individuals (none of whom have been identified as crossing the Canadian border), while it has detained thousands of individuals without a warrant or reasonable suspicion of criminal activity.

123.    Because of this practice and/or custom, Mr. Drewniak and Mr. Fuentes have suffered and will continue to suffer irreparable harm—namely being deprived of their Fourth Amendment rights.

124.    Unless restrained from doing so, CBP and Border Patrol will continue to violate the Fourth Amendment by enforcing this practice and/or custom of conducting Border Patrol checkpoints in New Hampshire that seize individuals without a warrant or reasonable suspicion. There is a substantial risk that harm from the unconstitutional checkpoint will recur.

125.    The harm to Plaintiffs would outweigh the harm CBP and Border Patrol would suffer from the imposition of an injunction.

126.    The public interest would not be adversely affected by an injunction.

## JURY DEMAND

127.    Plaintiffs demand a trial by jury in this action on any claim triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief as follows:

A.      Per Count I, grant compensatory and punitive damages in Plaintiff Jesse Drewniak's favor against Defendant Mark A. Qualter in an amount to be proven at trial[25];

B.      Per Count II, declare that the August 2017 Border Patrol checkpoint and other checkpoints in which Plaintiffs were detained violated the Fourth Amendment to the United States Constitution because they (i) were for the purpose of drug interdiction, and (ii) unreasonably seized Plaintiffs without a warrant or reasonable suspicion because its effectiveness (if any) at minimizing illegal entry from the Canadian border was outweighed by the degree of intrusion on his individual rights;

C.      Per Count II, preliminarily and permanently enjoin CBP, Border Patrol, former Chief Border Patrol Agent Robert N. Garcia, and Acting Chief Border Patrol Agent Richard J. Fortunato from operating unconstitutional Border Patrol checkpoints in New Hampshire for the purpose of drug interdiction;

D.      Per Count II, preliminarily and permanently enjoin CBP, Border Patrol, former Chief Border Patrol Agent Robert N. Garcia, and Acting Chief Border Agent Richard J. Fortunato from operating unconstitutional Border Patrol checkpoints on I-93 in Woodstock, New Hampshire that seize individuals without a warrant or reasonable suspicion because their purported effectiveness (if any) at minimizing illegal entry from the Canadian border is outweighed by the degree of intrusion on individual rights;

E.      Award reasonable costs and attorneys' fees; and

F.      Award such other relief as the Court deems just and equitable.

---

[25] *See supra* note 1.

Respectfully submitted,

Jesse Drewniak and Sebastian Fuentes,

By and through their attorneys affiliated with the
American Civil Liberties Union of New Hampshire
Foundation, the American Civil Liberties Union of Maine
Foundation, and the ACLU Foundation of Vermont,


*/s/ Gilles Bissonnette*
Gilles R. Bissonnette (N.H. Bar. No. 265393)
SangYeob Kim (N.H. Bar No. 266657)
Henry R. Klementowicz (N.H. Bar No. 21177)
American Civil Liberties Union of New Hampshire
18 Low Avenue
Concord, NH  03301
Tel.  603.224.5591
gilles@aclu-nh.org
sangyeob@aclu-nh.org
henry@aclu-nh.org

*/s/ Zachary L. Heiden*
Zachary L. Heiden*
American Civil Liberties Union of Maine Foundation
P.O. Box 7860
Portland, Maine 04112
Tel. 207.619.6224
heiden@aclumaine.org

*/s/ Emma E. Bond*
Emma E. Bond*
American Civil Liberties Union of Maine Foundation
P.O. Box 7860
Portland, Maine 04112
Tel. 207.619.8687
ebond@aclumaine.org

*/s/ Lia Ernst*
Lia Ernst*
James Diaz*
ACLU Foundation of Vermont
90 Main Street
Montpelier, VT 05602
Tel. 802.223.6304
lernst@acluvt.org
jdiaz@acluvt.org

Scott H. Harris (N.H. Bar No. 6840)
Steven Dutton (N.H. Bar No. 17101)
Jeremy Walker (N.H. Bar No. 12170)
McLane Middleton
900 Elm Street
Manchester, NH 03101
Tel. 603.628-1459
Scott.harris@mclane.com
Steven.Dutton@mclane.com
Jeremy.Walker@mclane.com


Albert E. Scherr (N.H. Bar No. 2268)
Professor of Law
University of New Hampshire School of Law
2 White Street
Concord, NH  03301
Tel. 603.513.5144
Albert.Scherr@law.unh.edu

Mark Sisti (N.H. Bar No. 2357)
Sisti Law Offices
387 Dover Road
Chichester, NH  03258
Tel. 603.224.4220
msisti@sistilawoffices.com

*Admitted *pro hac vice*.


December 7, 2021