**No copy of this transcript may be made prior to September 3, 2023**

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DREWNIAK, ET AL.,

        Plaintiffs,         20-cv-852-01-LM

   v.                         February 15, 2023

U.S. CUSTOMS AND BORDER      11:07 a.m.
PROTECTION, ET AL.,

        Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


MOTION HEARING

BEFORE THE HONORABLE LANDYA B. MCCAFFERTY


APPEARANCES:

For the Plaintiffs: Gilles R. Bissonnette, Esquire
                    Harrison Stark, Esquire


For the Defendants: Anna Dronzek, AUSA
                    Indraneel Sur, Esquire


Court Reporter:     Molly K. Belshaw, LCR, RPR
                    Duffy & McKenna Court Reporters
                    P.O. Box 1658
                    Dover, NH  03821
                    (800) 600-1000

P R O C E E D I N G S

THE CLERK:  For the record, court is now
in session.  This is a motion hearing, a motion
to compel and dismiss in Drewniak et al. v.
U.S. Customs and Border protection et al.  It
is 20-cv-852-01-LM.

If lead counsel who will be speaking today
would identify themselves for the record,
please.

MR. BISSONNETTE:  Thank you, Your Honor.
Gilles Bissonnette on behalf of Plaintiffs
Jesse Drewniak and Sebastian Fuentes.  I'll be
arguing most of the aspects of the two motions
with the exception of the APA claim and the
motion to dismiss, which will be handled by my
colleague.  And I'll introduce Harrison Stark
from the ACLU of Vermont.

MR. STARK:  Morning, Your Honor.
Harrison Stark on behalf of Mr. Drewniak and
Mr. Fuentes.

THE COURT:  Good morning.

Government?

MS. DRONZEK:  Good morning (audio cut
out) -- good morning, Your Honor.  My

1      apologies.
2          I am Anna Dronzek.  I am here to address
3      the motion to compel, and also here speaking on
4      behalf of the Government and his attorney,
5      Indraneel Sur, who will be arguing the motion
6      to dismiss.
7          THE COURT:  Okay.  Thank you all very
8      much.  It's nice to see everybody.
9          Let's go ahead and start with the motion
10     to dismiss.  And I'm thinking what I'd like to
11     do is hear counsel uninterrupted -- and I'll
12     try to let you speak without being interrupted,
13     and follow up with questions -- and give you
14     ten or 15 minutes, really, to tell me your
15     best, strongest arguments.  I'm listening
16     carefully.  I've read everything.  And I'll be
17     interested to see what you think your strongest
18     arguments are, and put those front and center
19     for me.
20         And then I'll look for, I guess,
21     Attorney Bissonnette to respond.  And then I'll
22     give you both a brief rebuttal, and then we can
23     move to the motion to compel.  All right.
24         So that would be, then, Attorney Sur.  If
25     you would like to give me your strongest

1      arguments with respect to the motion to

2      dismiss.

3           MR. SUR:   Thank you, Your Honor, and may

4      it please the Court.   The most straightforward

5      grounds for dismissing the amended complaint is

6      that plaintiffs lack Article III injury in fact

7      for the prospective relief that they seek here,

8      which is an injunction and a declaration.

9      That's because they have no certainly impending

10     harm from these future checkpoint operations of

11     the kind that Plaintiff Drewniak experienced in

12     the past.   And we've certainly briefed on other

13     issues, but the lack of certainly impending

14     harm alone is sufficient to grant the motion to

15     dismiss under Rule 12(b)(1) grounds.

16          So the Government's two declarations

17     supporting the Rule 12(b) motion, which are not

18     controverted -- that shows there have been no

19     checkpoints in New Hampshire in 2020 or in

20     2021.   And although the correct focus is on

21     December 2021, when the amended complaint was

22     filed, even in 2022, there's no current

23     checkpoint in Woodstock which could be used

24     even to measure whether Plaintiffs have a

25     certainly impending harm.

1           And the declarations explain how three key
2      characteristics of the temporary interior
3      checkpoints underlying Plaintiff Drewniak's
4      August 2017 encounter were no longer present by
5      the time the Plaintiffs filed the amended
6      complaint in December 2021.  And, again, just
7      to reiterate, that's the key date.  Because the
8      amended complaint superseded the original
9      complaint.
10          First, the operations orders authorizing
11     the checkpoints in 2017 and, subsequently, in
12     2018 and 2019, have expired.  Second, the state
13     police ended their practice of providing a
14     continuous presence at border patrol
15     checkpoints of the kind that the Plaintiff
16     Drewniak experienced.  And, third, the border
17     patrol changed its policies so that it ended
18     that surrendering of seized personal-use
19     marijuana to state police for potential
20     criminal proceedings that Plaintiff Drewniak
21     described.
22          So by the time the Plaintiffs voluntarily
23     filed their amended complaint on December 2021,
24     Plaintiff Drewniak had no certainly impending
25     harm from anticipated future checkpoint

1    operations based on that past experience in

2    2017.  And that's even more true for the newly

3    added plaintiff Fuentes, who never underwent

4    any criminal process.  Indeed, the officers at

5    the checkpoints he encountered never even

6    referred him for secondary inspection at any

7    checkpoint.

8         So one aspect that I think is maybe worth

9    underscoring is that the case concerns

10   temporary, and not permanent, checkpoints.  So

11   from the Plaintiff's perspective, there have

12   been many allegations about their repeated

13   travel in the Woodstock area.  But for the harm

14   that gave rise to Plaintiff Drewniak's 2017

15   checkpoint encounter to recur, it can't be

16   enough to describe an intention to travel in

17   the vicinity of Woodstock where there was a

18   previous checkpoint, because travel in the area

19   alone wouldn't lead to a checkpoint encounter

20   unless the border patrol, at some undetermined

21   time in the future, actually established a

22   checkpoint there.  And that would be a matter

23   of guesswork.

24        "Guesswork" isn't our term, Your Honor.

25   It's a term that the Court used in -- the

1        Supreme Court used in Clapper v. Amnesty

2        International as a way of urging caution in

3        this area where certainly impending harm is

4        concerned.  And beyond speculating about the

5        location of the checkpoint, as we explained in

6        the briefs, for the harm that Mr. Drewniak

7        experienced in August of 2017 to recur, there

8        would also have to be further events that are,

9        again, a matter of speculation.

10            The border patrol would have to, again,

11       approve operations orders that authorize such

12       checkpoints.  The state police would have to

13       change their practice, reverting to their

14       previous practice of staffing a continuous

15       presence at the hypothetical checkpoints.  And

16       the border patrol would also have to again

17       resume, contrary to what's now the contraband

18       practice, of surrendering -- they'd have to go

19       back to this practice of surrendering the

20       seized contraband to the state police for

21       criminal proceedings.

22            So that is piling speculation on

23       speculation.  It's an attenuated chain of

24       events that, consistent with Clapper, is beyond

25       what is allowed for a plaintiff to say their

```
 1        harm is certainly impending.  And it's not
 2        sufficient to show harm for an injunctive
 3        relief claim under Article III.
 4             Now, again, we've briefed a number of
 5        other issues.  But in terms of the most
 6        straightforward ground for granting dismissal
 7        at this stage, on this amended complaint and on
 8        this record, we think the most straightforward
 9        way to do that is to rely on the absence of a
10        sufficient showing of certainly impending harm
11        to grant dismissal.
12             THE COURT:  Thank you.
13             And, then, to the extent you want to
14        assert any other arguments or be heard on them,
15        I'm happy to hear that.
16             I'll let Attorney Bissonnette, then,
17        respond to your front-and-center loaded
18        argument on standing.
19             Go ahead, Attorney Bissonnette.
20             MR. BISSONNETTE:  Thank you, Your Honor.
21             I do want to address some of the points
22        that were raised by the Government, but I first
23        want to address some of my key themes, which is
24        I don't think this motion to dismiss is
25        complicated.  There's a lot of briefs that have
```

1        been filed since the amended complaint was
2        issued.  But when you strip away what I think
3        is, frankly, a Government's effort to rewrite
4        our complaint, rewrite our claims, rewrite the
5        injury that is being alleged in this case,
6        which is not the injury of being subjected to
7        state law prosecutions.  It's about the injury
8        of being subjected to a detention without
9        reasonable suspicion that a crime has occurred,
10       which applies to everyone that goes through the
11       checkpoints.  And if you strip that away, I
12       think this is, frankly, a straightforward
13       analysis and not complicated.
14            The standing arguments presented by the
15       Defendants here are not new.  This Court has
16       already addressed them, including the relevant
17       standard.  The real and only question before
18       this Court, even assuming that standing and not
19       mootness principles apply to Mr. Drewniak --
20       which is a separate question that I know we
21       have extensively briefed -- if whether, number
22       one -- two points.
23            Number one, whether there's substantial
24       likelihood that checkpoints will occur.  And
25       number two, whether there is substantial

1       likelihood that the specific plaintiffs here,

2       Mr. Drewniak and Mr. Fuentes, will be ensnared

3       in that.  It's the same analysis that this

4       Court went through back in 2021.

5              And even with Mr. Jesse Drewniak's changed

6       circumstances, which I acknowledge -- we've

7       submitted affidavits to that point, including

8       an addendum -- life happens -- it happens for

9       all of us, including me -- but even recognizing

10      those changed circumstances, the standing facts

11      here, I think, frankly, are equal to, if not

12      stronger, than the allegations that existed

13      back in the original complaint.  And I want to

14      explain why.

15             That's because here Mr. Sebastian Fuentes

16      travels in this area with even greater

17      frequency than what Mr. Drewniak alleged in the

18      original complaint.  He lives right next door

19      to these checkpoints.  And Defendants haven't

20      disclaimed their ability, or, frankly,

21      willingness, to conduct a checkpoint at any

22      time without notice.  So you hear the

23      Government say a lot.

24             We just heard the remarks that "well, you

25      know, it's speculative."  They control that,

1        Your Honor.  They decide when these checkpoints
2        occur.  So a situation that I think is not
3        necessarily callable to the plaintiffs here is
4        they're not disclaiming their ability to
5        protect these checkpoints.  This case goes away
6        somehow, and these checkpoints occur tomorrow,
7        which could happen.
8            The affidavits themselves, presented by
9        the two Government witnesses, make clear "we
10       could do these at any time."  That is one of
11       the fundamental concerns that we have.  And
12       that dynamic, frankly, existed back in the
13       original motion to dismiss.  And this Court, in
14       fact, articulated, I think quite clearly, how
15       the Government could potentially render this
16       case nonjudicial.
17           What the Court said was there, Mr. Garcia,
18       in the original affidavits, in the original
19       motion to dismiss, "failed to explain the
20       reason that no checkpoints are currently
21       planned.  He does not state that the agency has
22       abandoned the use of checkpoints as an
23       enforcements tool, nor does he state that the
24       Agency lacks sufficient resources to conduct
25       checkpoints.  He merely states that erecting

1        checkpoints requires resources.  In other
2        words, his declaration provides no explanation
3        for the lack of currently scheduled
4        checkpoints."
5             We have the exact same issue here.
6        Nothing has changed.  The Court gave the
7        Defendants guidance as to what to do,
8        potentially even how to render this case less
9        justiciable.  They haven't heeded that
10       guidance.  So here we are, two years later,
11       with the Government continuing, frankly, to
12       indicate that they can conduct these
13       checkpoints at any time.
14            So if the Defendants were to say today --
15       if they were to say today that "Your Honor, no
16       checkpoints -- there's not going to be an
17       interior checkpoint -- temporary interior
18       checkpoint in New Hampshire until
19       January 2025" -- if they were to tell you that,
20       if they were to put that in the affidavit, this
21       case would be different.  Perhaps we wouldn't
22       be here.  Perhaps this Court wouldn't have to
23       resolve two motions of the -- particularly on
24       the law enforcement privilege.  The Court
25       wouldn't have to resolve those questions.

1          Perhaps this case would be less justiciable
2          than it is now.  But they haven't done those
3          things, even when the Court provided that
4          guidance.
5               So there is a clear path.  The Defendants
6          haven't taken these steps pursuant to that
7          path.  But I don't litigate hypothetical
8          academic problems.  It's not worth my time;
9          it's not worth the Court's time.  But this
10         isn't a hypothetical academic problem, where
11         the Defendants won't say the things that it
12         needs to say to render here the harm
13         nonspeculative.  And, add to that, the harm
14         here is real with respect to both these clients
15         and with respect to Mr. Fuentes, who lives
16         right next door and, at least a couple times a
17         week, travels through that checkpoint area.
18              So I do want to flag that even if this
19         Court did think this was a close question on
20         jurisdiction, and we don't think it is, that is
21         precisely why discovery is necessary, including
22         on jurisdiction.  Discovery has been held up
23         with respect to privilege claims that kind of
24         seep into, probably, every relevant document in
25         this particular case.  But I do think that this

1    is a factual jurisdictional challenge that's
2    being raised -- not, apparently, an adequacy
3    challenge.
4        So what we have here is the Government
5    presenting affidavits.  And, I think, if that's
6    the path that the Government wants to take,
7    that can become part of discovery, just like
8    merits discovery can occur.  And this could be
9    resolved, as with the merits, on motion for
10   summary judgment or a bench trial, if
11   necessary.  I think that would be the prudent
12   way to do it.  As the Valentin court knows from
13   the First Circuit, when factual jurisdictional
14   challenges are raised, you have a minute's
15   discretion in how to process those.
16       But I haven't deposed these two witnesses,
17   because, I think, best practice is to wait
18   until document discovery is complete, and
19   that's clearly not complete yet.  And I
20   certainly would like that opportunity to talk
21   to them about all the things that Your Honor
22   raised in your April 2021 order that are not
23   addressed in the affidavits that have been
24   submitted to this Court in an effort to dismiss
25   the second amended complaint.

1          So I want to go through, real quick, those
2      two prongs that I talked about -- the
3      substantial likelihood of the checkpoints
4      recurring, number one.  And, number two, the
5      substantial llikelihood of our clients being
6      ensnared in those checkpoints.  Because I just
7      think that that's the analysis.  And, again,
8      this Court has looked at it.  The standard
9      already addressed by this Court -- I don't
10     think there's any need, necessarily, to go
11     into.
12          Again, number one, defendants haven't
13     disclaimed their ability to do these
14     checkpoints tomorrow.  They say, which is an
15     argument that could have been raised two years
16     ago --
17          "Well, the operation orders have expired."
18     The operation orders aren't a prerequisite to
19     an established policy.  They are part of the
20     policy; right?  Like, there's nothing that
21     would prevent the Government from putting
22     forward an operations order tomorrow to conduct
23     a checkpoint here next week.  So I think the
24     notion here that the operations order has
25     expired, and that somehow now makes this case

1          moot, which is the same scenario we were in

2          two years ago -- I just don't think that holds

3          water.

4               But, in addition, you have the changed

5          practices that have been claimed by the State,

6          that the State believes are no longer there,

7          and that they've also ended the practice of

8          seizing marijuana.  As I said at the outset of

9          my remarks, that is a straw man.  That is

10          irrelevant.  It is irrelevant because it

11          misunderstands the harm in our amended

12          complaint -- again, an effort to rewrite our

13          complaint.

14               The harm alleged is not the harm of being

15          prosecuted for a state drug offense by state

16          officials.  That's not the harm in the

17          complaint.  Certainly, that occurred, but that

18          is not the Fourth Amendment injury here.  The

19          Fourth Amendment injury is being subjected to a

20          warrantless seizure by border patrol officials

21          during a checkpoint that, in our view, is an

22          unjustified intrusion on civil liberties.  That

23          harm falls on everyone who is ensnared in the

24          checkpoints, regardless of whether that person

25          is ultimately persecuted -- I'm sorry,

1          prosecuted for a state law drug offense or not.
2          And that harm affects thousands of individuals.
3               And the Defendants concede -- I think, at
4          least -- that these checkpoints all really
5          occur in the same manner -- all ten of them in
6          New Hampshire, insofar as border patrol agents
7          inspect each vehicle with a K-9 that is tasked
8          with searching for drugs, and that applies to
9          everyone, and contraband is seized.  It doesn't
10         matter whether it leads to a state law drug
11         prosecution, by the way, but contraband was
12         seized.  In one instance, it was seized by the
13         feds and given to state officials.  Since the
14         McCarthy decision in 2018, the Defendants just
15         take it; right?
16              So I just want to make clear that I do
17         think that we have a little bit of a straw man
18         argument here with respect to the changed
19         circumstances that are being raised.  And we do
20         think that the policy itself is reflected in
21         the fact that we've had ten checkpoints.  And
22         courts that have distinguished --
23              Lyons have said when you have an
24         established policy, when you have a policy in
25         place -- here, ten instances to pass -- an

1        instance can be an indicia of that -- then you

2        can have standing to seek prospective

3        injunctive and declaratory relief.  This Court

4        held that two years ago.  We think the analysis

5        is the same here.

6             Now, as to Mr. Drewniak and Mr. Fuentes --

7        very quickly, again, as I acknowledged at the

8        outset, Mr. Drewniak does have some changed

9        circumstances.  We disclosed it and thought it

10       was critical and appropriate, frankly, to

11       disclose that to the Court and to the

12       Government.  We don't think, though, it impacts

13       his standing, mainly because his standing

14       allegations, when you look at the Berner First

15       Circuit case, we think, should be evaluated at

16       the time of the original complaint.

17            If the Court has some discomfort with that

18       based on what is in the current affidavits,

19       again, he's had two trips in 2022 to the

20       White Mountains, including traveling back

21       through the checkpoint area.  In July 2021 --

22       these are all in affidavits -- he visited

23       Mirror Lake near Wolfeboro.  He went with his

24       wife to Cannon Mountain as well in October of

25       2021.  So there is certainly past trips to the

1      area.  But even, again, if there's some

2      apprehension about his standing, Mr. Fuentes,

3      we think, seals the deal for the plaintiffs.

4      The original amended complaint does say he

5      travels in that area virtually every day.

6           His situation has changed as well, and I

7      just want to acknowledge that.  He took a new

8      job at Rising Democracy as a policy advocate.

9      So it's not every day anymore, and we've

10     disclosed that, appropriately so.  But he does

11     go there at least a couple times a week --

12     through the checkpoint area.  And, again, I

13     think those allegations are far stronger, even,

14     than Mr. Drewniak's from the original

15     complaint.

16          Again, it's true that he wasn't subjected

17     to criminal prosecution.  That is irrelevant,

18     in our view, for the reasons that we explained.

19     So, with that, I'll close my remarks.  I've

20     probably gone on for longer than 15 minutes,

21     Your Honor.  But those are the points that I

22     wanted to make.

23          Thank you.

24          THE COURT:  All right.

25          Attorney Sur -- is it "Sur" or "Sur"?

1              MR. SUR:  "Sur" is fine.

2              THE COURT:  All right.  Go ahead.

3              MR. SUR:  Thank you, Your Honor.

4          So I appreciate my friend on the other

5      side explaining their key points.  Let me start

6      with the significance of the operations orders.

7              They are not a triviality.  And this

8      notion that, somehow, just tomorrow there could

9      be checkpoints, I think, is not supported by

10     the record, as the Garcia declaration, in this

11     round, carefully explains.

12             There are a number of process and

13     substantive reviews and approvals that take

14     place before a checkpoint operation, under

15     these orders, and that's a very substantial way

16     in which the declarations now differ from the

17     record that was before the Court before.

18     Having considered the Court's previous ruling,

19     which, at that time, obviously, the Government

20     moved to dismiss -- the Court denied that

21     motion -- but the Government did -- while

22     maintaining its view of the law, did look at

23     the Court's ruling and consider the aspects

24     that it could address more completely when the

25     Plaintiffs amended their complaint.

1              And this new declaration from Chief Garcia

2         does carefully describe the internal process

3         checks that have to take place before these

4         checkpoint operations begin.  So while, as a

5         rhetorical matter, it would be easier for the

6         Plaintiffs to say that a checkpoint operation

7         could occur tomorrow, that's simply not

8         consistent with the record now.  The case has

9         changed, and this description of the operations

10        orders makes clear that there would be a lot of

11        process they would have to do to go on before

12        there would be checkpoints.

13             The presentation by the Plaintiffs also

14        shifts the focus in terms of where the time is.

15        Just to underscore, we have an amended

16        complaint here.  It was voluntarily amended.

17        And, so, consistent with the Supreme Court's

18        observation in the Rockwell case, the First --

19        sorry for the background noise -- the First

20        Circuit precedence that we described in our

21        brief says that when an amended complaint is

22        filed, it supersedes the original complaint,

23        and so that all motions would properly be

24        directed to the amended complaint and not the

25        original.

1            And, also, the approach, for example, that
2       this Court took in the Freeman case, where it
3       looked at the amended complaint but not events
4       subsequent to the amended complaint, we think
5       it's clear, in that sense, that the focus would
6       be on the state of affairs in December 2021.
7       And, at that point, there had been no
8       checkpoints in 2020.  There had been no
9       checkpoints in 2021.
10            Now, the declarations that the Government
11       filed with its motion to dismiss in March of
12       2022 brought the picture forward up to fiscal
13       year 2022, and stated that there would be no
14       checkpoints in 2022.  And there's been no
15       allegation that there has been such a
16       checkpoint.  And then in preparation for this
17       argument, CDP can represent to the Court that,
18       also for fiscal year 2023, there are no
19       checkpoints.  So even if the Court were to sort
20       of, if you will, widen the lens of the camera
21       to encompass a period that goes forward from
22       December 2021, there simply would not be a
23       basis for concluding that there's certainly
24       impending harm from this notion that these
25       checkpoints could occur tomorrow.

1          Now, I appreciate, again, this point that,
2     "Oh, well, the Government could do more to
3     disclaim."  As we explained in the briefs,
4     there have been cases -- and we pointed to a
5     case that has "Kemp Counsel" in the caption, I
6     think, from the early 2000s -- where the First
7     Circuit noted that when a prosecutor had
8     advised a potential criminal defendant that the
9     conduct -- the likely conduct of that defendant
10    would not be within the statute that the
11    prosecutor was feared to be enforcing, in that
12    pretty particular scenario, a prosecutor's
13    statement about that conduct not falling within
14    the statute is a disclaimer that could defeat
15    standing, I think, depending on the
16    circumstances.
17         But that has not been understood or
18    necessarily could fairly be understood to
19    require a disclaimer, as a legal matter, in
20    every setting to overcome an assertion of
21    standing.  So it may be sufficient in a
22    particular case for a criminal prosecutor to
23    make that kind of an assurance or disclaimer,
24    but it's not necessary.  And to make it
25    necessary would really shift the burden away

1      from the party that's supposed to be -- the

2      Plaintiffs, who are supposed to show that it is

3      they who have an injury in fact, and it would

4      shift the burden onto the Government, which

5      would not be consistent with, for example,

6      Clapper and other Supreme Court precedents.

7           I also think, on that disclaimer point,

8      that part of the difficulty that that would put

9      the Agency in is that we have a case where

10     there's no dispute that this statute itself, it

11     represents a congressional authorization to the

12     Agency to conduct checkpoints of the purpose

13     that is adequate to meet the Agency's mission.

14     And so the notion that, somehow, the Agency

15     could announce a disclaimer that would -- can

16     flout the statute would, I think, be severely

17     problematic.

18          So we do think, for those reasons, that

19     while we understand from the Plaintiff's

20     perspective why they might want to controvert

21     this as a case where a disclaimer is required,

22     that just wouldn't be consistent with the law.

23     I'm sorry.

24          There is one point I will raise also about

25     the orders.  I stressed the orders and their

1        careful process.  I do also want to note the

2        significance of the expiration of the orders.

3        Again, we found useful guidance by the Court's

4        observation in the Freeman v. Keene case that

5        involved the COVID-19 mask mandates.  And the

6        Court noted there that the expiration of the

7        orders had a potentially significant effect on

8        an assessment of the Article III situation.

9             We think that's informative here, where

10        the Plaintiffs, insofar as they're relying on

11        past injuries, are pointing to episodes -- and

12        just momentarily holding aside the difference

13        between the two plaintiffs in this case -- even

14        if you're looking at 2017, '18, and '19, those

15        orders are expired.  And that has a

16        significance, I think, that the Freeman v.

17        Keene case rightly acknowledged.

18             I think -- as we explained in the brief,

19        we think it's a standing question and not a

20        mootness question.  But even if the Court were

21        to frame it as a mootness question, the

22        declarations are clear about the current state

23        of affairs.  And there's really no reason to

24        come to a different conclusion for standing

25        purposes versus mootness.

1           Now, in a case where there had not been
2      declarations of the level of detail that the
3      Government provided, I think one might say that
4      there was a significance to the shift from
5      standing to mootness.  We acknowledge, of
6      course, that mootness would typically be the
7      Government's burden to show.  But because there
8      are declarations, I don't think that difference
9      matters.  So I don't think the Court really
10     needs to grapple with, to the extent that it
11     feels there's a subtlety, to the question of a
12     lack of standing versus mootness.
13          I also need to turn to this notion that I
14     think that there is no difference, that my
15     friend on the other side seems to be insisting,
16     on the allegations.  Again, we're looking here
17     to the past versus the future.  So the
18     Government's position is that the Court's
19     appropriate focus, at this stage, is on future
20     harm.
21          And there is no reason to distinguish the
22     two plaintiffs for purposes of future harm.
23     Because while both reside in the area, and
24     however frequently they may be traveling there,
25     these plaintiffs are not alleging that their

1           past travel somehow makes it more likely that

2           they will be subjected to checkpoints in the

3           future, any different from regular folks who

4           are driving through.

5                This sets us aside from a case where, for

6           example, there might be, like, a technological

7           reason why searching someone once makes it more

8           likely to search them again.  The plaintiffs

9           have relied on the Alasaad district court case.

10          And the plaintiffs in the Alasaad case pointed

11          to an earlier case called Tabbaa against

12          Chertoff in 2005.  We're putting this out in

13          the reply to brief.

14               In Tabbaa against Chertoff, there was a

15          database that someone who was searched was --

16          it had a file created.  And if that file was

17          created, then there was an allegation that that

18          would make it more likely that someone who had

19          been entered into that database might be

20          searched again.  There was nothing like that

21          here.  So the past and the future are, in our

22          view, most importantly, not connected in that

23          way.

24               But even if the Court were to look to the

25          past, there is a significant difference between

1       the experience of Plaintiff Drewniak, where he
2       did undergo criminal process, and the
3       experience of the Plaintiff Fuentes.  My friend
4       on the other side seems to believe that it's
5       appropriate to disregard the differences in
6       those experiences, and we don't think that's
7       consistent with either the First Circuit's
8       precedent or the Supreme Court.
9            If I may just briefly, in the opening
10      brief we pointed to a case called Gray against
11      Cummings.  This is a First Circuit case from
12      2019.  And the one sentence I'll flag here is
13      that to have standing to pursue injunctive
14      relief, "the plaintiff must establish a real
15      and immediate threat resulting in a sufficient
16      likelihood that she will again be wronged in a
17      similar way."
18           And when we focus on that "wronged in a
19      similar way," I do think that it's important to
20      distinguish the experience of
21      Plaintiff Drewniak from Plaintiff Fuentes.
22      Plaintiff Drewniak underwent a criminal
23      prosecution, and that resulted from the
24      checkpoints that has the particular
25      characteristics that we've described:

1          So there was a state police continuous
2    presence.  There was this former practice of
3    surrendering evidence that was gathered at the
4    checkpoints to the state police for the further
5    criminal process.  And, again, there were the
6    then in place, now expired, authorizing orders.
7    So we think the focus has to be wronged --
8    insofar as the past is pertinent, on how they
9    were wronged individually.
10          In that respect, Plaintiff Fuentes did not
11   have those allegations.  And so he really does
12   rely, for Plaintiff Fuentes, on this notion
13   that it falls on everyone.  And that would be
14   quite sweeping.  It raises -- and, again, we've
15   briefed it extensively, and I don't think the
16   Court needs to get into these issues now about
17   third-party standing, about seeking relief for
18   Northern New England.
19          I understand that if -- again, to use the
20   camera analogy, if you widen the lens to
21   include everyone, then it might seem that you
22   could obtain relief for all of Northern New
23   England.  But that has problems.  It has
24   Article III problems.  It has Rule 12(b)(6)
25   problems, including this third-party standing

1        point.
2             So we don't think the court needs to go
3        there.  But if the function of
4        Plaintiff Fuentes is to broaden the case to
5        allow the Plaintiffs to make this into the
6        functional equivalent of a class action, as
7        we've said in the briefs, that's very
8        problematic.  This isn't about a class action.
9        It's an individual, two-plaintiff case.  And
10       while I appreciate the points on the other
11       side, the focus has to be on the particular
12       checkpoint encounters of these particular
13       plaintiffs -- whether they can show future
14       injury, and what relief might follow from
15       that -- not relief that would be through
16       Northern New England.
17            And so I do think we're in a different
18       situation from the original complaint.  The
19       record is different.  From the Government's
20       point of view, we did carefully consider, Your
21       Honor, the original opinion, which provides
22       some guidance about the Court's concerns.  And,
23       I think, by giving a more careful description,
24       just to sum up, really, about the process
25       involved with the checkpoints, that emphasizing

1      the significance now of the expiration of those

2      past checkpoints -- that the record is

3      different.

4           And so this case simply is not the same as

5      it was in 2020 when the Plaintiffs filed the

6      original complaint.  Again, there have been no

7      checkpoints in 2020, 2021.  None in 2022.  And,

8      as I said, this notion that they could occur

9      tomorrow is just not consistent with the

10     record.  So there is, again, no certainly

11     impeding harm, and so we would ask that the

12     Court focus on that in granting the motion to

13     dismiss.

14          THE COURT:  Thank you.

15          Attorney Bissonnette?

16          MR. BISSONNETTE:  And I promise I'll keep

17     my rebuttal -- or surrebuttal, at this point,

18     to a few minutes, because I know Your Honor,

19     I'm sure, has some questions.  But I want to

20     just kind of bring this case to ground level

21     and bring it to its core.

22          If the Government said, "Hey, there's not

23     going to be temporary interior checkpoints

24     until 2025," we would be in a different place.

25     They have not said that.  They won't say it in

1    declarations.  They won't say it to this Court
2    today.  I think that, really, is the problem
3    that we have as plaintiffs.  At its core, we're
4    now learning that --
5         "Okay.  There now won't be checkpoints.
6    Don't worry, there won't be checkpoints for
7    fiscal year 2023."  But this type of piecemeal
8    approach is the very problem that we all
9    confront, as plaintiff's lawyers, in
10   anticipation of the potential that these
11   checkpoints can occur at any time, representing
12   individuals who frequently travel through this
13   area.
14        If they said that, the case would be
15   different.  They haven't said that.  And that's
16   why we're here.
17        THE COURT:  Why is 2025 a magic number, if
18   you will?
19        MR. BISSONNETTE:  I think at some point,
20   like, it does become too remote.  I freely
21   acknowledge that.  And so, I guess, in my view,
22   2025 is less remote than right now.  But right
23   now the representation that, I think, I'm
24   hearing from the Government is --
25        "All right.  Fiscal year 2023," which ends

1        in six months.  So that's the concern I have

2        here, is that "oh, there won't be checkpoints

3        for the next six months."  And then in month

4        seven, there could be checkpoints, and then we

5        have to redo all of this work that we have now

6        been doing over the past several years.  But I

7        would just look at the declarations.

8             And listening to the Government's

9        response, there's nothing in the declarations

10       with respect to operations orders that say, for

11       example, "Hey, this is a cumbersome process.

12       There are multiple layers of review, but it

13       could take months, and months, and months.

14       And, to the extent that that process occurs,

15       there wouldn't be checkpoints for a year or two

16       after an operations order."  There's nothing

17       like that.

18            Mr. -- I think one affidavit, document

19       Number 73-2, "Depending on the nature and scope

20       of the operation order," paragraph 12, "various

21       levels of review and approval occur before the

22       order is finalized, approved, and executed."

23       Okay.  That process can take a day, take a

24       week.  I mean, there's nothing here that says,

25       again, that an operation order can't be

1        fast-tracked, expeditiously done, and a

2        checkpoint can't occur tomorrow.

3             So I think we're hearing a lot of extra

4        things, I think, about operations orders during

5        this argument that I don't think are reflected

6        in the record.  But what is reflected in the

7        record, when you look at that same affidavit --

8        and now I'm moving to page -- to paragraph 33

9        and 34.  In particular, 34, "The location and

10       operation of any future immigration checkpoint

11       within the Swanton Sector is subject to change

12       based on a variety of factors to include, among

13       other things, logistics, law enforcement needs,

14       staffing, budgetary considerations."

15            They could happen tomorrow.  Now, they're

16       saying that maybe that's not the case today.

17       That's not in the affidavits.  And that is, I

18       think, the fundamental concern I have with

19       where we are.  Now, we could take discovery on

20       all of this, and maybe that's an appropriate

21       vehicle for resolving some of these things, is

22       I could sit down with Mr. Garcia and ask him

23       about all these things, ask him about the

24       framework that this Court provided two years

25       ago, and ask him probing questions about that

1          to get to the bottom of some of these things.

2               But the way that the record currently

3          exists, notwithstanding what we're hearing

4          today from the Government, is that I think

5          operations orders can be issued at any time,

6          and we could be subjected to these -- our

7          clients could be subjected to these particular

8          checkpoints.

9               I do want to address the issue of mootness

10         versus standing.  I don't want to get too

11         caught up on it, to some extent because I

12         freely concede and acknowledge that with

13         respect to Mr. Fuentes, it is a standing

14         analysis.  And his standing analysis is based

15         on the allegations that are in the second

16         amended complaint.  We don't think Mr. Drewniak

17         is, but I just wanted to kind of appreciate and

18         be explicit about that particular distinction.

19              But I do think the Alasaad case provides

20         some insight here which this Court relied upon

21         on its initial ruling.  There the Court

22         concluded that the Plaintiff's allegations of

23         future travel were sufficient at the motion to

24         dismiss stage, even though they were -- they

25         omit specific plans or dates of future travel,

1     where the Plaintiffs allege that they regularly

2     travel to the relevant location.  I mean,

3     that's what we have here, certainly, with

4     Mr. Fuentes.

5         With respect to, again, the disclaimer

6     itself, I understand, of course, the

7     Government's civil disclaimer is not required.

8     I'm not saying it's required, but absent a

9     disclaimer in this case, we believe that

10     standing exists as alleged.

11         And, I think, lastly, obviously, the

12     Government talks about its law enforcement

13     obligations.  No dispute about that.  There are

14     obligations, obviously, to keeps us all safe,

15     to patrol the borders.  No question about it.

16         But, of course, the statute that

17     authorizes checkpoints doesn't mandate

18     checkpoints, doesn't require that they actually

19     occur, number one.  And, number two, of course,

20     those activities need to be subjected to the

21     Fourth Amendment.  They are subjected to the

22     Fourth Amendment.  That is what the Edmonds,

23     right, was all about.

24         So the final point I want to make is what

25     I think is a little bit of, again, a red

 1        herring as well with respect to third-party
 2        standing.
 3             "Oh, this is complicated.  There's
 4        potential for a class action."  This isn't a
 5        class action.  It doesn't need to be a class
 6        action.  All that's required is that our
 7        clients have the ability and standing to seek
 8        injunctive relief, which they do here.  It
 9        doesn't matter whether that injury is impacted
10        by other individuals.
11             FEC versus Akins -- last thing I'll say,
12        Your Honor -- "Often the fact that an interest
13        is abstract and the fact that it is widely
14        shared go hand-in-hand, but their association
15        is not invariable.  And where a harm is
16        concrete, though widely shared, the Court has
17        found an injury in fact."
18             Same as the case here.  Yes, this injury
19        is shared by other individuals -- thousands of
20        individuals, in fact.  But our clients, we
21        believe, are likely to be injured by this
22        practice in the future.
23             Thank you.
24             THE COURT:  Attorney Sur, any response at
25        all?  Is there any guarantee that there will be

1          no checkpoints through 2025?  And we can call

2          it a day.

3               MR. SUR:  I appreciate the question, Your

4          Honor.

5               To my understanding, the 2025 is not a

6          specific time period for which the Plaintiffs

7          sought a written assurance in their briefs.  If

8          they did specify that as sufficient to resolve

9          the case in their briefs, I missed that, but

10         it's news to me.  I think, as I said in the

11         preparation for oral argument, recognizing the

12         Court might choose to examine various time

13         periods, I can give the agencies assurance of

14         about up to fiscal year 2023, but I do

15         understand that Plaintiffs -- to be not

16         satisfied by that.

17              And so, at this point, I really would need

18         to confer with the clients about this argument

19         about 2025, noting that the problem, of course,

20         which I alluded to before, I think, in the

21         declarations, which is that I think it's

22         difficult to make a commitment when the future

23         is so uncertain.  And I'm, actually, almost not

24         sufficiently well versed in baseball lore to

25         make this reminder, but there is an aphorism

1          that's attributed to Yogi Berra about how
2          difficult it is to make predictions, especially
3          about the future.  I do think that applies with
4          some force here and underlies some of the
5          difficulties that are presented by the
6          Plaintiffs' claims.
7               I will also respond to the notion that
8          this isn't a class action and it doesn't need
9          to be a class action.  Certainly, the
10         Government agrees that this is not a class
11         action.  And so that's why it would be
12         appropriate to limit any relief sought for
13         Article III reasons and for Rule 12(b)(6)
14         reasons on this amended complaint, to focus
15         that on the plaintiffs and to, at a minimum,
16         limit whatever further proceedings take place
17         to the Plaintiffs, rather than this notion that
18         the Plaintiffs stand for everyone who might
19         possibly be affected by the operations in,
20         quote, "Northern New England."
21              FEC against Akins involved a statutory
22         right to certain information, and whether that
23         was sufficient under Article III.  We don't
24         think an informational analogy is really
25         appropriate here.  Rather, we're talking about

1           a Fourth Amendment right.  And, as we explained
2           in the briefs, the Fourth Amendment, by itself,
3           hasn't always been understood -- or has
4           traditionally been understood, for decades, to
5           be an individual right, where we would expect
6           those other motorists to seek their own
7           counsel, and to bring their own claims, as
8           appropriate, including under traditional
9           motions to suppress evidence, if that were
10          appropriate.
11               And even apart from that Fourth Amendment
12          limitation on the third-party standing, as we
13          said in the briefs, there isn't the requisite
14          closeness between these plaintiffs and those
15          absentee motorists, and there is not any
16          hindrance to those absentee motorists bringing
17          their own claims.  So I think it is important
18          that -- I guess there's some agreement on
19          this -- that this is not a class action, and,
20          so, accordingly, it shouldn't be treated as
21          such.
22               THE COURT:  All right.  Well, let me do
23          this.  I do want to issue rulings in the case,
24          keep the case moving to the extent it has
25          merit.  This is still fairly early in the case.

1          I am going to -- I've listened carefully
2    to everything that's been argued, and I've read
3    everything on paper as well.  And I'm going to
4    issue a ruling orally, right now, on the motion
5    to dismiss, and then we'll move to the motion
6    to compel.
7          Defendant's move to dismiss Plaintiffs'
8    amended complaint for lack of standing under
9    12(b)(1), the Federal Rules of Civil Procedure.
10   Defendants also raise a few other arguments
11   that appear to be under 12(b)(6).  Both the
12   12(b)(1) and 12(b)(6) standards are outlined in
13   my prior orders in the case.  They remain the
14   same here, so I'm not going to repeat them.
15         Before getting into the standing issue,
16   there is a preliminary dispute about whether,
17   as to Drewniak, the Court should analyze the
18   issue under the standard for mootness or
19   standing.  Standing is determined in relation
20   to the facts that exist at the commencement of
21   litigation, while mootness considers whether
22   intervening events have changed circumstances
23   such that the issues presented are no longer
24   live, or the parties lack a legally cognizable
25   interest in the outcome.

1          The parties' dispute centers around what

2     "commencement" means.  Is it limited to the

3     filing of an initial complaint which begins the

4     case?  Or is a case commenced when an amended

5     complaint is filed?  I do not need to answer

6     this question directly, because the facts are

7     sufficient, in my view, to deny the motion

8     under either standard.

9          So, in other words, the facts are

10    sufficient to deny Defendant's motion of

11    considered under the standard for mootness,

12    which, in the context of this case, requires

13    the Defendants to show that there is no

14    reasonable expectation that the wrong will be

15    repeated such that it is impossible for the

16    Court to grant any effectual relief whatever to

17    the prevailing party.  And I cite City of Eerie

18    for that proposition.  Defendants have not

19    carried that burden.

20         The facts are sufficient to find standing

21    at this stage.  First, as to standing,

22    Plaintiffs, as the parties invoking federal

23    jurisdiction, have the burden.  Standing has

24    three prongs -- the Plaintiff suffered an

25    injury in fact; the injury is fairly traceable

```
1          to the challenged action of the defendant; and
2          it is likely, as opposed to merely speculative,
3          that the injury will be redressed by a
4          favorable decision.
5              We're primarily focused here on the first
6          prong, injury in fact, and, in particular,
7          whether Plaintiff's alleged injury is actual or
8          imminent as opposed to conjectural or
9          hypothetical.  As explained in the Court's
10         order denying Defendant's first motion to
11         dismiss, when a Plaintiff seeks injunctive or
12         declaratory relief, the Plaintiff must show a
13         threatened injury that is certainly impending
14         or that is a substantial risk that the alleged
15         injury will occur.
16             That order contains all the case law and
17         citations necessary to resolve this second
18         motion to dismiss, so I'll refer the parties
19         back to that order for the relevant legal
20         authorities which remain good law today.  The
21         difference is in the relevant facts between the
22         initial complaint and the amended complaint to
23         not change the outcome, at least as far as
24         Article III's standing is concerned.  In short,
25         these differences are Drewniak's representation
```

1        that he will drive to the White Mountains less

2        frequently than he had anticipated when

3        bringing the initial complaint, and the

4        addition of Fuentes, who has alleged several

5        new facts in support of standing as a

6        Plaintiff.

7             I find Drewniak's facts are sufficient for

8        standing.  I don't find the change in his

9        circumstances significant.  The COVID-19

10       pandemic, his work schedule, and his family

11       emergency have changed the frequency in which

12       he intends to recreate in the White Mountains.

13            As the Court previously found, Drewniak is

14       an avid outdoorsman who regularly takes trips

15       to the White Mountains via the roads where

16       Defendants have set up checkpoints in the past.

17       Those facts have not changed.  Drewniak still

18       intends to travel to the White Mountains for

19       recreation.  There's no reason to believe that

20       he won't continue to go to the White Mountains,

21       since he has even in the recent past, although

22       less frequently.

23            As to Mr. Fuentes, he alleges that he

24       lives close to Woodstock and frequently travels

25       in the locations where the Woodstock

1       checkpoints have occurred, in addition to
2       having actually traveled through the
3       checkpoints when they were ongoing.  At a
4       minimum, he passes through that area about two
5       times per week.
6            Now, I've already considered and rejected
7       the Defendant's argument that standing is
8       lacking because border patrol does not
9       currently have plans for future checkpoints.  I
10      already rejected the argument that Plaintiffs
11      lack standing because border patrol does not
12      have current plans for future checkpoints
13      anywhere in New Hampshire, as well as their
14      argument that the New Hampshire State Police
15      will not be continuously present at future
16      checkpoints.
17           As stated in that order, the Court cannot
18      conclude from the mere fact that no checkpoints
19      are currently scheduled that additional
20      checkpoints are unlikely.  So, in summary, I
21      find that the circumstances alleged in the
22      amended complaint, alongside the facts from the
23      declarations submitted by the parties are not,
24      in a material way, different from the
25      circumstances I found to be sufficient for

1          standing when denying the first motion to
2          dismiss.
3               I find that the allegations and facts both
4          parties have proffered as to standing are
5          sufficient to show that Fuentes and Drewniak
6          have suffered an injury in fact, and that they
7          are real and not hypothetical injuries.  And I
8          find there is a substantial risk that the
9          injuries will reoccur, for the same reasons I
10         found that when I denied the Defendant's first
11         motion to dismiss.
12              The other arguments in support of
13         dismissal we didn't spend much time on today,
14         but let me just put on the record.  I think I
15         can address these fairly quickly.  First, the
16         Defendants argue the Court should dismiss
17         Plaintiffs' constitutional claims or otherwise
18         refocus Plaintiffs' complaint on an APA claim
19         that Plaintiffs' did not assert.  Defendants
20         cite no authority, and the Court's not aware of
21         any authority, that permits the Court to
22         effectively amend a complaint to add a claim
23         that the plaintiff does not wish to assert.
24              Furthermore, even if the Court had
25         authority to add an APA claim to this case

| | |
|---|---|
| 1 | against Plaintiffs' wishes, it would not |
| 2 | necessarily demand dismissal of their |
| 3 | constitutional claim at this stage. |
| 4 | Constitutional avoidance means, in summary, |
| 5 | avoiding unnecessary decisions interpreting or |
| 6 | applying constitutional rules.  It does not |
| 7 | require the Court to dismiss constitutional |
| 8 | claims at the outset of a case because the |
| 9 | Plaintiff might ultimately prevail on a |
| 10 | statutory claim that's premised on the same |
| 11 | alleged misconduct. |
| 12 | And, then, also, Defendants argue the |
| 13 | Court should dismiss Plaintiffs' complaint |
| 14 | because the injunction requested by Plaintiffs |
| 15 | is overbroad.  They also argue the declaratory |
| 16 | relief is unwarranted because of considerations |
| 17 | of practicality and wise judicial |
| 18 | administration.  These arguments are premature. |
| 19 | At this stage, the Court is not deciding what |
| 20 | relief is warranted or unwarranted.  Plaintiffs |
| 21 | have done what is necessary at this stage, |
| 22 | which is to show the Court can redress their |
| 23 | injuries through injunctive or declaratory |
| 24 | relief. |
| 25 | Beyond that, I do not see why the Court, |

1           at this stage, must decide exactly what that

2           relief looks like.  So for these reasons,

3           Defendant's motion to dismiss, which is

4           Document Number 73, is denied.  But let me move

5           now to the motion to compel.

6                 Let me start by just asking the ACLU on

7           this one -- obviously, if I just agree to

8           conduct an in-camera review, look at this

9           material -- I know you're arguing they haven't

10          met the burden to warrant that -- that could

11          shortcut, obviously, this hearing.  And I

12          wonder if, ultimately -- I'd like to ask some

13          questions before I would decide that.

14                But, ultimately, I'm wondering if the

15          Government's proposal that I conduct in-camera

16          review makes any sense and is something you'd

17          be agreeable to.

18                MR. BISSONNETTE:  Yeah.  I think that's a

19          great question, Your Honor, and it's certainly

20          a prudent one.

21                I do want to say at the outset, before,

22          maybe, there's substantive discussion of this

23          motion, that portions that I'm -- that I have

24          received portions under an attorney's-eyes-only

25          protective order.  There are, obviously, still

1          portions of the operations orders that I

2          haven't seen that I know that you're

3          acknowledging would be subject to in-camera

4          review.  I only say that, Your Honor, because

5          I'm going to be -- I may be cryptic at times

6          about what I'm saying because this is a public

7          hearing and I know there's at least one member

8          of the press present.  So I just want to convey

9          my mindfulness of that.

10              I don't think there's any, I think,

11         inherent concerns, necessarily, with that.  I

12         know that with in-camera process, I know we

13         have some concerns about whether the threshold

14         has been met to justify in-camera review.  I

15         would not be doing my job if I didn't convey

16         some concerns I would have with respect to the

17         fact that I wouldn't have an opportunity, as

18         part of that in-camera process, to review the

19         materials and then argue before the judge --

20              "Hey, this is why this is relevant."  That

21         is, I think, one of the potential drawbacks of

22         the in-camera process, is that -- you know, I

23         know our claims.  I know why we're seeking

24         information.  I know kind of what elements I

25         need to be able to prove, or try to prove, to

1        establish my case.  I know Your Honor has far
2        more cases than I do, and will be less familiar
3        with it.
4              So there is maybe, I think, a mild concern
5        about this kind of evolving into a
6        non-adversarial process, where I don't have an
7        opportunity to explain, for example, even if
8        the privilege applies, why the privilege has
9        been overcome because of substantial need,
10       which is something I need to show.  So I have
11       no objection to the Court --
12             THE COURT:  I understand that.  I think
13       that's a fair concern.  It's a concern I have,
14       frankly, when I'm looking at the material.
15             How am I able to do an effective balancing
16       analysis if I'm not clear on precisely why
17       something might be relevant to this case?  Let
18       me do this, then.  Let's go through this pretty
19       quickly.
20             I'm going to go through categories, and
21       maybe you can get me a sense,
22       Attorney Bissonnette, as to what would I -- I
23       mean, obviously, you don't know what you don't
24       know.  But let's start -- I'm looking at the
25       affidavit in the case that the Government

| | |
|---|---|
| 1 | filed -- Chief BeMiller (phonetic).  And it |
| 2 | seems to me that contains, starting at page, I |
| 3 | think -- well, paragraph 23, he starts going |
| 4 | through the particular redactions.  And if I |
| 5 | miss any, obviously, circle back, but paragraph |
| 6 | 23-A. |
| 7 | Why would you need internal case numbers |
| 8 | that track a variety of different cases wholly |
| 9 | unrelated to the present one? |
| 10 | MR. BISSONNETTE:  We do not.  And I think |
| 11 | in our reply, I tried to focus it.  But I |
| 12 | understand your question, and I don't think |
| 13 | that's something that I need, Your Honor. |
| 14 | THE COURT:  Okay.  All right. |
| 15 | And then let's go to B, Staffing Numbers |
| 16 | and Associated Costs.  This could be used, |
| 17 | according to the Government, to predict future |
| 18 | vulnerabilities.  If they know that, for |
| 19 | instance, they have certain staffing problems |
| 20 | at particular checkpoints, it could increase |
| 21 | the likelihood of officer safety, just patrol |
| 22 | vulnerabilities. |
| 23 | So Staffing Numbers of Personnel and |
| 24 | Associated Costs -- give me a sense of that |
| 25 | category, as you vaguely understand it. |

1              MR. BISSONNETTE:  Sure.

2              With respect to staffing number, I

3     actually think that is germane.  One kind of

4     key component of the checkpoints that, without

5     getting too into the details that we're

6     concerned about, is really the use of K-9s and

7     K-9 teams that are used in the primary

8     inspection area.  And I think it's important

9     for us to know the degree to which that is

10    occurring.  How extensive is it occurring?  Is

11    it one team, or is it ten teams?  That is kind

12    of part of the intrusion that, I think, we are

13    concerned about that is endemic to everybody

14    that goes through the checkpoints, it seems.

15             But I just would need a way to verify that

16    in discovery.  I would note that in discovery,

17    the K-9 component of this case is going to be

18    really critical.  And I think that is one of

19    the reasons why I think staffing is important

20    to us, Your Honor.

21             THE COURT:  Okay.  So it's primarily the

22    number of K-9s that are available to CBP to

23    potentially conduct one of these checkpoints?

24             MR. BISSONNETTE:  Yes, Your Honor.

25             THE COURT:  And, ultimately, when this --

1          in 23-B, when the words "staffing numbers" --
2          that includes humans as well as K-9s?  And
3          you'd be interested in both of those,
4          Mr. Bissonnette?
5                MR. BISSONNETTE:  Yes, Your Honor.
6                THE COURT:  Okay.  All right.
7                And then 23-C, Patrol Area Designation,
8          and Miles Within a Station.  It's a small
9          location.  That's another issue of revealing
10         gaps on the border.  And that's -- that creates
11         concerns that it would result in an increase in
12         illegal immigration at certain spots.
13                MR. BISSONNETTE:  Yeah.  This is
14         difficult, I'm going to confess, Your Honor.
15         And the reason why is because these operation
16         orders are basically, like, justification for
17         why these checkpoints are necessary.  And it's
18         hard for me to know -- maybe that's something I
19         don't need; maybe it is.  Maybe what the
20         operations orders say, and I don't know, one
21         way or the other, is these checkpoints are
22         needed because of the patrol area problems
23         somewhere.
24                I think that's germane to the analysis of
25         the justification of the checkpoints, which I

1          have to show they're not justified under the

2          Fourth Amendment analysis.  So, at a high

3          level, I think that's kind of some of my

4          concern here.  And I do want to flag, again,

5          this is why we have a protective order.  We

6          negotiated that exhaustively to try to address

7          that.

8               THE COURT:  Right.  I -- now, what if --

9          let me ask the Government this.

10              What if you removed the specific name of

11         the location?  And, that way, that is not

12         something that would be remotely at risk of

13         inadvertent disclosure, so that you are not

14         designating a particular station or location,

15         but you're revealing staffing and resource

16         distribution along the United States-Canadian

17         border; what do you think of that possibility?

18              MS. DRONZEK:  So I understand, I think,

19         what the Court is getting at in terms of is

20         there a way that we can reveal things that are

21         pertinent to the Plaintiffs' needs here?

22              My concern would be that we are talking

23         about a relatively small area.  And so my

24         concern, at this point -- without having an

25         opportunity to consult with people who are

1          actually on the ground addressing the
2          patrolling, my concern would be that is there a
3          kind of a way that we can redact certain
4          elements and provide other ones that would not
5          pose such a risk?  And, unfortunately, I'm not
6          in a position to say for certain whether that's
7          the case.
8               I will say that the Government has really
9          tried to operate in good faith and to negotiate
10         the degrees of the redactions, and has gone
11         back and forth, a number of times, to reach
12         what we have here.
13              And so it may be that the Government's
14         response is going to be, "No, that's not
15         sufficient.  This really needs to be completely
16         redacted."  I'm afraid I can't give a complete,
17         concrete answer at this point without, as I
18         say, consulting further with those who
19         actually --
20              THE COURT:  Okay.  And it looks like 23-C
21         actually discloses already.  I mean, it's
22         stating in a public document that there's this
23         small location within the Beecher Falls station
24         that had gap issues.
25              I'm just wondering how much more needs to

1        be redacted to deal with this issue.  It seems

2        as though it's somewhat partially disclosed.

3        The concern has, at least, been disclosed.  But

4        I'll move on to the next one.  I'm just trying

5        to get a sense of where you both come down on

6        the -- D, again, is sort of related to C --

7        Operational Impediments, in Particular

8        Geographic Areas.  So I'm assuming that deals

9        with that same issue we just talked about.

10               MR. BISSONNETTE:  Yes.  I think that's

11       right, Your Honor.  Thank you.

12               THE COURT:  All right.  Now, E -- this one

13       caught my attention, obviously.  That seems

14       fairly concerning.

15               Intelligence Information and Case Numbers

16       that Relate to Ongoing Investigations.  And I

17       can see also where this may be of heightened

18       relevance to Plaintiffs as well.

19               So, again, I think I could look at the

20       redacted material and get a sense of what I

21       would be required to decide as I balance

22       Plaintiffs' interest in having the info, and

23       the Government's interest in keeping it forever

24       secret.  But I'm not sure if -- this one seems

25       to come the closest to that Second Circuit

1        decision that the Government's relying on, in
2        general.  Although that case is so
3        distinguishable from this case because it
4        involved ongoing investigations all over the
5        City of New York.  It involved confidential
6        informants.  It involved undercover agents.
7        And it -- the likelihood that somebody's
8        identity could be released would harm an
9        investigation of wide scope in the City of New
10       York -- it just -- to me, I'm reading through
11       these and I -- I'm concerned that the
12       protective order -- it seems to me that that's
13       the best way to handle this situation.
14            Because it allows for Plaintiffs to look
15       at each piece of evidence and decide whether or
16       not they're going to use it in their case in
17       chief.  It's hard to ask the Court to look at
18       this information and weigh it in-camera.  But
19       it's certainly a possible step that I could
20       take.  Did you -- I think there is one that
21       deals with radio frequencies.
22            Did you also disclaim any interest in
23       that?
24            MR. BISSONNETTE:  You know, I'm not
25       entirely sure if we did in our briefs.  And, if

 1          I didn't, my apologies.  But, no, that's not
 2     something I'm particularly interested in, nor
 3     do I think it's relevant to our claims.
 4          THE COURT:  Okay.  I can't find that one
 5     as I look at this --
 6          MR. BISSONNETTE:  Sure.  That's been --
 7          THE COURT:  Oh, it's F.  F -- right.  I
 8     was just about to get to that.  So that one
 9     makes sense to me that that would not be
10     something you would need.
11          And then the rest of these are kind of
12     relatively similar to what you already talked
13     about, Attorney Bissonnette, in terms of
14     potential relevance.  But internal tracking
15     mechanisms -- did you disclaim a need for that?
16     That goes down now to the Operations Checklist
17     section, which is paragraph 26.
18          MR. BISSONNETTE:  Got you.
19          THE COURT:  It's an alphanumeric code for
20     case number --
21          MR. BISSONNETTE:  Yeah -- I'm sorry to
22     interrupt you, Your Honor.  My apologies.
23          THE COURT:  No, go ahead.
24          MR. BISSONNETTE:  I think that would be
25     the same situation.  I don't think that's

1          something that we would need.  And if I didn't

2          specifically disclaim that, my apologies.  But,

3          no, that's not really what we're looking at.

4               As I think Your Honor has mentioned,

5          anything related to the justification, the

6          nexus to any potential criminality is one of

7          our key themes or key arguments, anyway, that

8          the primary purpose is criminal in nature.

9          Which is why some of these categories we

10         previously addressed have kind of a nexus to

11         our case theory.

12              THE COURT:  Okay.  So, really, would you

13         say that entire section, paragraphs 24 through

14         27D, the Operations Checklist -- is that

15         something you can disclaim, or just paragraph

16         26?

17              MR. BISSONNETTE:  I'd have to go through

18         the checklist again.  My apologies, Your Honor.

19         I don't know if I'm prepared to say that.

20         Certainly with respect to 26 and internal

21         tracking mechanisms.

22              Is it okay if I give some more thought to

23         this, Your Honor?

24              THE COURT:  Of course.  I'm inclined to go

25         ahead and do an in-camera review, but I'm also

1          respectful of your concerns about that.  And,

2          frankly, as a practical matter, I want to,

3          obviously, take the Government's security

4          concerns and balance those against the

5          relevance in the case.  And so, ultimately,

6          that's going to rest on me.  And I know there

7          are only 92 pages, so that's not daunting.  I

8          can do that.

9              But -- and I can give it a first shot,

10         obviously.  And I have not ever had to do this

11         with regard to an in-camera review, but I can

12         envision having a sealed hearing where I ask

13         the Government specific questions.  And,

14         obviously, without revealing the matter, say,

15         the Government wants to be sealed, could direct

16         my attention to certain things.

17             In other words, before I make a final

18         decision, I could have some sort of sealed

19         proceeding.  Not ex parte, but sealed, where we

20         would be careful, even then, in terms of

21         revealing what my questions are and what

22         material is being redacted.

23             So, ultimately, I think I'm inclined to

24         just go ahead and give it a careful review and

25         attempt to do the balancing test.  And to the

1        extent I don't feel I'm able to do that, I may

2        come back to counsel.

3             Would the Government be filing with the

4        proposed redaction and ex parte submission in

5        addition to the redactions?

6             MS. DRONZEK:  I mean, we can certainly do

7        that if that's how the Court would like to

8        proceed.  I understand that might be helpful

9        for you in terms of understanding our

10       perspective on why these redactions are

11       necessary.  Again, the information -- it would

12       not be materially different, I think, from what

13       is in the declaration that you already have.

14       But, to the extent it is helpful, the

15       Government is willing to do that.

16            MR. BISSONNETTE:  Your Honor, I can talk

17       about the checklist, as well, when you have a

18       moment.  I'm sorry.

19            THE COURT:  Okay.  I think I could be

20       prepared, based on what Attorney Bissonnette

21       has generally described as his needs for the

22       material.  But if it comes to a point where I

23       am not able to discern the possible relevance,

24       that's when I'm thinking I might want to have

25       some sort of proceeding where the Government --

1          I will not reveal what's in the documents, but,

2          ultimately, I could describe a scenario and ask

3          Attorney Bissonnette -- or Attorney Stark --

4               "How would this possibly -- something like

5          this be relevant to your case?"  And see if I'm

6          able to make that determination.  Hopefully,

7          what you've already told me,

8          Attorney Bissonnette, will be sufficient for me

9          to have a sense of what might be relevant.

10              So I think what we can do, then, is just

11         get me the -- I'm going to go ahead.  I have

12         some doubts about whether or not this rises to

13         the level of the kinds of security-related

14         material that a protective order isn't even

15         enough for.

16              It's hard for me to get a sense of that,

17         and I see it as different than the cases where

18         Courts have said, "We do not want to risk even

19         the slightest accidental disclosure."  I would

20         much prefer that a protective order be utilized

21         by the parties here.  And, that way,

22         Attorney Bissonnette is bound by that

23         protective order and, ultimately, has access to

24         material that he deems relevant, and doesn't

25         use anything else that, obviously, would be

1        attorney's eyes only.

2             My guess is it would be material he

3        wouldn't necessarily have to disclose to his

4        clients.  I know that the Government made that

5        argument that this would only be useful for him

6        if he could talk to his clients about it.  But

7        I think that coming up with theories of the

8        case, and finding evidence to support whatever

9        theories you're putting forth -- I think that

10       could be done attorney's eyes only.

11            But I'm going to respect the Government's

12       assertions here.  And I certainly am willing to

13       do an in-camera review and see what I -- and if

14       I have doubts, Attorney Bissonnette, about the

15       balancing test, I think what I would do is come

16       back and, in an opaque way, try to discern

17       whether or not something could be relevant to

18       your case.

19            MR. BISSONNETTE:  Understood.  Thank you,

20       Your Honor --

21            THE COURT:  How does that sound?

22            MR. BISSONNETTE:  That sounds fine, Your

23       Honor, to the Plaintiffs.  I can close the loop

24       on the checklist --

25            THE COURT:  Yeah, go ahead.

1          MR. BISSONNETTE:  -- if that's helpful.

2     I've pulled -- there's multiple versions --

3     publicly filed versions versus under seal.

4          It does look to me, just having pulled the

5     sealed version, without disclosing the

6     contents, that the redactions do appear to be

7     limited to internal tracking of an operation

8     name.  That's the information that I do not

9     have.  I do not think I need that.

10         THE COURT:  Okay.

11         MR. BISSONNETTE:  So in an effort to kind

12    of close the loop on checklists, I think -- I

13    feel like I'm pretty comfortable on the

14    checklist situation assuming that elsewhere,

15    there are more redactions for us.

16         But I'm basing that off of, Your Honor,

17    Exhibit F to the motion to compel that's under

18    seal, Bates stamped, in the sealed version,

19    Drew-PROD-035.

20         THE COURT:  And I'm looking at an

21    affidavit.  Is this under seal, the affidavit?

22         MS. DRONZEK:  The affidavit is not under

23    seal, Your Honor, no.  And that is what the

24    BeMiller affidavit does make clear, that the

25    only redactions to the checklist as opposed to

1            the operation orders and the executive
2            summaries was the internal tracking numbers.
3                 So what Attorney Bissonnette has said is
4            correct, to my understanding.  So we should be
5            -- you had asked about paragraphs 24 through
6            27, and only paragraph 26 addressed what
7            redactions.  The others are simply descriptions
8            of the items, so they don't need to be
9            addressed separately, I think.
10                THE COURT:  Okay.  Good.  I'm not sure how
11           many documents that will mean that I -- how
12           many fewer documents I look at.  But what I
13           would suggest, then, is that you go ahead and
14           file those for in-camera review, and I will try
15           to turn this around for you as quickly as I can
16           to the extent I need a further proceeding.
17                And I said that would be sealed or -- it
18           may not need to be, ultimately, because I would
19           be opaque in my descriptions of the redactions
20           anyway.  So I'll think about that to the extent
21           I'll need that.  I'll, obviously, let counsel
22           know, and we can get on a further video
23           hearing.  But, hopefully, this will be very
24           clear to me.  That's what I'm hoping.  So I'm
25           going to do the in-camera review and give you a

1      ruling on that.

2            So is there anything further I need to

3      accomplish today?

4            MR. BISSONNETTE:  Not for the plaintiffs,

5      Your Honor, unless my co-counsel texted me.  I

6      think we're fine.

7            THE COURT:  Okay.  All right.

8            Then it's good to see everybody.  Thank

9      you very much.  And court is adjourned.

10           (The proceedings were adjourned at

11              12:24 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            C E R T I F I C A T E

2            I, Molly K. Belshaw, a Licensed Shorthand
             Reporter for the State of New Hampshire
3    and Registered Professional Reporter, do hereby
     certify that the foregoing is a true and accurate
4    transcript of my stenographic notes of the
     proceeding taken at the place and on the date
5    hereinbefore set forth to the best of my skill and
     ability under the conditions present at the time.

6

7            I further certify that I am neither
     attorney or counsel for, nor related to or employed
8    by any of the parties to the action in which this
     proceeding was taken, and further, that I am not a
9    relative or employee of any attorney or counsel
     employed in this case, nor am I financially
10   interested in this action.

11           The foregoing certification of this
     transcript does not apply to any reproduction of the
12   same by any means unless under the direct control
     and/ or direction of the certifying reporter.

13

14                          _____

15                          Molly K. Belshaw
                            RPR, LCR No. 00162
16

17

18

19

20

21

22

23

24

25

Duffy & McKenna Court Reporters, LLC
1-800-600-1000